1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                          :

HARSHARAN SETHI,          :11-CV-2511 (MKB)
                       :

       Plaintiff,     :
                       :

                       :United States Courthouse
   -against-        :Brooklyn, New York
                       :

                       :Thursday, May 9, 2013
RANDY NAROD, ET AL.,   :
                       :

       Defendants.    :
                       :
                       :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S:

For the Plaintiff:    VINCENT R. FONTANA
                  1010 Franklin Avenue #200
                  Garden City, New York 11530
             BY:VINCENT R. FONTANA, ESQ.

For the Defendant:    MORITT HOCK & HAMROFF, LLP
                  400 Garden City Plaza
                  Garden City, New York 11530
             BY:A. JONATHAN TRAFIMOW, ESQ.
                  JUAN GARCIA, ESQ.


Court Reporter:  Richard W. Barry, RPR
                Official Court Reporter
                E-mail: rwbarrycourtreporter@gmail.com

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

- C O L L O Q U Y -                    2

1      COURTROOM DEPUTY:  This is civil cause for oral

2  argument, docket number 11-CV-2511, Seth versus Narod et al.

3          Counsel state your name for the record.

4          MR. FONTANA:  Vincent Fontana for the plaintiff.

5          THE COURT:  Good morning, Mr. Fontana.

6          MR. TRAFIMOW:  Morning, Your Honor, John Trafimow

7  for the defendants.

8          THE COURT:  Trafimow, correct?

9          MR. TRAFIMOW:  Right.

10         THE COURT:  Good morning, Mr. Trafimow.  I

11 understand that Mr. Garcia maybe joining you.

12         MR. TRAFIMOW:  He may, yes.

13         THE COURT:  Okay.

14         We are here today on a motion for summary judgment

15 made by the defendant and also a motion to strike certain

16 submissions.  I will first hear from the defendant, since it

17 is the defendant's motion.  But I have a few questions in

18 reviewing this.

19         So, one of my questions for you, Mr. Fontana, it is

20 unclear to me what the adverse employment action is, that you

21 are alleging.  So can you clarify that for the Court.

22         MR. FONTANA:  Sure.

23         THE COURT:  For the Title VII action.

24         MR. FONTANA:  Well, initially, as I understood

25 defendant's motion, it was addressing the wrongful

- C O L L O Q U Y -                              3

1   termination, allegations of wrongful termination.  However,

2   there was no wrongful termination allegation in the Complaint.

3           THE COURT:  But you are alleging a Title VII

4   violation, correct?

5           MR. FONTANA:  Yes, I am.

6           THE COURT:  Are you alleging that it's based on

7   national origin or on Mr. Sethi's race?

8           MR. FONTANA:  Both, race and national origin.

9           THE COURT:  And, his race being what?

10          MR. FONTANA:  Asian.

11          THE COURT:  And his national origin being the fact

12  that he is?

13          MR. FONTANA:  Indian.

14          THE COURT:  Okay.

15          So, for Title VII purposes, in order to make out a

16  case, the plaintiff has a prima facie burden which requires

17  him to prove four basic things:

18          That he is a member of the protected class, which

19  the defendants seem to concede, correct, Mr. Trafimow?

20          MR. TRAFIMOW:  Trafimow.

21          THE COURT:  You can stay seated, you don't have to

22  stand at all, unless you would prefer to do so.

23          MR. TRAFIMOW:  Yes, Your Honor, we concede that he

24  is alleged that he is a member of a protected class.

25          THE COURT:  And, is that a protected class being

- C O L L O Q U Y -                           4

1    both race and national origin or just national origin?

2            MR. TRAFIMOW:  National origin only, Your Honor, I

3    believe is all that he's alleged.

4            THE COURT:  And with regard to the second prong,

5    that he is qualified for the position he held, even though the

6    defendants may quarrel as to whether or not he was very good

7    at his job, I don't think there is any dispute about the fact

8    that he was in fact, qualified for his job.  Correct?

9            MR. TRAFIMOW:  Your Honor, we would agree that he

10   had the basic qualifications for the job for purposes of--

11           THE COURT:  Your motion.

12           MR. TRAFIMOW:  Right.  And the second element of the

13   prima facie case.

14           THE COURT:  Correct.

15           So, the third prong, Mr. Fontana is that the

16   plaintiff suffered an adverse employment action.

17           And so, in your papers, in certainly in response to

18   the motion made by the defendants, you have consistently made

19   it clear that you are not bringing this claim for anything

20   beyond a certain time period, excluding the time period when

21   your client was terminated.

22           So then my question to you is, what is the adverse

23   employment action that you are alleging for purposes of this

24   Title VII claim, to make out your prima facie case?

25           MR. FONTANA:  Well, one is, that we contend that Mr.

- C O L L O Q U Y -                                  5

1  Sethi was required to produce a doctor's note whenever he was

2  absent, whereas other employees at his level, were not

3  required to do that.

4           THE COURT:  So, is your allegation that he was

5  somehow treated differently than other similarly situated

6  employees?

7           MR. FONTANA:  Yes.

8           THE COURT:  And this is because of his race and

9  national origin?

10           MR. FONTANA:  Yes.

11           THE COURT:  So, where is the evidence in the record

12  to show this?

13           MR. FONTANA:  Well, there is documentation I believe

14  that he was disciplined-- well, he was-- a letter was put into

15  his file indicating that he was not providing a doctor's note

16  when it was requested.

17           THE COURT:  And where is the evidence that similarly

18  situated employees were not required to provide a doctor's note?

19           MR. FONTANA:  Well, Erica Lee was the chief

20  technical officer, chief operating officer of the company.  If

21  you look at her absente schedule, there is no reference on her

22  schedule that she had to produce a doctor's note.

23           During the course of the deposition, Deborah

24  Morrissey who was the executive vice president for human

25  resources said that if anyone was required, anyone produced a

- C O L L O Q U Y -                                              6

1    doctor's note it would appear on these forms.

2           Now, you look at Mr. Sethi's form and there is no

3    reference to a doctor's note.  You look at Erica Lee's absente

4    form and Deborah Morrissey's absente form and there is also no

5    reference to a doctor's note.  There is reference to the fact

6    that they were absent.

7           So at least as to those individuals, there is that

8    evidence that he was treated differently than they are.

9           Because as far as we know, there is nothing in

10   either Erica Lee's personnel file or Deborah Morrissey's

11   personnel file.

12          THE COURT:  Well, did you look at those files?  I

13   mean what does the discovery show in terms of evidence as to

14   whether or not there is?

15          MR. FONTANA:  Well, as far as we know there is

16   nothing in either of their personnel --

17          THE COURT:  You keep saying, as far as we know.

18   Discovery is closed, this is summary judgment.  So what does

19   the evidence show, that is my question.  It has to be based on

20   the evidence that has now been produced in this case.

21          MR. FONTANA:  There is no evidence that they were

22   required to produce a doctor's note.

23          THE COURT:  Okay.  So your basis for your adverse

24   employment action as best as I can understand it, is the fact

25   that he was treated differently on the basis of requiring to

RW Barry     OCR

- C O L L O Q U Y -                    7

1    produce doctor's notes for absences when others were not

2    required to.

3              MR. FONTANA:  Yes.

4              THE COURT:  Anything else?

5              MR. FONTANA:  Yes.  As far as Mr. Sethi receiving

6    overtime, when he worked more than forty hours a week, he did

7    not get paid overtime.  Yet there is documentation that Erica

8    Lee and Deborah Morrissey did get paid overtime.  They are

9    higher level individuals than Mr. Sethi was.

10             THE COURT:  So not being paid overtime when others

11   were and you are comparing him to Lee and whom else?

12             MR. FONTANA:  Deborah Morrissey.

13             There are others, but as to those, who are at higher

14   level than Mr. Sethi.

15             THE COURT:  Anything else?

16             MR. FONTANA:  Yes.

17             There was a memo put in Mr. Sethi's file, personnel

18   file that he gave too short a notice when he was going to be--

19   have to leave the office early or be absent.

20             And again, looking at Deborah Morrissey and Erica

21   Lee, they would on occasion give short notice to others, you

22   know, Mr. Narod who is the president or Deborah Morrissey,

23   that they were going to either be leaving early or be absent.

24   They did not have anything in their personnel file to indicate

25   that they gave inadequate notice.

- C O L L O Q U Y -                                    8

1    Whereas that was in Mr. Sethi's personnel file.

2    THE COURT:  Okay.

3    MR. FONTANA:  The last item, there was an entry,

4    document put into Mr. Sethi's personnel file that he was

5    frequently late.  As a matter of fact, I believe it was

6    November of 2008, he received a memo and supposedly a written

7    warning for his chronic lateness, but under the employee

8    handbook, you are only supposed to get written up if there is

9    a third lateness.  There is nothing in Mr. Sethi's personnel

10   file to indicate that he was late on more than one occasion.

11   If one looked at the hand scans for Mr. Sethi, that

12   would indicate that he was not late, at least as of November

13   of 2008, on more than one occasion.

14   And finally, there was an incident involving Mr.

15   Sethi and Mr. Narod back in November of 2009, where Mr. Narod

16   assaulted Mr. Sethi during the course of a meeting and Justice

17   Bucaria in Nassau State Supreme Court, in case -- index 2499

18   of 2011, he in connection with deciding a motion to dismiss,

19   concluded that the assault on the plaintiff was in Justice

20   Bucaria's view, an adverse employment action.

21   THE COURT:  So, those are the things that you are

22   relying on as the adverse employment action and raising an

23   inference of discrimination here.

24   MR. FONTANA:  Yes, Your Honor.

25   THE COURT:  To make out the plaintiff's prima facie

- C O L L O Q U Y -                    9

1   case.

2          MR. FONTANA:  Yes.

3          THE COURT:  On the Title VII claim.

4          MR. FONTANA:  Yes.

5          THE COURT:  Now I will hear from the defendants on

6   their motion and why they believe the Title VII claim should

7   be dismissed.

8          MR. TRAFIMOW:  Your Honor, let me start by

9   responding to the issue that you have raised regarding adverse

10  employment action.  A few comments.

11          First, none of these were alleged in the Complaint;

12  second, under the case law submitted in our papers and

13  elsewhere, it is clear that being asked to produce a doctor's

14  note, a memo put in a personnel file, those kinds of sort of--

15  frankly, petty grievances, simply don't rise to the level of

16  an adverse employment action.

17          Now, regarding the alleged assault--

18          THE COURT:  Well, I think what he is really saying

19  is the treatment, right?  And you agree that the case law does

20  support that you can make an argument that where you can show

21  similarly situated employees, who are treated differently,

22  that you can make out a prima facie case.

23          MR. TRAFIMOW:  I don't agree with your comment

24  characterized that way Your Honor, with due respect.

25          I think that the areas in which the plaintiff claims

- C O L L O Q U Y -                    10

1   that he was treated differently have to be significant enough

2   that even if the allegation were true, right, that that would

3   rise to the level of an adverse employment action.  That is

4   the third element of the prima facie case, which is, really

5   what we are focusing on right now.

6            So what I am suggesting is, when we look at the

7   alleged adverse employment actions, right, we will get to the

8   issue in a minute whether there is any evidence that they were

9   motivated by racial or national origin animus and there isn't.

10           But, putting that aside for a moment, what I am

11  suggesting is even if they had been, they don't rise to the

12  level of an adverse employment action.

13           Now, we discussed in our reply papers, a decision

14  from the Second Circuit.  I'm not sure I can pronounce it

15  correctly.  There-- Mathiram --

16           THE COURT:  Can you spell that for the reporter.

17           MR. TRAFIMOW:  Give me a second.

18           M-A-T-H-I-R-A-M-P-U-Z-H-A, v Potter, 548 F3d 70, 2nd

19  Circuit 2008.

20           In that case, it is in footnote two of our reply

21  brief, the plaintiff testified for the following incident with

22  his supervisor:

23           On the aisle I saw Mr. Ron Saco standing near by the

24  clock.

25           THE COURT:  Slow down, counsel.

- C O L L O Q U Y -                                11

1        MR. TRAFIMOW:  On the aisle, I saw Mr. Ron Saco,

2   standing near by the clock E 12.  He yelled at me from there,

3   Joe, where are you going?  I responded that I was going to

4   pick up the reject mail.  He then shouted, go to otherwise

5   punch out and go home.  Soon he rushed me like a football

6   player, hit my chest and shoulder with his full body power.  I

7   fell onto the yellow rails, I tried to hold on to the rails,

8   not to fall down.  He squeezed me with one hand while holding

9   me tightly with his other arm.  He continued this for almost

10  three to five minutes, stating that he will never let me go to

11  Hartford. His spit came onto my face because he was too close

12  to my face.  His hand poked my left eye and tears were rolling

13  down from my eyes.

14       The Court ruled that this incident did not rise to

15  the level of an adverse employment action.

16       MR. FONTANA:  Your Honor.

17       MR. TRAFIMOW:  Let me continue.

18       THE COURT:  You will have your turn, counsel.

19       MR. TRAFIMOW:  The defendants have no idea what

20  plaintiff's counsel is referring to with his characterization

21  of Justice Bucaria's decision.

22       I have read all of Justice Bucaria's decisions

23  regarding Mr. Sethi's claims against the Cambridge defendants

24  and I recall nothing remotely approaching his characterization

25  of it.  Suffice it to say, Your Honor, he has not submitted

1    that decision to this Court, for the Court to make its own

2    determination.

3          That leaves only the -- as an adverse employment

4    action, of those that Mr. Fontana has identified as potential

5    adverse employment actions, the idea of not getting paid

6    overtime, when he alleges Ms. Lee and Ms. Morrissey did get

7    paid overtime.

8          For that, there is no evidence of that in the record

9    that I'm aware of, and Mr. Fontana has cited to none, to my

10   knowledge.

11         Ms. Lee testified in her affidavit, I believe

12   paragraph 23, that she is Asian.  And, frankly, those

13   arguments fail really for many of the same reasons we contend

14   Mr. Sethi's FLSA claim fails, i.e., he was exempt.  So he has

15   no legal right to be paid overtime for overtime hours worked.

16         THE COURT:  Well, was Ms. Lee paid overtime?

17         MR. TRAFIMOW:  To my knowledge, no.  There is no

18   evidence of that in the record.  Mr. Fontana has not

19   identified where in the record he is coming up with this.

20         Again, the remaining items he is complaining about

21   are simply trivial, they don't rise to the level of an adverse

22   employment action, even if they were connected to race and if

23   Your Honor is prepared for me to move on to that issue, I am

24   prepared to do so.

25         THE COURT:  Proceed.

- C O L L O Q U Y -                    13

1          MR. TRAFIMOW:  So, in terms of whether there is any

2    evidence that these alleged adverse employment actions had

3    anything to do with his race or his national origin, there is

4    simply no evidence of it.

5          Now, importantly, Your Honor, the plaintiff has not

6    alleged for example an FMLA claim or disability claim.  He has

7    raised no allegation that he had some medical condition where,

8    you know, there would be somehow, some connection to his

9    doctor's notes.

10          He claims-- I mean he claims that Ms. Lee was absent

11    on certain occasions.  I'm not sure where in the record that

12    is either, but suffice it to say, Mr. Fontana hasn't even

13    alleged here, to you, that Ms. Lee was absent for a medical

14    reason.  She wasn't absent for a medical reason, there is no

15    relevance to a doctor's note.

16          I have no idea why she was out on any particular

17    day.  It has never been raised as an issue in this case until

18    this moment.  While I can't claim to mastered every piece of

19    paper in the record, I'm not aware of where in the record Mr.

20    Fontana is referring.

21          In terms of all of these issues, right, it is

22    undisputed, Mr. Sethi admits at page 113 of his deposition

23    testimony, which is attached to the affidavit of Ms. Lee, that

24    he concedes that both Mr. Narod and Ms. Lee knew that he-- you

25    know, knew of his race and national origin background when

- C O L L O Q U Y -                    14

1   they hired him.

2        The entire duration of his employment is well under

3   two years and so, you know, clearly as the Court is well

4   aware, the adverse employment-- I'm sorry, the same act or

5   inference is stronger, the closer in time to the hiring

6   decision the alleged adverse employment action is.

7        It is not clear to me exactly when within Mr.

8   Sethi's employment these various alleged adverse employment

9   actions occurred, but based on the chronology of the entire

10  duration of his employment, the adverse employment action

11  applies and applies with sufficient favor if summary judgment

12  is warranted.

13       Mr. Sethi through his counsel has not offered any

14  persuasive evidence, evidence sufficient to raise genuine

15  issues of fact for trial, that any of these purported adverse

16  employment actions, were causally connected to his race or

17  national origin.

18       Indeed the record is replete with overwhelming

19  evidence of other factors.  By way of illustration only, I can

20  go on longer if the Court will permit.

21       Mr. Sethi complains that early on in his tenure at

22  Cambridge, he was very upset and complained about a different

23  company that Cambridge had the U.S.-- U.S.A. Honors entity,

24  and that he felt that somehow Cambridge was doing something

25  improper with that.  And he claims that they retaliated

- C O L L O Q U Y -                    15

1   against him for that.  Of course, Cambridge would disagree

2   with that, but to the extent that that is true, Your Honor,

3   that has nothing to do with race or national origin.

4          There was clearly friction over Mr. Sethi's work

5   place behavior, conduct.  Failure to comply with what he was

6   told repeatedly were rules of the work place.  Punch in, punch

7   out, show up on time.  Be there to do your job.  Take

8   legitimate instruction from your supervisors.  The record is--

9   there is no dispute that the parties had significant issues,

10  throughout his employment.

11         These issues have nothing to do with race or national

12  origin, they have to do with his conduct in the work place.

13         THE COURT:  Okay.  I will hear from you counsel.

14         MR. FONTANA:  I would like to just add to the

15  adverse employment action that I inadvertently failed to

16  include before.

17         On February 12th of 2010, Mr. Sethi was suspended

18  although with pay, and he was not permitted back on the

19  premises.  Thereafter, during the period of February 12th,

20  2010, to May 10, 2010, when he was eventually fired, he

21  repeatedly requested information as to what his status was.

22  Was he going to come back, was he fired, what was his status.

23         So, we contend that his suspension on February 12th,

24  2010, also constituted an adverse employment action.

25         THE COURT:  I think the case law is clear that the

- C O L L O Q U Y -                          16

1   suspension with pay cannot be an adverse employment action.

2          MR. FONTANA:  On the same act or argument, there is

3   clearly a question when one looks at Mr. Narod's deposition

4   and Ms. Lee's deposition and David Morrissey's deposition,

5   that it's not clear, whether Mr. Narod, hired Mr. Sethi and

6   Mr. Narod fired him, or Ms. Lee hired him and Mr. Narod fired

7   him, or vice versa.  There is a clear question as to who

8   actually hired him and who made the decision to terminate him.

9          But in any event, the same act or inference is lost

10  here, because assuming that they knew he was from India in an

11  Asian-- I guess July 28th, or 21, 2008 when he was hired, he

12  wasn't fired until May of 2010.

13         So, the same act or inference, it gets pretty much

14  lost because of the time between the hiring and the ultimate

15  firing.

16         So we submit that that same act or argument is not

17  appropriate.

18         THE COURT:  Counsel, why isn't his employment, his

19  termination of his employment an adverse employment action here?

20         MR. FONTANA:  It would be.  It would be.

21         But, the issue of his termination was certainly-- is

22  certainly being addressed in State Court litigation, in

23  connection with the violation of State whistle blower laws.

24         THE COURT:  What does that have to do with this

25  action?

RW Barry    OCR

- C O L L O Q U Y -                    17

1          MR. FONTANA:  Nothing.

2          THE COURT:  So, why is it not raised as an adverse

3     employment action, for purposes of your Title VII claim?

4          MR. FONTANA:  As best as I can say, Your Honor, it

5     was an oversight.

6          THE COURT:  An oversight counsel?

7          MR. FONTANA:  Because the behavior towards Mr. Sethi

8     during the period of November 2008, to February of 2010, is

9     the thrust of his Title VII claim.  There is a pattern of

10    behavior towards Mr. Sethi.

11         THE COURT:  A pattern of behavior.  But what are you

12    alleging?  Are you saying that it was a hostile work

13    environment which you have not claimed in your complaint.  Are

14    you saying that if what you are saying is that it was in fact

15    discrimination based on his race and origin, you can't make

16    out a claim without an adverse employment action.

17         MR. FONTANA:  Well, as far as wrongful termination,

18    we have not tried to make a claim because--

19         THE COURT:  Counsel.

20         MR. FONTANA:  It took three months after he was

21    suspended and we could not find any evidence that the

22    termination decision was based on his national origin or his

23    race.

24         THE COURT:  I see.  So you are saying that his-- you

25    don't believe and there is no evidence that the termination

1   itself, was based on his national origin or his race?

2           MR. FONTANA:  Right.

3           THE COURT:  And--

4           MR. FONTANA:  There are other reasons why we-- that

5   he was terminated.

6           THE COURT:  Are you also saying that-- so then, how

7   can you maintain a Title VII action here in this Court?

8           MR. FONTANA:  Well, I believe that the indications

9   of the adverse employment action, that we have suggested is

10  the basis for the Title VII claim.

11          THE COURT:  But, counsel, they are not adverse

12  employment actions.  The case law is very clear as to what is

13  an adverse employment action.

14          MR. FONTANA:  On an isolated basis, I would have to

15  agree with the Court.  But when you put it all together there

16  is a pattern.

17          THE COURT:  Put what together?  A pattern suggests

18  that you are making a hostile work environment claim, not a

19  Title VII claim.  They are two different things.

20          If what you are saying is that there was a pattern

21  of treatment, a pattern where the environment was such that

22  your client was uncomfortable, then you are making a hostile

23  work environment argument, not a Title VII claim.

24          And if what you are saying is that his termination

25  had nothing to do with his treatment and that he-- his

- C O L L O Q U Y -                    19

1   termination didn't result, as a result of this discriminatory

2   treatment, then I don't see how you make out your Title VII

3   claim because I don't see another adverse employment action.

4          I mean you are claiming a number of different

5   things.  You said the suspension.  But the case law says, that

6   being suspended with pay, is not an adverse employment action.

7          And all these other things that you mentioned, I can

8   go back and look at the case law.  But, I'm pretty sure it is

9   going to say the same thing.  They don't rise to the level of

10  an adverse employment action.

11         So, I don't see how you make out the Title VII claim

12  which requires as one of the elements of your prima facie

13  burden, that the plaintiff suffered an adverse employment action.

14         MR. FONTANA:  Well, the incidents that we described,

15  were all incidents that--

16         THE COURT:  But the incidents don't amount to an

17  adverse employment action.

18         MR. FONTANA:  Well, we submit--

19         THE COURT:  How did they effect plaintiff's

20  employment?

21         MR. FONTANA:  Well, ultimately, that was the basis

22  for various memos put into his personnel file demonstrating --

23         THE COURT:  How did it effect his employment,

24  counsel?  He wasn't terminated as a result of it.  Did he lose

25  pay as a result of it?

- C O L L O Q U Y -                        20

1        MR. FONTANA:  No.

2        THE COURT:  So, what?  How?  What is the adverse

3   impact?  There has to be something that is what the law

4   requires.  And so, simply saying that these things happened,

5   is not enough.  There has to be an adverse employment action

6   as a result of the discrimination.

7        MR. FONTANA:  I can't add anything more--

8        THE COURT:  So, if it is not the termination of his

9   employment, if it can't be his suspension, then I don't see

10   what it is in this record before this Court that will sustain

11   his Title VII claim.  Okay.

12        MR. FONTANA:  I can understand.

13        THE COURT:  Let's move onto the Fair Labor Standards

14   Acts claim.

15        Now, with regard to that particular claim-- also,

16   just to make clear, because there was some confusion, I think

17   on the defendant's part, as to your Title VII and when we

18   speak about Title VII, we are also speaking about your New

19   York State Human Rights Law claim.  Since the standard is the

20   same as to both.

21        I know you said that you were bringing it both on

22   race and national origin, but there is nothing in the record

23   as to race.  The only allegation as to Mr. Sethi's national

24   origin, the fact that he was born in India, educated in India

25   and then the comments that were made about him going back to

- C O L L O Q U Y -                              21

1    India and the particular name that he was called, all to me

2    suggesting national origin, nothing about his race.

3            But with regard to your Title VII claim, I assume

4    that that was only brought as to the company, and not as to

5    the individual defendants.

6            MR. FONTANA:  Yes.

7            THE COURT:  Since there is no individual liability.

8            Moving on now to the FLSA claims and the parties

9    here disputing whether or not Mr. Sethi fits under the

10   exception as either a computer employee, administrative

11   employee or a professional employee.

12           So I will hear from the defendant on their motion.

13           MR. TRAFIMOW:  Thank you, Your Honor.

14           My suggestion would be that we just start with the

15   computer exception and then if we find it appropriate, go onto

16   the others.

17           There are some undisputed facts in this record that

18   I think are dispositive.  First, and frankly foremost, is

19   compensation is not disputed.  Starting out at $70,000 per

20   year, rising a few months later to $95,000 per year.

21           As the Supreme Court said in Christopher versus

22   Smith Klein Beecham Corp, 132 Supreme Court 2156, 2012

23   decision:  "Petitioners each of whom earned an average of more

24   than $70,000 per year, are hardly the kind of employees that

25   the FLSA was intending to protect".

1    THE COURT:  Counsel, that case does not stand for

2    the proposition that anyone making over $70,000 could not be

3    covered by FLSA.  It simply held under those circumstances in

4    that case, it was salary and other circumstances, why those

5    employees were exempt.

6        MR. TRAFIMOW:  I agree with you, Your Honor, that it

7    does not stand for-- that the salary of $70,000 a year or even

8    $95,000 a year does not in and of itself foreclose his FLSA

9    claim.  However, I suggest that it does support the

10   proposition that his compensation is an important

11   consideration.

12       THE COURT:  Okay.

13       MR. TRAFIMOW:  Now, it is also undisputed that the

14   plaintiff was paid on a salary basis.  So, it seems to me the

15   only dispute here, is whether his duties fit within the

16   requirements of the various exemptions that the Court

17   identified, beginning with the computer exemption.  Here I

18   think we now begin to go into the areas of some disputing

19   issues of fact.

20       It seems to me that a threshold issue is looking at

21   what plaintiff testified to at his deposition, and ignoring

22   the contradictory statements in his self serving affidavit--

23       THE COURT:  Counsel, you say, contradictory.  I

24   don't find it contradictory at all.

25       MR. TRAFIMOW:  Okay.

- C O L L O Q U Y -                          23

1      THE COURT:  So in his declaration, he says in-house,

2  that he considers his work to be in-house, desktop support.

3  Making up some ninety percent of his time to include,

4  resolving E-mail connectivity issues, correcting internal

5  network connectivity issues, connectivity to servers, printer

6  connectivity issues and user access issues.

7      All of which can fall within the categories of

8  network, connectivity and server issues that he admitted to in

9  his deposition.  I don't see a contradiction in his

10  declaration and his deposition.

11      MR. TRAFIMOW:  Well, his deposition concedes, as the

12  Court just noted, that most of his time, over fifty percent

13  was spent working on network problems and that those problems

14  required experience and certifications.

15      That is pages 70 to 72.

16      THE COURT:  Counsel, but you yourself, your client

17  is the one who questions plaintiff's capability to do any of

18  this work.

19      MR. TRAFIMOW:  Yes.  The issue here-- these are two

20  separate issues.

21      THE COURT:  I don't see them as two separate issues.

22  I mean on the one hand you are saying he is this experienced

23  guy who fits under this professional exception, but on the

24  other hand, you are saying he is really not a professional at

25  all, and he doesn't have the experience or qualification.  I

- C O L L O Q U Y -                    24

1   don't see them as two different things.

2           MR. TRAFIMOW:  Respectfully, Your Honor, we say that

3   he submitted to us, and he testified to, extensive

4   qualifications in the computer area.

5           THE COURT:  Regardless, counsel, the professional

6   requirement is one that basically requires an expertise that

7   you basically-- you almost learn by having to go to school and

8   get a particular expertise in the area.  Correct?

9           MR. TRAFIMOW:  I'm sorry, do you want to talk about

10  the professional exception or the computer exception.  Let's

11  talk-- if we may.  I --

12          THE COURT:  Okay.  Let's stick with the computer

13  exception.

14          MR. TRAFIMOW:  So, there are four requirements

15  pursuant to 29 U.S.C. Section 213(a)(17).

16          The first is the application of systems analysis

17  techniques and procedures.  It says, and I quote, including

18  consulting with users.

19          So, to the extent that he is saying that he is

20  consulting with users, that does not bring him outside of that

21  category.

22          To determine hardware, software or system functional

23  specifications.

24          I think his deposition testimony brings him squarely

25  within that.

- C O L L O Q U Y -                    25

1        THE COURT:  You are saying that he falls within B

2   and C.

3        MR. TRAFIMOW:  I am saying he falls within all of

4   them.  And D, is a combination of the first three.

5        THE COURT:  Yes.  But, the evidence in the record as

6   presented disputes this.  And these, as you said from the

7   beginning, raise-- they raise issues of fact that I can't

8   decide.  He is saying that he did certain work, and that you

9   are saying that he did something else.

10       And the case law is clear that as to the work that

11  was done by the plaintiff, that is an issue of fact, that the

12  fact finder has to decide.  I cannot decide that as a matter

13  of law.

14       The only thing I can decide as a matter of law is

15  once it is clear, what work the plaintiff did, then as a

16  matter of law, I can decide whether or not he fits within the

17  exception.

18       So, as I sit here, based on this record before me,

19  there are too many factual issues for me to decide whether or

20  not he fits within this computer exception.

21       MR. TRAFIMOW:  If I may, Your Honor.

22       When you refer to the case law, are you referring to

23  the Clark and the Bobadilla decisions?  Those are the two

24  decisions--

25       THE COURT:  I have looked at both of those

- C O L L O Q U Y -                    26

1   decisions, counsel, and I realize that in both of those

2   decisions, the Court did grant summary judgment.  But they

3   were not disputed issues of fact as to the work that was

4   performed by the plaintiff.  That was a settled area.

5          So, what I have before me is, sworn testimony both

6   in the form of deposition and declaration, which I don't find

7   contradictory from the plaintiff, saying that he did-- he

8   performed work which is different from the work your client is

9   saying that he performed.  That in and of itself creates an

10  issue of fact that I can't decide as a matter of law.

11         MR. TRAFIMOW:  Your Honor, I would simply suggest

12  that if you look at his deposition testimony, and it is really

13  from more or less pages 65, 75.  And you read that, I think it

14  is-- I think it is clear that those duties that he testifies

15  to and the amount of time that he claimed that he is spending

16  performing those duties, brings this case squarely within the

17  Clark and the Bobadilla decisions.

18         THE COURT:  Counsel, I have looked at those and I

19  disagree with you.

20         MR. TRAFIMOW:  Okay.

21         THE COURT:  I have looked at them.  I don't agree

22  with you.  I believe that there are too many factual issues as

23  to the work actually performed by the plaintiff in this case.

24         So, I am precluded from making a determination as to

25  what that work is, where he is disputing the claim made by the

- C O L L O Q U Y -                    27

1  defendants as to what his work is.  So, I have two sets of

2  facts before me.  I can't choose one over the other.

3         MR. TRAFIMOW:  Without trying to push the point too

4  much, if you are telling me that is your holding, then

5  obviously I respect it.

6         I point out in Clark as in this case, the plaintiff

7  submitted a declaration in opposition to motion for summary

8  judgment, that Judge Mann found was inconsistent with his

9  prior deposition testimony.

10        THE COURT:  Correct.  I don't find this to be

11 inconsistent, that is where there is a difference.

12        So, if I were to find it inconsistent, yes.  Then I

13 would find whatever is in his deposition testimony and if it

14 wasn't contradictory to what you are saying, then-- and there

15 are no issues of fact, then I can make a determination as a

16 matter of law.  But having looked at both the deposition

17 testimony, the declaration, I don't find any contradictions

18 and so, they are issues of fact between the parties that I

19 can't decide as a matter of law.

20        I believe as a result, I cannot grant summary

21 judgment on this issue.

22        PLAINTIFF SETHI:  Can I make a statement on my

23 behalf?

24        THE COURT:  Please.  Your counsel is here to

25 represent you.  If you have anything to say, you can say it to

- C O L L O Q U Y -                    28

1  counsel.

2          PLAINTIFF SETHI:  Can I talk to him for a minute.

3          THE COURT:  We are in the middle of oral argument.

4          PLAINTIFF SETHI:  Sorry.

5          THE COURT:  As for the administrative employee and

6  the professional employee, it is the same, at least the Court

7  believes that there are issues of fact as to both.

8          With regard to the administrative employee, there is

9  testimony in the record that Erica Lee closely controlled the

10 plaintiff's work, and that he didn't have discretion as to his

11 assignments when and how he had to complete them.  So that to

12 me also raises an issue of fact and the same with regard to

13 the professional employee issue as to the skill and training

14 that is required.

15         So, as to all of these, I think there are issues of

16 fact that as a matter of law, I cannot decide them on summary

17 judgment.

18         But I will hear you on your arguments on these.  But

19 I wanted you to know what the Court's position is as of now.

20         MR. TRAFIMOW:  Thank you, Your Honor.

21         I do understand the Court's position, and I

22 appreciate the opportunity to try to persuade you.

23         THE COURT:  Of course.

24         MR. TRAFIMOW:  On pages 55, 56 of his deposition.

25 Mr. Sethi admits and therefore-- Erica Lee agrees with this.

- C O L L O Q U Y -                              29

1   That she was not a technical person, a hands on person with

2   the computer, that Mr. Sethi was the guy, the only guy, the

3   top guy at this Internet based company responsible for keeping

4   these computers working.  Okay.  She didn't have the

5   competence to do that.

6          And in fact, he was hired because the company was

7   having to spend a lot of money to-- she lays this out in her

8   affidavit, to pay these consultants because that work was

9   needed in order for the company to function.

10         Mr. Sethi was brought in and his high level

11  qualifications, his very certifications, his vast proclaimed--

12  on his resume, his vast experience in the area, were critical

13  to Cambridge because of the very nature of what this company

14  is and what they do.

15         Erica Lee did not have the competence to do this

16  herself, she could not have micro managed Mr. Sethi with

17  regard to the very functions that he was hired to do because

18  she did not have the ability to do it.

19         THE COURT:  Counsel, all that does is create an

20  issue of fact.  I have plaintiff's testimony, her testimony.

21  I cannot decide that she is right and he is wrong.  Not my

22  role on summary judgment, counsel.

23         MR. TRAFIMOW:  I understand Your Honor.  I do-- I

24  understand what you are saying and I agree with you about your

25  role on summary judgment.  Respectfully where I disagree, I --

- C O L L O Q U Y -                    30

1      THE COURT:  And I have to draw all inferences in

2   favor of the plaintiff on top of it all.

3      MR. TRAFIMOW:  But, you do not have to disregard his

4   admitted statement of fact in his deposition.

5      THE COURT:  No, but I also have to look at his

6   entire deposition testimony and I also have to consider the

7   fact that even defendant's evidence says, that plaintiff did

8   not have the requisite skill set to be a high level network

9   manager.  That he was hired for relative simple IT task, but

10   simply lacked the skill set to manage, CW's computer

11   solutions.

12      MR. TRAFIMOW:  So, let me address that if I may.

13   Right.  You are referring to Jerry Mott's assessment of the

14   plaintiff.

15      THE COURT:  Correct.

16      MR. TRAFIMOW:  A few days before he was placed on

17   paid leave.

18      This was-- this is the difference, Your Honor,

19   respectfully, between identifying what his duties were for

20   purposes of determining his exempt status and assessing how

21   well he performed those duties.

22      There is no question that-- to the extent Mr.

23   Sethi's position is that he wasn't very good at his job, we

24   would agree with that.  But that doesn't mean that his duties

25   weren't exempt duties.  He was supposed to be, you know, his

- C O L L O Q U Y -                    31

1   job was to make sure that the computer systems run.  That is

2   why it was important that he be at work-- that is the

3   undercurrent for the disputes over when he needed to work and

4   changing his hours.  Because when he wasn't there, either the

5   consultants had to be brought into do his job, or the job went

6   undone and that was not a tolerable situation because of the

7   nature of what the company does.

8          So, there is no question when Jerry Mott comes in

9   and he looks at this and says, would you, you know, when I

10  look around this company and I see-- I look at the IT systems

11  here, yeah, Mr. Sethi did a poor job, but that was still his

12  job and those were still his duties.

13         That is respectfully maybe where I would disagree

14  with the Court's reading of the undisputed facts of the

15  record.  Right?  The facts are--

16         THE COURT:  Counsel, that is just an add on to the

17  disputed facts in the record.  I mean, I have read what you

18  are suggesting that I read and the way I read and understand

19  the record, there is a difference between what plaintiff is

20  saying, his duties, his day-to-day responsibilities were, and

21  what his supervision level were compared to what you are

22  saying they were.

23         And that, in and of itself creates an issue of fact

24  that I can't decide.  I can't say, he's wrong and your client

25  is right.  Regardless of why you hired him, he's created an

- C O L L O Q U Y -                          32

1    issue of fact.

2              MR. TRAFIMOW:  But he is the one who admitted at the

3    deposition, that most of his time was--

4              THE COURT:  You are pointing to one specific part of

5    his deposition transcript counsel.

6              MR. TRAFIMOW:  I will point to more.  I mean--

7              THE COURT:  Counsel, I have read what you submitted.

8              MR. TRAFIMOW:  Okay.

9              THE COURT:  I mean if you want to submit additional

10   documentation, but I have read what you have submitted.  I am

11   telling you, based on what you have submitted, there are

12   issues of fact that I cannot decide.

13             You are saying one thing, he is saying something

14   else.  And for me to rule as a matter of law, I have to pick

15   one side over the other and that is not my role.  There is an

16   issue of fact.

17             So, I can't make a decision as to whose right and

18   who is wrong in order to rule as a matter of law.  That is my

19   position.

20             You are basically saying to me, but Ms. Lee said

21   this and he agreed on that.  Yes.  But there are also many

22   areas in his deposition where he said otherwise and there is

23   his declaration.  When I read the record as a whole, there are

24   issues of fact.

25             MR. TRAFIMOW:  Your Honor, I don't want to pester

- C O L L O Q U Y -                    33

1  the Court, if you--

2          THE COURT:  You are not being a pest at all.  I

3  expect you to advocate for your client.

4          MR. TRAFIMOW:  Right.

5          THE COURT:  I understand your position.

6          MR. TRAFIMOW:  Right.

7          THE COURT:  Your position is, he is hired as this

8  high level manager to oversee this and this is his expertise.

9  He is hired because of it and because of his experience, and

10  this is what it is.

11          He is saying something else counsel.  I understand

12  that you disagree.

13          MR. TRAFIMOW:  Right.

14          THE COURT:  But, once there is sworn testimony that

15  is different from what you are saying, there is nothing that I

16  can do at summary judgment.

17          MR. TRAFIMOW:  I will just leave it with this, Your

18  Honor.

19          THE COURT:  Okay.

20          MR. TRAFIMOW:  To me, when you look at-- it is not a

21  lot to review.

22          THE COURT:  Okay.

23          MR. TRAFIMOW:  It is just--

24          THE COURT:  Go ahead.

25          MR. TRAFIMOW:  It is just, it is really --

- C O L L O Q U Y -                    34

1      THE COURT:  Specify the pages, I will go back.

2      MR. TRAFIMOW:  Let's say pages 60 through 75 or 80

3  of his deposition.  When you look at that, right, and you see

4  what he says that he is doing, and then you compare it to what

5  he says in his declaration, respectfully.

6      THE COURT:  You think it is a contradiction.

7      MR. TRAFIMOW:  It is a clear contradiction.

8      THE COURT:  Okay.

9      MR. TRAFIMOW:  He is dealing with the network in his

10  deposition.  He is high level guy.  He is working with the

11  server, he is dealing with the connectivity issues.  When you

12  read the declaration, it is as if he is a guy wheeling

13  hardware around from one room to another, it is just two

14  different people.

15      THE COURT:  Okay.

16      Counsel.

17      MR. FONTANA:  I just would like to make this

18  observation.  We received in connection with other litigation,

19  a document from Cambridge.  It is an E-mail from Jerry Mott to

20  Randy Zellen, concerning what Mr. Sethi's duties were.

21      I have a copy for the Court, if you would-- if I

22  could present it to the Court, to counsel.  This was not

23  something -- we received this around February.

24      Mr. Mott's conclusion, this is Mr. Sethi's

25  supervisor.  Mr. Sethi provided adequate and very basic

- C O L L O Q U Y -                    35

1   desktop support and baseline server administrative

2   functionality.

3           This is Mr. Mott, describing what Mr. Sethi did.

4           THE COURT:  Counsel just addressed that.  He said

5   that was his conclusion as to what he did, but not what he was

6   hired to do.

7           MR. FONTANA:  Well, he may have been hired to do

8   something else.  But the issue was what did he actually do,

9   not what his title was, not what his job description was, but

10  what did he actually do on a day-to-day basis.

11          Erica Lee was clearly his supervisor.  She assigned

12  duties and responsibilities to Mr. Sethi.

13          THE COURT:  Let's speak about the individual

14  defendants.  You brought this particular claim against every

15  defendant.  Are you still pursuing this claim as to each

16  defendant, counsel?

17          MR. FONTANA:  I think to the extent that they are

18  defined as employers, yes.

19          THE COURT:  Well, let's talk about that.  Let's

20  start with the last defendant on the list, Donald Trump.  What

21  is your claim that he is somehow an employer under the

22  definition of employer?

23          MR. FONTANA:  No, we are not going to pursue it

24  against Mr. Trump.

25          THE COURT:  Okay, the claim is dismissed as to

- C O L L O Q U Y -                    36

1    Donald Trump.  He is no longer a defendant in this action.

2            What about Neil Schorr, who was I believe a

3    shareholder?

4            MR. FONTANA:  Yes.

5            THE COURT:  Are you pursuing your claim as to him?

6            MR. FONTANA:  Yes.

7            THE COURT:  Under what theory?

8            MR. FONTANA:  That he still had the opportunity and

9    responsibility to direct activity of Mr. Sethi.

10           THE COURT:  Where is your evidence that he did

11   anything, or that he had any authority to hire or fire

12   employees or to supervise or control their work schedule?

13           MR. FONTANA:  I don't, Your Honor.

14           THE COURT:  The case is dismissed as to Neil Schorr,

15   there is no evidence in the record.

16           What about Israel Dorinbaum?

17           MR. FONTANA:  No, we are not pursuing it against

18   him.

19           THE COURT:  The case is dismissed as to him.  Also

20   no evidence in the record.

21           Richard Someck?

22           MR. FONTANA:  I apologize to the Court.

23           THE COURT:  He was a minority shareholder and vice

24   president of operations.

25           MR. FONTANA:  Well, I don't believe there is

- C O L L O Q U Y -                    37

1   anything in the record other than what his job description

2   was.

3           THE COURT:  And counsel, why do you believe that is

4   enough to maintain a claim against him?

5           MR. FONTANA:  Primarily because he could still

6   control the activities--

7           THE COURT:  Counsel, you are at summary judgment,

8   this is not a motion to dismiss.  You have conducted

9   discovery.  If you don't have any evidence, your case cannot

10  proceed.

11          MR. FONTANA:  Right.  I don't have any evidence,

12  Your Honor.

13          THE COURT:  The case is dismissed as to Richard

14  Someck.  There is no evidence in the record that he is an

15  employer for purposes of the Fair Labor Standards Act.

16          What is your evidence with regard to Mr. Pitkiewicz,

17  P-I-T-K-I-E-W-I-C-Z, who was a minority shareholder and

18  director of sales recruiting at CWW.

19          MR. FONTANA:  I have no evidence, Your Honor.

20          THE COURT:  The case is dismissed as to him also.

21          Mr. Wasserman, who was a financial consultant or CFO

22  to CWW?

23          MR. FONTANA:  There was, unfortunately I don't

24  recall offhand what was in the record with respect to Mr.

25  Wasserman's involvement, but there was a meeting in

- C O L L O Q U Y -                    38

1   February 12th of 2010, between Mr. Wasserman and Mr. Sethi

2   relating to Mr. Sethi's continued employment.

3           I am afraid I can't--

4           THE COURT:  Is that in the record, counsel?

5           MR. FONTANA:  I can't cite to anything specific in

6   the record other than--

7           THE COURT:  But, do you know that it's in the

8   record?

9           MR. FONTANA:  I can't misrepresent to the Court.  At

10  this point, I don't know.  I can check the record myself and

11  communicate with the Court if you would like.

12          THE COURT:  Counsel, would you like to be heard on

13  that?

14          MR. TRAFIMOW:  I can't answer the Court's specific

15  question with definity either Your Honor.  I don't recall it

16  being in the record, but I can't categorically rule it out.

17          I would say, I don't think it matters that even if

18  that were in the record, I don't think that he needs-- it

19  meets the standards under the Nakahata decision and others.

20  But, I can't answer the Court's question definitively.

21          THE COURT:  The only information that the Court saw

22  in the record was a statement that Mr. Wasserman made that he

23  is responsible for the smooth running of this operation.  Is

24  that the statement you are referring to, counsel?

25          MR. FONTANA:  Yes, Your Honor.

- C O L L O Q U Y -                          39

1      THE COURT:  Is that your basis for claiming that

2  somehow he is an employer under FLSA?

3      MR. FONTANA:  Yes.

4      THE COURT:  That is insufficient, and so he is

5  dismissed.  There is no additional evidence that has been

6  presented to this Court to show that he qualifies as an

7  employer under FLSA.

8      Mitchel Robbins, who is consultant CEO to CWW?

9      MR. FONTANA:  I don't recall specifically anything

10  in the record one way or the other, Your Honor, I just don't

11  recall.

12      THE COURT:  Action is dismissed as to Mr. Robbins.

13  There is no evidence in the record that he had-- that he

14  hired, fired or made any decisions at all regarding

15  plaintiff's schedule and hours or even had any interaction

16  with him in a supervisory capacity.

17      As to Deborah Morrissey and Erica Lee, there are

18  issues of fact in the record, that would preclude the Court

19  granting summary judgment as to those two defendants at this

20  time.

21      I believe Mr. Narod's testimony as to Mr.-- as to

22  Ms. Lee, was that Ms. Lee had the power to hire and fire

23  employees including the plaintiff.  That she did so with

24  regard to plaintiff, and that plaintiff had to check with Ms.

25  Lee.

- C O L L O Q U Y -                    40

1      As to Ms. Morrissey, VP of Human Resources, she was

2  responsible for hiring, dismissals and record keeping.

3  Although the level of her operation control is unclear, and

4  the parties dispute her level of oversight of plaintiff, there

5  is sufficient factual issues there that would preclude me

6  dismissing her from the case.

7          So, the Court is in fact reserving decision, because

8  I am going to go back and review plaintiff's allegations as to

9  what he believed could potentially be adverse employment

10  actions, even though the Court doesn't believe that there are

11  any here.  Especially in view of plaintiff's representation

12  that his termination was not as a result of any discriminatory

13  action.

14          So I don't-- it is not clear to me that the Title

15  VII claim will survive for lack of an adverse employment

16  action.

17          And as to the fair labor standards claim, standards

18  act claim, that claim I am denying your summary judgment

19  motion, because I do find that there are issues of fact as to

20  whether or not plaintiff qualifies as an exempt employee.

21          And I do believe that it's defendant's burden to

22  show that he is an exempt employee.  That claim only survives

23  as to the company, Mr. Narod, who you did not make a motion as

24  to; Ms. Lee and Ms. Morrissey.  All other defendants are

25  dismissed from this action.

- C O L L O Q U Y -                    41

1      Unless the law is different from what the Court

2   believes it will be, more likely than not, the Title VII claim

3   is not going to survive.  I don't believe you have made out an

4   adverse employment action.

5          Is there anything else?

6          MR. FONTANA:  Would the Court accept a letter that

7   was-- is E-mailed from Mr. Mott that we just received dated

8   May 11th, 2010.  I think it supports Mr. Sethi's contention as

9   to what exactly his duties were.

10         THE COURT:  Is there any objection to the Court

11  accepting that?

12         MR. TRAFIMOW:  Yes, there is Your Honor.  Number

13  one, I don't know what he is talking about.  Number two, I

14  don't know if it was produced in discovery in this case and

15  number three, I have not had a chance to look at the letter to

16  make it  -- an assessment, so at this point, I do object.

17         THE COURT:  It sounds like it was produced in one of

18  your other cases, but produced from you.  Why don't you show

19  it to counsel, so that he can have an opportunity to take a

20  look at it.

21         (Handing.)

22         THE COURT:  Mr. Sethi.

23         PLAINTIFF SETHI:  I'm sorry.

24         THE COURT:  That is okay.  You can come up and speak

25  to your counsel.

- C O L L O Q U Y -                           42

1            PLAINTIFF SETHI:  Thank you very much.

2            MR. TRAFIMOW:  We have no objection.

3            THE COURT:  So there is no objection to me receiving

4    that document.  I will receive it.

5            Can we mark it so that we can identify it in some

6    way.

7            MR. TRAFIMOW:  Shall I mark it Court Exhibit 1.

8            THE COURT:  Yes.

9            MR. FONTANA:  Shall I provide a copy to the Court.

10           (So marked.)

11           THE COURT:  He is marking it as Court Exhibit 1.

12           Two other matters that I'm going to deal with.

13   There was also a claim for-- under FLSA for record keeping

14   violations.  There is no private cause of action for record

15   keeping violations.  I assume you know that counsel.

16           MR. FONTANA:  Yes.

17           THE COURT:  But that you brought that with regard to

18   the potential trial issues that could result from that.  But

19   there is no private cause of action, so to the extent that you

20   have a claim, or cause of action based on that, that also is

21   dismissed.

22           And, with regard to the defendant's motion to strike

23   the additional E-mails that were submitted.  Counsel, I don't

24   know if you have a basis to strike these documents.  You are

25   moving on the grounds that they were not produced in

RW Barry    OCR

- C O L L O Q U Y -                    43

1  discovery.  But these E-mails are E-mail chains that were

2  exchanged at the company, correct?

3           MR. TRAFIMOW:  In large part, yes.

4           THE COURT:  So, you should have had these documents

5  and seems like you should have produced them in discovery.

6  I'm not going to strike these documents.  So your motion to

7  strike is denied.

8           I believe I have dealt with everything that is

9  currently before the Court.

10          MR. TRAFIMOW:  Your Honor, I think there is one

11 more.

12          THE COURT:  What is that?

13          MR. TRAFIMOW:  As we-- I think it is not crystal

14 clear in the Complaint, but we interpreted certain allegations

15 in the Complaint as alleging a violation of the minimum wage

16 chapter of the labor law and we move for summary judgment on

17 it.

18          THE COURT:  Minimum wage chapter.

19          MR. TRAFIMOW:  Right, I think plaintiff believes he

20 was bringing an overtime claim under the state labor law, but

21 he brought it under the minimum wage chapter.  So we briefed

22 this in our papers.

23          Probably the best section to look at is our reply

24 brief, pages-- page seven.

25          THE COURT:  Counsel, your claim here under the FLSA

- C O L L O Q U Y -                          44

1   and New York Labor Law is based on failure to pay overtime?

2               MR. FONTANA:  Yes.

3               THE COURT:  Correct?

4               MR. FONTANA:  Yes.

5               MR. TRAFIMOW:  But when you look at the Complaint,

6   he brought it under Section 663.  So that is-- in the amended

7   complaint at paragraph 71.  That is under the minimum wage

8   statute of the Labor Law.  So that is what he alleged.

9               THE COURT:  So you are saying it is just the wrong

10  section.

11              MR. TRAFIMOW:  I'm saying that he has not pled a

12  claim under section, I think 191.

13              THE COURT:  Which is overtime.

14              MR. TRAFIMOW:  Right.  He has pled a violation of

15  the minimum wage act, right, Article 19 of the New York Labor

16  Law, that is what he pled.

17              THE COURT:  But the allegations are for overtime.

18              MR. FONTANA:  Yes.  If I may, Your Honor, if you

19  look at paragraphs 54--

20              THE COURT:  Do you understand what counsel is

21  saying?

22              MR. FONTANA:  Yes.

23              THE COURT:  Counsel is basically saying it sounds

24  like to me, you cited the wrong statute.  That while you are

25  claiming that your client wasn't paid overtime, so that that

- C O L L O Q U Y -                    45

1    relates to a different statute, did you say Section 191,

2    counsel?

3              MR. TRAFIMOW:  I'm not absolutely sure about that

4    Your Honor.

5              THE COURT:  But that is a different statute.  The

6    statute that you have actually cited in your complaint is

7    Section 663, which is the minimum wage requirement asserting,

8    which suggests that you are asserting that your client wasn't

9    paid the minimum wage required.

10             MR. FONTANA:  That is not my intention.

11             THE COURT:  That is not what you are claiming here.

12             MR. FONTANA:  No.  It is under New York Labor Law

13   190; 191 that we are claiming.

14             MR. TRAFIMOW:  So, he brought it under the, right,

15   Article 19 instead of Article Six of the labor law.

16             THE COURT:  So it sounds like it is an error,

17   counsel, not that he was bringing a minimum wage claim as

18   counsel himself just asserted.

19             So, counsel, you need to just submit a letter

20   clarifying that your Complaint, while it cites, I guess you

21   can just amend the Complaint at this point.  I will give you

22   the right to do so since it is a typographical error.

23             I certainly didn't read your Complaint to be

24   asserting a minimum wage claim.  I understood it to be an

25   overtime, a failure to pay overtime claim.

- C O L L O Q U Y -                          46

1       But you have alleged the wrong statute.  So you

2  should submit an amended complaint alleging the correct

3  statute, and making it clear that you are bringing an overtime

4  claim and not a minimum wage claim.  Does that--

5             MR. FONTANA:  Well --

6             THE COURT:  Does that take care of the defendant's

7  concern?

8             MR. TRAFIMOW:  Yes.  I guess the only point we would

9  make then Your Honor is, you know, if after you read the pages

10 of plaintiff's deposition testimony that we are requesting

11 that you do, if you actually change your mind on that, then

12 that would apply to his article-- his to be forthcoming

13 Article Six claim as well.

14            THE COURT:  Correct.  Since that is what we were

15 arguing here today anyway.

16            MR. TRAFIMOW:  I understand.

17            THE COURT:  Okay.

18            MR. FONTANA:  Mr. Sethi reminded me of something

19 that I neglected to bring to your attention, when we talked

20 about the adverse employment action issue before.  I apologize

21 to the Court.

22            THE COURT:  Okay.

23            MR. FONTANA:  In defendant's motion papers, they

24 made reference, I believe to-- there was justification for not

25 promoting Mr. Sethi to the position of chief technical

- C O L L O Q U Y -                        47

1    officer.  Mr. Sethi had applied for the position, and he was

2    denied the position, and Mr. Jerry Mott received it.  But was

3    given that position, ostensibly, because he had certain

4    experience that Mr. Sethi did not have.

5              So, to the extent that--

6              THE COURT:  When did Mr. Sethi apply for this

7    position that he was denied?

8              MR. FONTANA:  Mr. Mott was hired in early February

9    of 2010 and Mr. Sethi had communicated with Mr. Narod about

10   being considered for the position.  He did so in the end of

11   January, I believe of 2010.

12             And we have-- we were just provided--

13             THE COURT:  What is the evidence that he was not

14   given this position because of his race or national origin?

15             MR. FONTANA:  I don't have any specific basis for--

16   that that was the reason why.

17             The only evidence we have in the record, I believe

18   is it relates to Mr. Sethi did not have the qualifications for

19   the position.  Whereas if you look at Mr. Mott's resume, you

20   see that he really didn't have the qualifications for the

21   position either.

22             THE COURT:  Well, if-- let me make sure I understand

23   this.

24             So, you are now asserting that the adverse

25   employment action is the failure to promote him, for which he

- C O L L O Q U Y -                    48

1   communicated that he was interested in.  To the extent this is

2   your adverse employment action, you have to, in order to make

3   out your prima facie case, show that the circumstances of

4   that, give rise to an inference of discrimination.

5          So, what if any evidence is there in the record of

6   that?  That he didn't get this position because he was being

7   discriminated against because of his race or national origin?

8          MR. FONTANA:  Excuse me, Your Honor.

9          (Pause.)

10         MR. FONTANA:  I'm sorry, Your Honor.

11         THE COURT:  You can take a few minutes if you need

12  to consult with your client.

13         MR. FONTANA:  I have nothing further, Your Honor.

14         (Pause.)

15         THE COURT:  Counsel, so, you have given me a

16  potential adverse employment action, but no inference of

17  discrimination.

18         MR. FONTANA:  Right.

19         THE COURT:  Which still results in a failure of your

20  Title VII claim.

21         Would you like to be heard?

22         MR. TRAFIMOW:  If the Court is essentially ruling

23  that--

24         THE COURT:  I am listening, I am still going to go

25  back and at least consider all of the other arguments made,

- C O L L O Q U Y -                    49

1   because I am required to.  They were made here today, and so,

2   I want to consider all of the other potential adverse

3   employment actions that were raised by Mr. Sethi.

4          But, on this argument, certainly failure to promote

5   is a-- and can be an adverse employment action, but in terms

6   of the last element of the prima facie case, since it sounds

7   like there is no inference of discrimination, then Mr. Sethi

8   still can't make out a prima facie case if his reliance is on

9   this particular adverse employment action.

10         MR. TRAFIMOW:  So, the first comment I would make

11  is, I agree with that last comment, Your Honor.  There is no

12  inference of discrimination, but really beyond that, I would--

13  the Court can read, you know, paragraphs 54 through 60 of

14  Erica Lee's affidavit in which she goes through this and it

15  is-- explains the position was announced to all Cambridge

16  employees, that plaintiff asked why he had not been offered

17  the position and Erica Lee approached him to apply, and he

18  never did.

19         So, I don't believe there is any record evidence to

20  the contrary that in other words, that he never did apply for

21  the position.  I think it follows from that, that there is no

22  evidence that he was not hired under circumstances giving rise

23  to an inference of discrimination.

24         I guess the last comment I would make on that, the

25  plaintiff's complaint makes no allegation of this, as an

- C O L L O Q U Y -                    50

1   alleged adverse employment action.

2        I guess the fourth comment would be, not that it is

3   dispositive but Mr. Mott was hired on January 26th, 2010,

4   according to Ms. Lee's declaration in paragraph 58 and Mr.

5   Sethi's paid leave of absence began a couple of weeks later.

6   So we are really not talking about a significant adverse

7   employment action, even if there had been one.

8        THE COURT:  Okay.  Anything else from either side?

9        MR. FONTANA:  Not from me, Your Honor.

10       MR. TRAFIMOW:  The only comment I will make, I know

11  the Court is well aware of this, nonetheless, I feel like it

12  is a point worth making.

13       While I understand the Court's comment on the FLSA

14  claim about competing factual issues, nonetheless, the

15  determination of what the primary duty was, is an issue of

16  law.  And I don't hear any-- the Court's comments to be--

17  contrary, but in other words, our view is when you take the

18  deposition testimony--

19       THE COURT:  I don't understand your comment just now

20  counsel.

21       MR. TRAFIMOW:  That once the facts of the case are

22  before the Court.

23       THE COURT:  Correct.  And that is exactly what I

24  said earlier.

25       MR. TRAFIMOW:  Right.  I agree.

- C O L L O Q U Y -                    51

1          THE COURT:  That is correct.

2          MR. TRAFIMOW:  Right.

3          THE COURT:  So it as matter of law for me to decide

4   whether or whether or not his duty--

5          MR. TRAFIMOW:  Yes --

6          THE COURT:  Is exempt.  But the issue is what is his

7   duty.  And that underlining issue.

8          MR. TRAFIMOW:  Is what we are going to ask you to go

9   back and take another look at.

10          THE COURT:  Correct.  Which is what I'm going to do.

11          MR. TRAFIMOW:  We have nothing further, Your Honor,

12   thank you.

13          THE COURT:  Okay.

14          Thank you both sides.  Have a great day.

15          MR. FONTANA:  Thank you, Your Honor.

16          THE COURT:  Try to stay dry.

17          (Matter concluded.)

18          - - o o O o o - -

19

20   CERTIFIED to be a true
     and accurate transcript
21   ONLY if an original or
     signed copy.
22
     s/Richard W. Barry
23   _____
     Richard W. Barry, RPR
24

25