UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

HARSHARAN SETHI,

                Plaintiff,                      **MEMORANDUM & ORDER**
                                                 11-CV-2511 (MKB)

        v.

RANDY NAROD, ERICA LEE, DEBORAH
MORRISSEY and CAMBRIDGE WHO'S WHO
PUBLISHING, INC.,

                Defendants.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Harsharan Sethi brought the above-captioned action against Defendants Randy

Narod, Erica Lee, Deborah Morrissey, Mitchel Robbins, Brian Wasserman, Stanley Pitkiewicz,

Richard Someck, Israel Dorinbaum, Neil Schorr, Donald Trump, Jr., and Cambridge Who's Who

Publishing, Inc. ("CWW") alleging race and national origin discrimination under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State

Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("NYSHRL"). Plaintiff also asserted claims

against all Defendants under the Fair Labor Standards Act ("FLSA") and the New York State

Labor Law ("NYLL"), alleging failure to pay overtime compensation and violation of record-

keeping requirements. Defendants moved for summary judgment on all claims. At oral

argument on May 9, 2013, the Court granted Defendants' motion for summary judgment as to

Plaintiff's FLSA claim against individual Defendants Mitchel Robbins, Brian Wasserman,

Richard Someck, Donald Trump, Jr., Neil Schorr, Stanley Pitkiewicz and Israel Dorinbaum, and

Plaintiff's claims for violation of the record-keeping provisions of the FLSA and the NYLL.

After oral argument Plaintiff cross-moved for summary judgment on all of his remaining claims.[1]

For the reasons set forth below, the Court denies Defendants' and Plaintiff's motions for

summary judgment as to the FLSA and the NYLL claims.  The Court defers ruling on

Defendants' and Plaintiff's motions for summary as to the Title VII and the NYSHRL claims

and directs Plaintiff to submit additional documentation as specifically set forth below on or

before October 14, 2013.  Defendants shall file any objections to those documents on or before

October 28, 2013.

### I.   Procedural Background

Plaintiff was represented by counsel from the filing of the Complaint in this proceeding

through oral argument on Defendants' motion for summary judgment.  (*See* Docket Entry

Nos. 1, 62, 63, and Order dated June 17, 2013.)  After oral argument on Defendants' motion for

summary judgment, Plaintiff terminated his attorney and is now proceeding *pro se*.  Plaintiff

thereafter sought to file additional arguments in opposition to Defendants' motion, (Docket Entry

No. 62), and was permitted to do so by a letter not to exceed five pages. (Order dated June 18,

2013.)  Plaintiff submitted a five-page letter enclosing over 3,000 pages of exhibits.  (Plaintiff's

Letter dated June 24, 2013, Docket Entry No. 67.)  Plaintiff also filed a cross-motion for

summary judgment with additional exhibits in excess of 2,000 pages.  (Pl. Cross-Mot., Docket

Entry No. 73.)  Plaintiff noted that many of the documents he submitted were being offered for

---

[1]   In deciding the motions the Court construes the Plaintiff's additional *pro se*
submissions liberally.  *See Ferran v. Town of Nassau*, 471 F.3d 363, 369 (2d Cir. 2006) ("This
Court will construe briefs submitted by pro se litigants liberally."); *Thompson v. Tom Vazquez
Janitorial*, No. 05-CV-808, 2006 WL 3422664, at *2 (E.D.N.Y. Nov. 28, 2006) (noting that a
court "must construe the *pro se* plaintiff's claims liberally in deciding the motion for summary
judgment" (citing *Sawyer v. Am. Fed'n of Gov't Emps., AFL-CIO*, 180 F.3d 31, 36 (2d Cir.
1999))).  In addition, "[a] district court enjoys broad discretion (1) to consider arguments made
for the first time in a reply brief, [and] (2) to rely on evidence submitted with the reply
papers . . . ." *Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela*,
341 F. App'x 722, 724 (2d Cir. 2009) (citations omitted).

the purpose of trial.  (Plaintiff's Letter dated July 3, 2013, Docket Entry No. 70.)  Plaintiff also

requested additional discovery.  (Plaintiff's Letter dated Aug. 6, 2013, Docket Entry No. 75.)  In

addition, for the first time Plaintiff asserted conspiracy and retaliation claims.  (Pl. Cross-Mot.,

Docket Entry No. 73.)

  The Court held a conference on August 15, 2013 to discuss Plaintiff's submissions.  (*See*

Minute Entry dated Aug. 15, 2013.)  The Court struck the additional documents submitted by

Plaintiff and informed Plaintiff that documents that he sought to present at trial should be

submitted at a later date if the Court denied Defendants' motion for summary judgment.

(Aug. 15, 2013 Conference.)  The Court also denied Plaintiff's request for additional discovery.

(Minute Entry dated Aug. 15, 2013.)  The Court noted that the discovery deadline was August of

2012 and that, to the extent Plaintiff was seeking documents that were demanded from

Defendants but were never provided, his counsel should have moved to compel their disclosure.

(Aug. 15, 2013 Conference.)  The Court also noted that because the additional discovery sought

by Plaintiff related to fraud that was allegedly being committed by Defendants against the

government and Plaintiff, and because there are no fraud allegations in the Complaint before the

Court, the discovery sought by Plaintiff did not appear to be relevant to Plaintiff's claims of

discrimination or violations of the FLSA and the NYLL.

  The Court also struck Plaintiff's new retaliation and conspiracy claims, and denied

Plaintiff's application for leave to amend the complaint as untimely and unduly prejudicial.[2]

---

[2]  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (holding that district court did not exceed discretion to deny leave to amend complaint two years after filing of complaint and after filing of summary judgment motion); *see also In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 11-MD-2213, 2013 WL 1100770, at *6 (S.D.N.Y. Mar. 18, 2013) ("[L]eave to amend a complaint should generally be denied when a motion to amend is filed solely in an attempt to prevent the Court from granting a motion to

(*See* Minute Entry dated Aug. 15, 2013.)  Plaintiff's action was commenced two years prior in

May 2011, Plaintiff was represented by counsel from the commencement of the proceeding,

Plaintiff has filed multiple actions against some of the Defendants, including seven proceedings

in New York State Supreme Court challenging, among other things, his termination and asserting

a claim for retaliation, (*see* New York State Supreme Court Index Nos. 2499/2011, 7904/2011,

11750/2011, 14021/2011, 17178/2011, 1035/2012, 14058/2012), and the Court noted Plaintiff's

intimate involvement with the proceeding, including his presence at the oral argument of

Defendants' summary judgment motion and his many objections and suggestions to his counsel.

(Aug. 15, 2013 Conference.)  The Court accepted Plaintiff's cross-motion for summary

judgment, and directed Defendants to respond to Plaintiff's summary judgment motion as to the

Title VII and NYSHRL race and national origin discrimination claims, as well as the FLSA and

the NYLL overtime claims.  (*See* Minute Entry dated Aug. 15, 2013).

## II.  Factual Background

### a.  CWW and the Individual Defendants

Randy Narod is the President of CWW and owns 85% of CWW.  (Deposition of Randy

Narod ("Narod Dep.") 5:22–6:2, 8:12–2; Pl. 56.1 ¶¶ 65–66.)  Defendant Erica Lee is the Chief

Operating Officer and Chief of Operations and Logistics for CWW.  (Declaration of Erica Lee

("Lee Decl.") ¶ 1; Pl. 56.1 ¶ 32.)  Plaintiff was interviewed for his position at CWW by both

Narod and Lee.  (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 115; Deposition of Harsharan Sethi ("Sethi Dep.")

39:25–40:2.)  According to Narod, Lee made the decision to hire Plaintiff and Lee had the

authority to send a termination severance agreement to Plaintiff without discussing it with Narod

in advance.  (Narod Dep. 38:5–21, 52:12–53:2; Pl. 56.1 ¶ 94.)  According to Lee, she made the

---

dismiss or for summary judgment, particularly when the new claim could have been raised
earlier." (citation and internal quotation marks omitted)).

recommendation to hire Plaintiff to Narod, and Narod accepted the recommendation and approved the decision to hire Plaintiff.  (Lee Decl. ¶ 17.)  During some period of his employment, Plaintiff was required to obtain permission from Lee before leaving work at the end of the day.  (Deposition of Erica Lee ("Lee Dep.") 103:12–104:18; Pl. 56.1 ¶ 54.)  Lee also generally provided Plaintiff with his assignments.  (Lee Dep. 166:15–20; Pl. 56.1 ¶ 48.)

Deborah Morrissey is the Vice President of Human Resources for CWW.  (Deposition of Deborah Morrissey ("Morrissey Dep.") 5:19–24; Pl. 56.1 ¶ 1.)  Morrissey's responsibilities include "recruiting, hiring, dismissals, personnel evaluation, benefits, organizational development with the executive board, payroll and updating policies that were decided by the executive board, negotiations with benefit vendors and paycheck vendors, and managing a small group of HR individuals to complete all duties related to both the HR department as well [as] assisting to report sales figures for the sales representatives."  (Morrissey Dep. 10:20–11:9.)  Her decisions to hire or fire, or to modify salary, hours or terms of employment had to be approved by Narod.  (Declaration of Deborah Morrissey ("Morrissey Decl.") ¶ 29.)  She was also responsible for making "sure that files were kept in order" and "for stepping in as a manager for the sales managers if Erica Lee was not present, opening other offices and supervising those offices."  (Morrissey Dep. 10:20–12:18; Pl. 56.1 ¶ 2.)  Morrissey also processed payroll and certain documents to implement Plaintiff's termination.  (Morrissey Decl. ¶ 31.)

### b.  Plaintiff's Educational Background and Work at CWW

Plaintiff was born and educated in India.  (Sethi Dep. 9:21–10:19.)  He obtained a bachelor's degree in business administration, with a major in finance and a minor in business management.  (Declaration of Harsharan Sethi ("Sethi Decl.") Ex. 3.)  His professional experience prior to CWW included working as a manager of information systems for

approximately seven years.  (*Id.*)  Plaintiff had various technical certifications.  (Def. 56.1 ¶¶ 3,4; Pl. Resp. 56.1 ¶¶ 3–4.)  Plaintiff claims that his certifications, which he earned in 1999–2000, are now obsolete.  (Sethi Decl. ¶ 57.)

Plaintiff worked as the Director of Management Information Systems ("MIS Director") at CWW from July 21, 2008 to May 10, 2010.  (Am. Compl. ¶ 2; Answer ¶ 2.)  Plaintiff was hired after responding to a job posting for a network administrator.  (Def. 56.1 ¶ 8; Pl. Resp. 56.1 ¶ 8.) Plaintiff reported to Lee.  (Def. 56.1 ¶ 25; Sethi Decl. ¶ 15.)  When Plaintiff started his job with CWW in July 2008, Plaintiff's designated work hours were Monday through Thursday from 9:00 AM to 5:30 PM and Friday from 9:00 AM to 5:00 PM.  (Def. 56.1 ¶ 34; Pl. Resp. 56.1 ¶ 34.) Plaintiff's hours were subsequently changed to 8:30 AM to 5:00 PM Monday through Friday. (Def. 56.1 ¶¶ 34–35; Pl. Resp. 56.1 ¶¶ 34–35).  In 2009, Plaintiff's hours were changed again, to 8:30 AM to 5:30 PM.  (Lee Decl. Ex. M at 21; Pl. Resp. 56.1 ¶ 35; Pl. Cross-Mot. Reply Ex. 4.) In February 2010, Lee told Plaintiff that his hours were Monday through Thursday 8:30 AM to 5:30 PM and Friday 8:30 AM to 6:00 PM.  (Pl. Cross-Mot. Reply Ex. 4.)  Plaintiff's starting salary was $75,000 annually, and after a probationary period his salary was increased to $95,000 in November 2008.  (Def. 56.1 ¶ 12; Pl. Resp. 56.1 ¶ 12.)

The nature of Plaintiff's work at CWW is disputed by the parties.  According to Plaintiff, he spent 90% of his time working on in-house desktop support, 5% of his time on server issues, and 5% of his time on issues related to the backup, restoration, integrity and troubleshooting of backed-up data.  (Sethi Decl. ¶ 12.)  Plaintiff has also described his work as "a hundred percent . . . desktop support."  (Pl. Cross 56.1 ¶ 3(c).)  Plaintiff testified that "a hundred percent of my time was in systems administration," which included "[d]esktop support, connectivity, network problems, network maintenance, server problems, et cetera."  (Sethi Dep. 69:7–70:5.)

Plaintiff spent "[m]ost of the time" "working on network problems." (*Id.* at 70:19–22.) Lee closely controlled Plaintiff's work activities and gave him assignments, (Sethi Decl. ¶ 15), and "[a]t no time did [he] have discretion as to [his] assignments or when and how to complete them," (*id.* ¶ 3).

Defendants claim that, as the "highest ranking IT person at CWW that had hands-on experience with the system," Plaintiff handled network and software issues, and spent most of his time on network problems and systems administration. (Def. 56.1 ¶¶ 21–22, 25–26.) "Plaintiff was hired as a chief IT systems analyst to set policies for and improve the security and efficiencies of CWW's network infrastructure," and Plaintiff's duties "were maintaining, improving, researching, recommending, and implementing policies and procedures regarding CWW's computer network and infrastructure," and "included researching and reporting to [Lee] best industry practices for security and communications protocols and other network aspects." (Lee Decl. ¶¶ 25, 30.)

When Plaintiff joined CWW, CWW was relying on an outside IT vendor called Proactive, which CWW continued to utilize while Plaintiff was employed at CWW. (Lee Dep. 14:4–16:25; Pl. 56.1 ¶¶ 3, 61, 123, 124.) The parties dispute the degree of Plaintiff's interaction with Proactive. Plaintiff claims that Lee would primarily interact with the vendor, and that Plaintiff had only occasional contact with Proactive. (Pl. 56.1 ¶ 124.) Defendants claim that Plaintiff interacted directly with Proactive, (Def. 56.1 ¶ 27), and was hostile to the employees at Proactive, (Lee Decl. ¶¶ 37–44).

**c.  May 2009 USA Honors Society Email**

In approximately May 2009, Plaintiff received an e-mail from the "USA Honors Society" ("Honors Society"), a new company established at CWW. (Am. Compl. ¶ 27; Sethi Dep. 82:16–

86:4.)  The email indicated that Plaintiff had been selected for membership in the Honors Society for his contributions to the profession.  (*Id.*)  Plaintiff believed that the representations in the email were false, and reported his concerns to Lee.  (*Id.*)  According to Lee, "Plaintiff believed [the Honors Society] was a separate entity [from CWW] and that customers should be advised of this.  I explained to Plaintiff that [the Honors Society] was a branch of CWW, yet he continued to express his concerns that CWW engaged in wrongful business offerings."  (Lee Decl. ¶ 36.)

After this incident, Plaintiff claims he experienced changes in his duties and responsibilities, including a unilateral increase in his work hours.  (Sethi Dep. 86:5–90:8.)  Plaintiff claims that he endured long hours of work in retaliation for questioning things such as the Honors Society, when he would receive overtime pay, and why he must provide technical support to Narod's personal businesses outside of CWW.  (Pl. 56.1 ¶¶ 127–30; Sethi Dep. 88:22–89:21.)  Plaintiff alleges that as part of the "abus[e]" he subsequently experienced, beginning in September 2009, CWW's executives and managers constantly remarked about Plaintiff's Indian heritage, including calling him "Harshidoodle" or "Harshipoodle" in front of other employees.[3]  (Am. Compl. ¶ 31.)

### d.  November 2009 Confrontation with Narod

On November 10, 2009, Plaintiff attended a meeting with Narod, Lee and Morrissey.  (Sethi Decl. ¶ 26; Sethi Dep. 130:19; Lee Decl. ¶ 52.)  According to Plaintiff, during this meeting Narod "physical[ly] assault[ed]" him.  (Sethi Dep. 124:2; *see also* Pl. 56.1 ¶¶ 133–134;

---

[3]  Plaintiff recalls that he was first called "Harshidoodle" by Narod, (Sethi Dep. 103:22–104:3), but does not recall how many times Narod referred to him as "Harshidoodle," (*id.* at 105:23–106:5).  Plaintiff also did not identify any other individual who called him "Harshidoodle."  (*Id.* at 106:6–107:16.)  Plaintiff stated that he had "no clue" where the nickname came from.  (*Id.* at 108:3–5.)  Plaintiff believes that Narod intended the word "Harshidoodle" to refer to Plaintiff's Indian heritage because "Narod had very poor look towards Indians in the sense he thought he could hire as many Indians for double the job and half the pay."  (*Id.* at 112:21–113:4.)

Sethi Dep. 120:2–125:25.)  Plaintiff accused CWW of illegality, telling Narod, "This company is illegal.  What you are doing here is illegal."  (Sethi Dep. 122:4–5.)  Narod allegedly responded, "You f--king Indian, what do you think about yourself?  I will make sure you are sent back to India.  You don't know who you are dealing with.  You fear my wrath in your dreams."  (Pl. 56.1 ¶ 133; Sethi Dep. 116:21–125:19.)  Narod also told Plaintiff, "[I]f this is illegal, you are part of it, so we both will go to jail."  (Sethi Dep. 124:20–22.)  Plaintiff alleges that during this meeting Narod "charged" at him, slapped his face, and "chested" him, hitting Plaintiff with his chest.  (Sethi Dep. 122:19–123:21.)  Defendants admit that a meeting occurred, but deny Plaintiff's allegations concerning what happened at the meeting.  (Def. Cross-Mot. 56.1 ¶¶ 132–34.)

### e.  Plaintiff's Alleged Unfair Treatment

At or about the same time that Narod allegedly assaulted Plaintiff, Plaintiff claims that Morrissey began to demand that Plaintiff produce a doctor's note whenever he was out of the office due to illness, regardless of how long he was absent, while other employees were only required to produce a doctor's note if they were out of the office more than two consecutive days due to illness.[4]  (Am. Compl. ¶ 33.)  Plaintiff alleges that CWW's policy was that medical documentation was only required when utilizing un-accrued time-off, and Plaintiff never took un-accrued time-off but was still required to submit medical documentation for his sick time.  (Pl. Cross-Mot. Reply 2–3 (citing Pl. Cross-Mot. Reply Exs. 7A, 7B, 7C, 8–11).)  Plaintiff alleges that other similarly situated employees were not required to produce medical

---

[4] At oral argument, Plaintiff's counsel stated that "a letter was put into [Plaintiff's] file indicating that he was not providing a doctor's note when it was requested."  (Oral Arg. Tr. 5:13–16.)  Counsel argued that Lee and Morrissey were not subject to the same medical documentation requirements.  (Oral Arg. Tr. 5:14–6:22.)

documentation.[5]  (*Id.*)  According to Defendants, "CWW's standard policies and procedures required . . . medical documentation for any sick time for which an employee had no available accrued paid sick time."  (Def. 56.1 ¶ 38.)

Plaintiff asserts that he was singled out and treated unfairly in several ways.  Plaintiff claims that he was not given the number of vacation days he was due based on the number of vacation days given to others.  According to Plaintiff, he was "originally told" he would have "10 days [of] vacation per year," but "in reality . . . had only five days [of] vacation per year." (Sethi Decl. ¶ 50; *see also* Pl. Cross-Mot. Reply 3 (citing Pl. Cross-Mot. Exs. 14–16).)  Plaintiff relies on an email dated December 11, 2009, which indicates that he had "5 Vacation Days [remaining]."  (Sethi Decl. Ex. 16.)  Plaintiff asserts that other employees were given 10–21 vacation days each year.  (Pl. Cross-Mot. Reply 3.)  Plaintiff relies on the attendance records of employees Morrissey, Tara Siciliano and Yona Block.  (*See id.* (citing Pl. Cross-Mot. Reply Ex. 16).)  Morrissey's attendance records for 2009 indicate 11 days listed under the column labeled "V[acation]"; Siciliano's 2009 attendance records indicate 15 days listed under the "V[acation]"column; and Block's attendance records indicate 10 days listed under "V[acation]." (*See id.*)  Plaintiff submitted no additional information about Siciliano and Block.  Defendants assert that because Plaintiff was a manager and an exempt employee, he received ten vacation days.  (Morrissey Dep. 163:17–22.)  Plaintiff also asserts that he was only allowed to roll-over three vacation days while others were allowed to roll-over an "infinite number" of vacation days each year.  (Pl. Cross-Mot. 3 (citing Pl. Cross-Mot. Exs. 5, 17–18, 19A, 19B).)  Plaintiff points to employee Siciliano's attendance records which indicate that fifteen vacation days were used in

---

[5] The documents submitted by Plaintiff shows that other employees took time-off or missed work due to illness, but there is no evidence in the record regarding whether those employees had available accrued time-off or whether those employees were required to provide medical documentation or provided medical documentation.  (*See* Pl. Cross-Mot. Reply Ex. 11.)

2009.  (Pl. Cross-Mot. Reply Ex. 18.)  Plaintiff submitted what appears to be an excerpt from

CWW's employee handbook stating that "any unused vacation days will roll over," (Pl. Cross-

Mot. Reply Ex. Ex. 19A), and another excerpt stating that "[n]on-management employees can

only roll over a maximum of 3 vacation days," (Pl. Cross-Mot. Reply Ex. 19B).  According to

Morrissey, the employee handbook provides for the roll-over of three vacation days.  (Pl. Cross-

Mot. Reply Ex. 17.)  Plaintiff further asserts that he was denied vacation pay after he was

terminated, while other employees were paid for their vacation time after termination.  (Pl.

Cross-Mot. 29.)

    Plaintiff also asserts that he was treated unfairly because he was required to submit

paperwork in order to obtain paid time off while other employees "were not required to fill out

anything."  (Pl. Cross-Mot. 4 (citing Pl. Cross-Mot. Exs. 20–21).)  According to Plaintiff, he was

required to provide three weeks of advance notice for vacation and paid time off while other

employees were not required to give advance notice.  (Pl. Cross-Mot. 4 (citing Pl. Cross-Mot.

Exs. 20, 21).)  Plaintiff refers to a collection of email correspondence between Morrissey and

various employees regarding their sick time and medical appointments.  (Pl. Cross-Mot. Reply

Ex. 21.)  According to Morrissey, during Plaintiff's employment with CWW, the employee

handbook policies required that all employees submit requests for vacation at least three weeks

in advance and request personal time-off in advance using a form from the human resources

department.  (Pl. Cross-Mot. Reply Ex. 20.)  Defendants claim that "CWW's standard policies

and procedures required pre-approval of time taken for vacation and accrued personal time as

well as same-day or prior notification of any sick time as practicable."  (Def. 56.1 ¶ 38.)

    Plaintiff asserts that he was subjected to unfair treatment in a number of other ways.

Plaintiff alleges that CWW did not follow the company's "progressive discipline system" with

regard to him, but did so with regard to other employees.  (Pl. Cross-Mot. 3 (citing Pl. Cross-Mot. Exs. 12–13).)  Plaintiff alleges that a memorandum was placed in his personnel file indicating that he failed to give sufficient notice in advance of taking leave or departing the office early.  (Oral Arg. Tr. 7:17–8:1.)  Plaintiff also alleges that an entry was placed in his personnel file regarding chronic lateness, (Oral Arg. Tr. 8:3–8:13), and Plaintiff submitted a written formal warning regarding tardiness that he received on November 24, 2008, (Pl. Cross-Mot. Reply Ex. 12).  Plaintiff submitted what appears to be an excerpt from the employee handbook concerning tardiness policies proscribing procedures for addressing "[s]ales [r]epresentatives who are repeatedly late to work."  (Pl. Cross-Mot. Ex. 13.)

Another way in which Plaintiff asserts that he was treated unfairly is that Morrissey, Lee and others received overtime pay, while he did not.  (Oral Arg. Tr. 7:5–7:14; Pl. Cross-Mot. Reply 2 (citing Pl. Cross-Mot. Exs. 4–5, 6A, 6B, 6C, 6D).)  Plaintiff submitted evidence of CWW employees other than Morrissey and Lee who were paid overtime compensation.  (*See* Pl. Cross-Mot. Reply Ex. 6.)  However, Plaintiff does not submit any evidence about the roles, duties, seniority, or exempt status of these employees.  Defendants claim that managers like Morrissey and Lee did not generally receive overtime, but Morrissey admits that she received overtime pay once for working on a Saturday.  (Morrissey Dep. 69:8–15; Pl. 56.1 ¶ 14.)  According to Morrissey, she generally works "[o]ver 60 hours a week" and never received overtime pay other than that one occasion.  (Morrissey Dep. 69:8–70:6.)  Lee testified that she "never received overtime," (Lee Dep. 87:2), but according to Morrissey, Lee did receive overtime pay once, when she worked on Memorial Day in 2012.  (Pl. 56.1 ¶ 15; Morrissey Dep. 70:7–15.)

Plaintiff asserts that he was treated unfairly because his benefits did not begin on the first day of his employment, while other employees were given benefits from their first day, and he was "discriminatorily forced on probation for 90 days" when he started work, while other employees "were never on probation."  (Pl. Cross-Mot. 4 (citing Pl. Cross-Mot. Exs. 22–23).) Plaintiff cites to a copy of his offer letter, indicating that he would have the option to enroll in a health insurance plan after 90 days of employment, (Pl. Cross-Mot. Reply Ex. 22), as well as an offer letter from CWW to a Michael Langdon stating that Langdon would not need to wait the 90-day probationary period for benefits and an email to a Jeffrey Rook stating that he was enrolled for benefits, but not indicating his start date, (Pl. Cross-Mot. Reply Ex. 23).

Plaintiff asserts that he was treated unfairly because he was denied free health insurance benefits while other employees were given free individual health benefits.  (Pl. Cross-Mot. 4 (citing Pl. Cross-Mot. Exs. 22–23).)  Plaintiff cites to his offer letter which states that "the company [would] pay a stipend of $280 monthly towards [his health insurance] deduction," the offer letter to Langdon which states that "the company would pay for his individual medical benefits," and the email to Rook which states that "Randy will be paying for this monthly in full" and "[w]e have not done this for many employees here, so please keep this confidential."  (Pl. Cross-Mot. Reply Exs. 22, 23.)  Plaintiff alleges that he was also deprived of a raise in exchange for "not taking medical benefits from CWW," while other employees "were given [a] raise in pay for not taking medical benefits from CWW."  (Pl. Cross-Mot. 4 (citing Pl. Cross-Mot. Ex. 24).)  Plaintiff points to an email from Narod to Morrissey stating, "Please give [R]onda [L]eaderman a 50 week [sic] raise in sall [sic] she does not use health insurance[.]"  (Pl. Cross-Mot. Reply Ex. 24.)

Plaintiff also asserts that he was treated unfairly for discriminatory reasons because he "was not introduced to a single employee," was "denied orientation, an initial introduction to the CWW employees and a welcoming email" when he started his employment at CWW, while other employees were "given very good introduction[s] and emails were sent to the whole company welcoming" them "very cordially."  (Pl. Cross-Mot. Reply 4–5.)  Plaintiff cites to a number of emails welcoming other new employees to CWW.  (Pl. Cross-Mot. Reply Exs. 25A, 25B.)[6]  Plaintiff claims that he was also denied business cards, while other employees were provided with business cards.  (Pl. Cross-Mot. 31.)

Plaintiff additionally asserts unfair discriminatory treatment because he was denied compensation for travel mileage when he traveled to work off-site, while other employees received compensation for travel mileage, (*id.* at 29); because he was forced to use CWW's hand-scanner attendance system for logging arrivals and departures at CWW while other employees were not required to hand-scan their arrivals and departures, (*id.* at 30); and because he was denied CWW-provided legal services, while other employees were offered a "legal service plan."  (*Id.* at 31.)

Defendants dispute that Plaintiff was treated unfairly.  Defendants allege that Plaintiff did not always comply with CWW procedures, including providing sufficient notice when he was leaving early or planning to be absent, and he was often absent, tardy and insubordinate. (Morrissey Decl. ¶¶ 17–28.)

---

[6]  In his post-oral argument submissions Plaintiff also alleges that when he started at CWW, the "American person/entity" Plaintiff replaced was paid more per hour than Plaintiff, (Plaintiff's Letter dated June 24, 2013, at 3; Pl. Cross-Mot. 23), and after he left CWW, he was replaced by an "American" individual, (Pl. Cross-Mot. 19).

### f.   Chief Technology Officer Position

In January 2010, CWW created a position of Chief Technology Officer ("CTO").  (Def. 56.1 ¶ 52; Pl. Resp. 56.1 ¶ 52.)  Lee announced via email on January 13, 2010, that CWW was about three days away from hiring a CTO.  (Lee Decl. Ex. O.)  Lee wrote that all of the applicants had over twenty-plus years of experience and had managed technology for large companies.  (*Id.*)  Plaintiff forwarded the announcement to Narod and asked, "[a]ny reason I was not given this opportunity?"  (*Id.*)  In response, Narod asked Plaintiff if he had the experience necessary for the position.  (*Id.*)  Plaintiff responded, "Yes [t]ry [m]e."  (*Id.*)  Narod advised Plaintiff that he would have to go through the interview process, as the applicants had "high level" experience.  (*Id.*)  According to Lee, Plaintiff "requested an opportunity to apply for the [CTO] position."  (Lee Dep. 57:17–19.)  At that time, CWW had already vetted candidates and given a soft response to a candidate indicating that CWW was "leaning . . . that person's way." (*Id.* at 57:19–24.)  CWW was looking for a candidate with a wide range of skill sets.  (*Id.* at 59:5–7.)  When Plaintiff inquired about the CTO position, Lee emailed Plaintiff and told him that the top candidates had extensive programming experience and had taken projects from inception to execution on their own.  (Sethi Dep. 167:9–18; Pl. Cross-Mot. Reply Ex. 2.)  She wrote that the candidates were willing to write code as well as manage CWW business practices, and that CWW had not approached Plaintiff about the position because CWW was "looking for candidates that have executed from a business process, software development side and had strong programming backgrounds."  (Pl. Cross-Mot. Reply Ex. 2.)  Plaintiff does not recall if he

15

responded to this email.  (Sethi Dep. 168:19–168:8.)  Defendants claim that Plaintiff never

applied for the CTO position.[7]  (Lee Decl. ¶ 57.)

CWW hired Gerard Mott for the CTO position.  (Def. 56.1 ¶ 56; Pl. Resp. 56.1 ¶ 56.)

Mott had served as the CTO at a number of large organizations, including WebMD, and had

acted as "lead management" before.  (Lee Dep. 60:18–25.)  According to Lee, Mott was brought

on because of his years of experience in big business and his large corporate CTO experience.

(*Id.* at 61:16–23.)  Mott also had experience in managing programmers and "taking projects from

inception."  (*Id.* at 63:17–65:6.)  Lee testified that Plaintiff "taking on the position of the CTO at

the time didn't seem viable because he was supposed to be our lead systems administrator and

systems analyst."  (*Id.* at 59:5–14.)

Plaintiff admitted that he did not have the desired coding experience, nor experience

"execut[ing] from a business process software development side."  (Weber Day 1 Tr. 168:9–

169:20.)  Plaintiff asserts that Mott also lacked the relevant experience.  According to Plaintiff,

Mott "did not understand" a technical conversation with Plaintiff and had "no experience in

network."  (*Id.* at 170:4–22.)  Plaintiff also asserts that a background search of Mott on LinkedIn

showed that Mott had prior jobs as a manager, but no technical positions.[8]  (*Id.* at 170:2–171:7.)

### g.  **Mott's Assessment of Plaintiff**

Mott met with Plaintiff after Mott was hired.  (Def. 56.1 ¶ 58; Sethi Dep. 171:14–179:3.)

Defendants allege that Mott assessed Plaintiff's skills and experience and found Plaintiff's

---

[7]  Plaintiff in his post-oral argument submissions alleges that he "agreed [to] an interview," relying on evidence not in the record before the Court.  (*See* Plaintiff's Letter dated June 24, 2013, at 3.)  There is no evidence in the record that Plaintiff applied for the CTO Position.

[8]  Plaintiff in his post-oral argument submissions has made additional arguments concerning his qualifications relative to Mott and Lee, however Plaintiff relies on evidence not in the record.  (*See, e.g.*, Plaintiff's Letter dated June 24, 2013, at 1–2; Pl. Cross-Mot. at 20–22.)

skillset to be "above a typical desktop technician but well below that of a competent network administrator." (Def. 56.1 ¶ 58.) According to Mott, Plaintiff had no knowledge regarding CWW's database and web servers, and he could not provide Mott with basic information about "the number of hard drives, processors, memory, or configuration for redundancy in case of failure." (Declaration of Gerard Mott ("Mott Decl.") ¶ 8.) Mott assessed Plaintiff's knowledge as limited to knowing "the backup drives (or 'tapes') in the servers needed to be removed every night and replaced." (*Id.*) When questioned about his policies for "the configuration of the servers" that ran CWW's web services and online portals, Plaintiff had no knowledge. (*Id.* ¶ 9.) Plaintiff disputes that this meeting occurred. (Pl. Resp. 56.1 ¶ 58.)

### h.  Plaintiff's Allegedly Hostile Behavior

Defendants allege that Plaintiff exhibited hostile behavior during his time at CWW. According to Lee, Plaintiff "demonstrated a hostile attitude" toward other CWW employees, as well as employees of Proactive. (Lee Decl. ¶ 34, 40.) After Plaintiff wrote a January 12, 2010 email to Proactive that Lee found to be "unnecessarily hostile and combative" and Proactive employees "expressed frustration" to Lee regarding "Plaintiff's aggression and his combative attitude toward them," Lee arranged a meeting with Proactive and Plaintiff for January 15, 2010. (*Id.* ¶ 37–41.) Lee felt that her "efforts to improve Plaintiffs behavior and cooperation with Proactive were not successful." (*Id.* ¶ 42.) On or about February 1, 2010, Proactive employees removed some computer components from Plaintiff's office in order to install them on other employees' computers. (*Id.*) When Plaintiff discovered this, he sent Lee an email stating that "[w]hoever opened my office this morning . . . can do so again at their own risk." (*Id.*) Lee found the email disturbing and threatening. (*Id.*) According to Lee, CWW employees reported other incidents to the human resources department where Plaintiff had belittled or behaved in a

17

hostile manner toward other CWW employees.  (*Id.* ¶ 43.)  Lee claims that by February 2010,

Plaintiff's "inexplicable anger, belligerence and hostility towards his CWW colleagues and

members of Proactive made it impossible for him to carry out his duties and responsibilities

effectively."  (*Id.* ¶ 44.)  Plaintiff disputes these allegations.  He claims that when he wrote that

others can open his office "at their own risk," he meant that "whoever opens my office is

responsible for anything missing from my office. . . . [W]hoever opens it has the risk of that

liability that goes along with entering into somebody's office without a courtesy call, without

any monitoring, without any responsibility."  (Sethi Dep. 209:7–18.)  Plaintiff claims that Lee is

"attempt[ing] to make something out of nothing," and that certain CWW colleagues were

"pleased" with his treatment of them.  (Sethi Decl. ¶ 21.)

### i.   Plaintiff's Departure from CWW

Plaintiff did not appear for work on February 10, 2010, due to snow, and on February 11,

2010, he was absent for a half-day.  (Def. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59.)  According to

Defendants, Plaintiff subsequently requested clarification regarding the hours he was expected to

be at CWW and how many days he had available for vacation and personal time. (Def. 56.1

¶ 60.)  Lee sent Plaintiff an email stating the hours CWW expected him to be on the premises.

(Lee Decl. ¶ 63.)  Lee asked a staff member from the human resources department to address

Plaintiff's request about his available vacation and personal days.  (*Id.*)  According to Lee,

Plaintiff questioned Lee's authority to clarify his work hours.  (*Id.* ¶ 65.)  The correspondence

regarding Plaintiff's time prompted a meeting between Plaintiff, Lee, and others on February 12,

2010.  (*See* Def. 56.1 ¶ 61–62; Pl. Resp. 56.1 ¶ 61–62.)

The circumstances of the February 12, 2010 meeting and Plaintiff's subsequent departure

from CWW are unclear.  According to Defendants, the meeting was to discuss Plaintiff's time

18

and attendance.  (Lee Decl. Ex. M.)  Plaintiff became combative and refused to listen to the policies and procedures, and tried to change the subject of the meeting and discuss other issues. (*Id.*)  Plaintiff asked "what happens . . . if he doesn't obey the policies," and "challenge[d] and confront[ed] the authorities at the meeting."  (*Id.*)  According to Lee, Plaintiff questioned her authority and CWW's policies.  (*Id.*)  At the meeting, they also discussed Plaintiff's January 12, 2010 email that he sent after Proactive employees entered his office, which Lee construed as a threat to CWW employees and consultants.  (Def. 56.1 ¶ 44.)  Plaintiff informed Lee that he had spoken with Narod by telephone and that "Narod had instructed him to leave for the day (with pay)."  (Lee Decl. ¶ 66.)  After the meeting, Plaintiff asked CWW employee Michelle Trabucchi for access to his Personnel File.  (Lee Decl. Ex. M.)  CWW Handbook Policy states that all employees may see their Personnel File once each year and that a request to do so should be submitted in writing.  (*Id.*)  Plaintiff was asked to follow the procedure.  (*Id.*)  Plaintiff "fumed more harassment and stormed off."  (*Id.*)  Plaintiff disputes Defendants' characterization of the meeting and asserts that he "was sent home immediately" on February 12, 2010, after requesting in writing to see his personnel file.  (Sethi Decl. ¶ 30.)

Following the meeting on February 12, 2010, Plaintiff took a leave of absence with pay. (Pl. Resp. 56.1 ¶ 50; Def. 56.1 ¶ 65.)  Narod told Plaintiff by telephone that he would personally address Plaintiff's concerns on February 16, 2010.  (Def. 56.1 ¶ 63; Pl. Resp. 56.1 ¶ 63.)  On February 16, 2010, Narod met with Plaintiff.  (Def. 56.1 ¶ 64; Pl. Resp. 56.1 ¶ 64.)  Lee attended a portion of the meeting with Narod and Plaintiff and heard them discuss possible resolutions of Plaintiff's concerns and complaints.  (Lee Decl. ¶ 68.)  After the meeting Narod decided not to terminate Plaintiff.  (Lee Decl. ¶ 69.)  Instead, Narod decided to give Plaintiff a leave of absence but did not change any of the terms of Plaintiff's employment.  (*Id.* ¶ 69.)

Plaintiff subsequently sent several emails to CWW employees accusing CWW and its employees of wrongdoing, and threatening to take action to injure CWW and its employees if they did not accede to his demands.  (*Id.* ¶ 70.)  Plaintiff claims that the emails were "not designed to hurt CWW but to bring the company's attention to [his] concerns."  (Pl. Resp. 56.1 ¶¶ 66–77.)  In an email dated February 14, 2010, forwarding a note written by Plaintiff dated February 12, 2010, Plaintiff stated that he was being forced to resign for "voicing complaints against fraud and illegal activities" and stated that "this is very serious and might become very very ugly by Monday/Tuesday[ February ]16th."  (Lee Decl. Ex. R.)  Plaintiff also stated that he "fear[ed] for [his] life," and might "file a criminal complaint."  (*Id.*)  Plaintiff indicated that he would be sending the letter to various "State and Federal authourities [sic]" and asked that CWW "let me know if I am to report to work on Monday 15th or Tuesday Feb. 16[] as usual so that this matter can be discussed and settled amicably for smooth running of the business."  (*Id.*)

In an email dated February 19, 2010, Plaintiff levied further accusations at CWW, including that CWW was "buying girls for immoral sexual acts and or prostitution."  (Lee Decl. Ex. S.)  Plaintiff also claimed that CWW was "transacting drugs," "commit[ting] fraud, harass[ing] employees, enslav[ing] employees," "collectively assault[ing] employees," and engaging in "scare tactics" and other "various illegal activities."  (*Id.*)  Plaintiff wrote that he "was belittled, insulted, harassed, discriminated, enslaved, threatened and assaulted on the threat of getting fired."  (*Id.*)  He threatened to go to the media, as well as "have every call and every employee past and present subpoenaed . . . as I have had it with these threats."  (*Id.*)

On February 22, 2010, Plaintiff sent another email to Narod and others at CWW suggesting that "we can set aside all our ego's [sic] and circumstances and start all over again to work together towards any common business goals there by [sic] rectifying the situation and the

issues in the quickest time possible trying to achieve normalcy with minimum damage." (Lee Decl. Ex. T.) Plaintiff wrote, "[L]et me know what you want to do, I am giving you three days to figure this out calmly and coolly along with your associates. All I want is to go back to my work as before as I do not believe that I have done anything to cause such circumstances." (*Id.*) On March 5, 2010, Plaintiff emailed to Narod, "Its [sic] been a while now and I need to get back to work at Cambridge preferably by Monday March 8th." (Lee Decl. Ex. U.) On March 11, 2010, Plaintiff again wrote to Narod, "I am a patient and peaceful man you know that and I believe I have been patient enough but its [sic] high time I get back to work." (Lee Decl. Ex. V.) "Rectifying the wrong and letting me return to work is most probably the only way you can keep the attorney's [sic] out of this mess." (*Id.*)

Plaintiff wrote to Morrissey, copying Narod and others, on April 30, 2010, requesting an "update . . . on my status of employment." (Lee Decl. Ex. W.) He asked if "any investigation [was] conducted by HR on my complaints," and requested that the findings be forwarded to him. (*Id.*) He accused Morrissey of "continuing to harrass [sic]" him. (*Id.*) Morrissey informed Plaintiff by email that Narod was not in that day but someone would contact him the following week to discuss the matter. (Lee Decl. Ex. X.) Plaintiff followed-up with another email on May 3, 2010, with further allegations of illegality, including accusing CWW of manipulating and falsifying his personnel file, and of "discriminatingly" and forcibly increasing Plaintiff's work hours. (*Id.*) Plaintiff accused CWW of "fooling around" with his life and wrote, "Please be advised that if my health runs into any complications cardiac or otherwise I will hold each of you individually responsible[ ]and liable." (*Id.*)

On May 6, 2010, Plaintiff wrote to Narod and Morrissey that they had "till Friday May 7th," after which point he would be "busy at [CWW's building] Cafeteria . . . meeting

employees, Newsday, [p]ossibly Channel 12 News, Help me Howard and EEOC Attorneys," and would also be posting information on various websites including "Cambridgeregistryscam.com," "Cambridgewhoswhoscams.com," "Cambridgewhoswhoconnectscam.com," and "Worldwidewhoswhoscam.com."  (Lee Decl. Ex. Y.)  Plaintiff wrote that "involving attorney's [sic] and third parties might have a spiral effect which could get out of control but you are leaving me no choice I guess.  This is your choice not mine."  (*Id.*)  Plaintiff referenced various allegations including "threats to my life and assault," "VP HR illegally harassing me for my medical records," "discriminatory work hours," "defaming me for insubordination," and "HR trying to illegally and discriminatorily deduct[] my personal, sick and vacation hours."  (*Id.*)  Plaintiff signed the email "Buddy Hershidoodle."  (*Id.*)

On May 8, 2010, Plaintiff emailed Morrissey and Narod regarding "www.worldwidewhoswhoscam.com," stating that he "would like to increase awareness by bringing it to peoples [sic] attention."  (Lee Decl. Ex. Z.)  The following day Plaintiff wrote to Narod, Morrissey and another CWW employee that "I guess we are now moving towards point of no return very rapidly."  (Lee Decl. Ex. AA.)  In the email Plaintiff challenged Morrissey's qualifications and asserted that she was "not qualified to look into my grievences [sic] relating to my complaints for which I was sent on a so called legal leave of absence."  (*Id.*)

Plaintiff was terminated by CWW on or about May 11, 2010.  (Sethi Decl. ¶ 58.)  CWW claims that based on Plaintiff's threats, it had no choice but to terminate him.  (Lee Decl. ¶ 83.)  Plaintiff commenced this action on May 25, 2011.  (Docket Entry No. 1.)

## III.  Discussion

### a.  Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*, --- F.3d ---, ---, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).  The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Taddeo v. L.M. Berry & Co.*, --- F.3d ---, ---, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b.  FLSA Claim

Plaintiff claims Defendants violated the FLSA by failing to pay him overtime.  (Pl. Mem. Law 9.)  Defendants claim that they were not obligated to pay Plaintiff overtime because he was exempt from the FLSA as either a computer employee, an administrative employee, or a professional employee.  (Def. Mem. Law 12–16.)  The parties have cross-moved for summary judgment as to Plaintiff's FLSA claim.

Under the FLSA, employers are obligated to compensate their employees at one and one-half times their regular hourly rate for a workweek longer than forty hours.  *See* 29 U.S.C.§ 207(a)(1).  Certain categories of employees are exempt from the FLSA's overtime requirements, including qualified computer employees, administrative employees and professional employees.  *Id.* § 213.  "Because the FLSA is a remedial Act," the Court must "narrowly construe[]" its exemptions, and the "employer bears the burden of proving that its employees fall within an exempted category of the Act."  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (alteration omitted) (citations and internal quotation marks omitted).  Whether an employee is exempt from FLSA overtime coverage "is a mixed question of law and fact."  *Id.* (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010)).  "The question of how the [employee] spent their working time . . . is a question of fact.  The question [of] whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ."  *Id.* (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).  The Court addresses each category of exemption separately.

### i.    Computer Employee Exemption

The FLSA exempts from its overtime requirements "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty" is:

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
>
> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and  who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.

29 U.S.C. § 213(a)(17); *see also* 29 C.F.R. § 541.400(b) (setting forth same).  The term "primary duty" means the employee's "principal, main, major or most important duty."  29 C.F.R. § 541.700.  "Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of this exemption."  29 C.F.R. § 541.400(a).  The Supreme Court has cautioned that the exemptions to the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those cases plainly and unmistakably within their terms and spirit."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. ---, 132 S. Ct. 2156, 2172 n.21 (2012) (alteration, citation and quotation marks omitted).[9]

---

[9]  Defendants argue that "the general rule of construction that FLSA exemptions are narrowly construed is inapplicable to this case" because the definition of "primary duty" "appl[ies] throughout the FLSA and its regulations, and therefore should not be narrowly construed."  (Def. July 22, 2013 Ltr. at 1.)  The Supreme Court has stated that the narrow construction given to exemptions is "inapposite where . . . we are interpreting a general definition that applies throughout the FLSA."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. ---, 132 S. Ct. 2156, 2172 n.21 (2012) (construing the "broad statutory definition of 'sale'" while assessing the outside sales exemption).  While Defendants are correct that definitions that apply throughout the FLSA are construed broadly, such as the definition of an employee's "primary duty," the exemptions that Defendants seek to apply to Plaintiff — for computer,

The computer employee exemption has been considered by a limited number of courts in this

Circuit, including *Clarke v. JPMorgan Chase Bank, N.A.*, No. 08-CV-2400, 2010 WL 1379778

(S.D.N.Y. Mar. 26, 2010), and *Bobadilla v. MDRC,* No. 03-CV-9217, 2005 WL 2044938

(S.D.N.Y. Aug. 24, 2005).  In both cases the courts engaged in fact-intensive analyses of the

duties of the employees in order to evaluate whether their computer-related responsibilities rose

to the level required by the exemption.  Factors considered by the courts in these cases included:

(1) the volume of data the employee managed; (2) the number of users the employee supported;

(3) the type and complexity of the problems that were handled by the employee, including

whether complicated problems were specifically escalated to the employee; (4) the layers of

assistance below the employee to handle lower-level or simple problems, including whether

there was a helpdesk below the employee to handle routine issues; (5) the skill level of the

employee, including certifications held, and the relevance and importance of those skills and

certifications in the execution of the job; (6) the level of initiative, creativity, strategy, etc.,

allowed the employee in the execution of their job responsibilities; (7) the priority of the

employee's work relative to the overall work of the company; and (8) the relation of their role

and compensation as compared to other technical employees.  *See generally Clarke*, 2010 WL

1379778; *Bobadilla*, 2005 WL 2044938.  Despite the fact-heavy nature of the inquiry, in

*Bobadilla* the court concluded that Bobadilla qualified as an exempt computer employee, and

granted defendant's motion for summary judgment.  *See Bobadilla*, 2005 WL 2044938, at *9.

Similarly, in *Clarke* the court found that one plaintiff also qualified as an exempt computer

employee, and granted defendant's motion for summary judgment as to that plaintiff.  *Clarke*,

2010 WL 1379778, at *22, *25.

---

administrative and professional employees — are *exemptions*, not definitions, and they are
therefore construed narrowly.  *See id.*

Defendants argue that Plaintiff can be directly analogized to the plaintiffs in *Bobadilla* and *Clarke*. However, unlike the plaintiffs that were found exempt in *Bobadilla* and *Clarke*, the nature and complexity of Plaintiff's responsibilities in this case is heavily disputed. Plaintiff characterizes his work as more akin to that of desktop support, and describes it as controlled and dictated by Lee. (Sethi Decl. ¶¶ 12, 15, 3.) Although technical credentials and certifications are relevant to an assessment of an employee's qualification for the exemption and Plaintiff had many, it is not clear that Plaintiff's certifications were necessary to obtain the job or utilized in Plaintiff's work at CWW. (*See, e.g.*, Sethi Decl. ¶ 57.)

Defendants argue that Plaintiff is attempting to create issues of fact to preclude summary judgment by making allegations in his declaration regarding his responsibilities that contradict his deposition testimony. (Def. Reply 6.) "It is well settled in this circuit that a party's affidavit which contradicts [his] own prior deposition testimony should be disregarded on a motion for summary judgment." *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at *9 (E.D.N.Y. Mar. 28, 2013) (quoting *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995) (alteration in original) (internal quotation marks omitted)); *see also Ciullo v. Yellow Book, USA, Inc.,* No. 10-CV-4484, 2012 WL 2676080, at *1 n.1 (E.D.N.Y. July 6, 2012) ("It is of course axiomatic that a party cannot defeat summary judgment by submitting an affidavit that contradicts prior sworn deposition testimony." (internal quotation marks omitted)); *Ciliberti v. Int'l Bhd. of Elec. Workers Local 3*, No. 08-CV-4262, 2012 WL 2861003, at *11 (E.D.N.Y. July 10, 2012) ("A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." (alteration and citation omitted)). However, an affidavit is only to be disregarded if it is actually inconsistent. *See Ellis v. Century 21 Dep't Stores*, No. 11-CV-2440,

Slip Op. at p. 58 n.29 (Sept. 28, 2013) (declining to disregard testimony not actually inconsistent but rather explaining and clarifying earlier testimony); *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at *9 n.5 (E.D.N.Y. Aug. 14, 2013) (declining to disregard testimony not actually inconsistent); *Helena Associates, LLC v. EFCO Corp.*, No. 06-CV-0861, 2008 WL 2117621, at *8 (S.D.N.Y. May 14, 2008) ("the principle does not apply if the deposition and the later sworn statement are not actually contradictory" (quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000))).

Defendants contrast Plaintiff's statement in his declaration that "[n]inety percent (90%) of my time was spent on in house Desk Top support," and 5% on "server" issues, (Sethi Decl.¶ 12), with Plaintiff's deposition testimony that he spent most of his time on network, connectivity and server issues. (Def. Reply 6; *see also* Sethi Dep. 69:7–70:24.) A careful review of Plaintiff's statements suggests no contradiction. Plaintiff's declaration states that he considered his "in house Desk Top support" work (making up some 90% of his time) to include resolving "[e]mail connectivity issues," "[c]orrecting internal network connectivity issues," "connectivity to servers," "printer connectivity issues," and "user access issues," (Sethi Decl. ¶ 12), all of which could also fall within the categories of "network," "connectivity," and "server" issues that Defendants argue Plaintiff admitted at his deposition are most of his work, (Def. Reply 6).

Moreover, while Defendants seek to elevate Plaintiff's responsibilities for purposes of their argument that Plaintiff is exempt from the FLSA, Defendants argue that Plaintiff did not have the requisite skillset to be a high-level network manager in support of their argument that CWW's actions taken with regard to Plaintiff were justified because Plaintiff was not adequately performing his job nor qualified for the CTO position. Defendants contend that when newly

hired, CTO Mott assessed Plaintiff's abilities days before Plaintiff was suspended and concluded that "Plaintiff was fine for relatively simple IT tasks, but simply lacked the skill set to manage CWW's computer operations," (Def. Mem. of Law 9), "Plaintiff's skills set [sic] 'is above a typical desktop technician but well below that of a competent network administrator,'" (Def. 56.1 ¶ 58), and "Plaintiff . . . had no knowledge regarding CWW's database and web servers, and could not provide me such basic information as the number of hard drives, processors, memory, or configuration for redundancy in case of failure.  All that Plaintiff appeared to know was that the backup drives (or 'tapes') in the servers needed to be removed every night and replaced." (Mott Decl. ¶ 8.)  While Defendants argue that these statements address how *well* Plaintiff performed his job duties, rather than what his job duties were, Defendants' allegation that Plaintiff had "no knowledge regarding CWW's database and web servers" by the end of his tenure at CWW, (*id.*), is inconsistent with Defendants' argument that Plaintiff "spent most of his time working on exempt duties involving the server, backups, or other critical computer systems," (Def. July 22, 2013 Ltr. at 3).

Because there are disputed issues regarding how Plaintiff spent his working hours, the Court cannot decide whether Plaintiff falls within this exemption.  This is an issue of fact to be decided by a jury.  *See Ramos*, 687 F.3d at 558 (stating that the "question of how [Plaintiff] spent [his] working time . . . is a question of fact.").

### ii.    Administrative or Professional Employee Exemption

The FLSA also exempts from the overtime requirements "any employee employed in a bona fide . . . administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  The regulations implementing the FLSA provide that an employee falls under the administrative employee exemption when (1) the employee is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; (2) the employee's "primary duty is the performance of office or non-

29

manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(1)–(3).  To qualify for the professional employee exemption, an employee must meet the same salary-based requirement as for the administrative employee exemption.  *See* 29 C.F.R. § 541.300(a)(1).  In addition, to be exempt as a professional employee the regulations require that the employee's "primary duty is the performance of work: (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor."  29 C.F.R. § 541.300(a)(2).

The first requirement for both the administrative and professional employee exemptions is a salary requirement.  *See* 29 C.F.R. §§ 541.200(a)(1), 541.300(a)(1).  It is undisputed that Plaintiff was paid on a salary basis, and at all times was paid in excess of $455 per week. Plaintiff therefore meets the first test for both the administrative and professional employee exemptions.

### 1.  Administrative Employee

To fall under the administrative employee exemption, Plaintiff's primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and Plaintiff must exercise "discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2)–(3); *see also In re Novartis Wage & Hour Litig.*, 611 F.3d 141, 155 (2d Cir. 2010), *abrogated on other grounds by Christopher*, 567 U.S. ---, 132 S. Ct. 2156; *Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., Inc.*, No. 11-CV-8670, 2013 WL 1285295, at *13 (S.D.N.Y. Mar. 29, 2013).  Defendants argue that Plaintiff is exempt from the FLSA as an

administrative employee because "Plaintiff's primary duty involved office or non-manual work directly related to the management or general business operations of the employer of the employer's customers and include[d] the exercise of discretion and independent judgment with respect to matters of significance." (Def. Mem. 16 (citation and internal quotation marks omitted).) According to Plaintiff, Erica Lee closely controlled his work activities and parceled out his assignments. (Sethi Decl. ¶ 15.) Plaintiff alleges that "[a]t no time did [he] have discretion as to [his] assignments or when and how to complete them." (*Id.* ¶ 3.) Plaintiff has presented sufficient evidence to raise a genuine issue of disputed fact as to whether he falls within the administrative employee exemption.

### 2. Professional Employee

Defendants also argue that Plaintiff is exempt from the FLSA as a professional employee because his primary duty involved "work requiring advanced knowledge in a field of science or learning customarily acquired by a paralegal [sic] course of specialized intellectual instruction." (Def. Mem. 15–16.) A professional employee is defined as an employee whose primary duty is the performance of work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(i); *see also Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009); *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 43 (S.D.N.Y. 2012). This phrase "restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d); *see also Young*, 586 F.3d at 205; *Pippins*, 921 F. Supp. 2d at 44. "If a job does *not* require knowledge customarily acquired by an advanced educational degree . . . then, regardless of the duties performed, the employee is not an exempt professional under the FLSA." *Young*, 586 F.3d at 206. Moreover, "[t]he learned professional exemption also does not apply to occupations in which most employees have

acquired their skill by experience rather than by advanced specialized intellectual instruction." 29 C.F.R. § 541.301(d).

Plaintiff has a bachelor's degree in business administration, with a major in finance and a minor in business management.  (Sethi Decl. Ex. 3.)  Plaintiff also has certain computer-related certifications, which were obtained in 1999–2000.  (Sethi Decl. ¶ 57.)  Plaintiff asserts that they are now obsolete and not relevant to his job.  (*Id.*)  There is no evidence that the certifications obtained by Plaintiff were as a result of "prolonged course[s] of specialized intellectual instruction," 29 C.F.R. § 541.300(a)(2)(i), or that they otherwise qualify as the type of advanced and prolonged educational degree contemplated by the FLSA.  In addition, the job description of Plaintiff's position, when posted in 2008, required the applicant to have a "[d]egree in Computer Science, Information Technology/Systems, or *possess equivalent experience*."  (Lee Decl. Ex. E (emphasis added).)  Plaintiff's job did not require knowledge customarily acquired by an advanced educational degree, thus, regardless of the duties performed by Plaintiff, he is not an exempt professional under the FLSA.  *See Young*, 586 F.3d at 206 (holding that "an employee is not an exempt professional unless his work requires knowledge that is customarily acquired after a prolonged course of specialized, intellectual instruction and study" and "[i]f a job does *not* require knowledge customarily acquired by an advanced educational degree . . . then, regardless of the duties performed, the employee is not an exempt professional under the FLSA").

In sum, the Court finds that Plaintiff is not exempt from the FLSA as a professional employee and dismisses Defendants' claim as to this exemption.  The Court finds that there are disputed issues of material fact as to whether Plaintiff is exempt from the FLSA as a computer employee or administrative employee.  Plaintiff's and Defendants' motions for summary judgment on the FLSA claim are therefore denied.

### c.   NYLL Claim

The NYLL provides wage and overtime protections for employees similar to the protections afforded to employees by the FLSA.  *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010) ("The NYLL, too, mandates overtime pay and applies the same exemptions as the FLSA.")  Employers are required to pay employees overtime at a rate of one and one-half times their regular rate for time worked in excess of forty hours during any work week, unless they are exempt.  12 N.Y.C.R.R. § 142–2.2.  The NYLL also provides exemptions for some employees similar to the FLSA.  *See id.* ("[A]n employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act . . . overtime at a wage rate of one and one-half times the basic minimum hourly rate . . . ."); *see also id.* §§ 142–2.14(c)(4)(ii) (defining administrative employee), 142–2.14(c)(4)(iii) (defining professional employee).  The parties have cross-moved for summary judgment as to Plaintiff's NYLL claim.  As discussed below, as with Plaintiff's FLSA claim, there are disputed issues of material fact as to whether Plaintiff is exempt under the NYLL as a computer employee or administrative employee.

### i.   Computer Employee Exemption

The NYLL borrows the computer employee exemption, 29 U.S.C. § 213(a)(17), directly from the FLSA.  *See* 12 N.Y.C.R.R. § 142–2.2 (borrowing 29 U.S.C. § 213).  Because as discussed above there are material issues of fact as to the nature of Plaintiff's work that preclude this Court from making a determination as to whether Plaintiff falls under this exemption of the FLSA, they also preclude a determination as to whether Plaintiff falls under this exemption of the NYLL.  *See Clarke*, 2010 WL 1379778, at *15 n.7 (stating that plaintiff's NYLL claim was also subject to the FLSA exemptions, that there is general support for giving them consistent interpretations, and applying a unified analysis for the computer employee exemption under both the FLSA and the NYLL); *see also Ramos*, 687 F.3d at 556 n.1 ("Like the FLSA, the NYLL

33

mandates overtime pay and applies the same exemptions as the FLSA.  We therefore discuss

only the FLSA, and do not engage in a separate analysis of plaintiffs' NYLL claims, which fail

for the same reasons as their FLSA claims." (citation and internal quotation marks omitted)).

### ii.   Administrative or Professional Employee Exemption

Under the NYLL, the administrative employee and professional employee exemptions

are substantially similar to the exemptions under the FLSA.  *See* 12 N.Y.C.R.R. § 142-

2.14(c)(4)(ii), (iii).

### 1.   Administrative Employee

Work in a bona fide administrative capacity means work by an individual:

> (a) whose primary duty consists of the performance of office or
> nonmanual field work directly related to management policies or
> general operations of such individual's employer;
> (b) who customarily and regularly exercises discretion and
> independent judgment;
> (c) who regularly and directly assists an employer, or an employee
> employed in a bona fide executive or administrative capacity (e.g.,
> employment as an administrative assistant); or who performs,
> under only general supervision, work along specialized or
> technical lines requiring special training, experience or knowledge;
> and
> (d) who is paid for his services a salary of not less than . . . $543.75
> per week . . . inclusive of board, lodging, other allowances and
> facilities.

12 N.Y.C.R.R. § 142-2.14(c)(4)(ii); *see also Reiseck*, 591 F.3d at 105–108 (conducting one

combined analysis of the administrative employee exemption under both the FLSA and the

NYLL because the NYLL "applies the same exemptions as the FLSA"); *Scarpinato v. E.*

*Hampton Point Mgmt. Corp.*, No. 12-CV-3681, 2013 WL 5202656, at *3 (E.D.N.Y. Sept. 13,

2013) (finding that where plaintiff's FLSA overtime claim failed because she qualified as an

administrative employee under the FLSA, "[b]ecause N.Y.L.L. applies the same exemptions as

the FLSA to overtime pay . . . her N.Y.L.L. claim could not prevail").

Similar to the FLSA, in order to fall under the NYLL administrative exemption, a plaintiff must "customarily and regularly exercise[] discretion and independent judgment."  12 N.Y.C.R.R. § 142–2.14(c)(4)(ii).  As discussed above, there are disputed issues of fact as to whether Plaintiff exercised discretion and independent judgment sufficient to bring him within this exemption.

### 2.  Professional Employee

Work in a bona fide professional capacity means work by an individual:

> (a) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes; or original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination or talent of the employee; and
> (b) whose work requires the consistent exercise of discretion and judgment in its performance; or
> (c) whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

12 N.Y.C.R.R. § 142-2.14(c)(4)(iii).

The language of the NYLL's duty requirement for professional employees is nearly identical to that of the FLSA, requiring that an exempt individual's primary duty consist of work "requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study."  12 N.Y.C.R.R. § 142–2.14(c)(4)(iii).  However, unlike the FLSA, the NYLL's professional employee exemption does not include a salary requirement.  *See Bachayeva v. Americare Certified Special Servs., Inc.*, 12-

CV-1466, 2013 WL 1171741, at *5 (E.D.N.Y. Mar. 20, 2013) ("New York law differs from federal law . . . in that to establish the [professional employee] exception, the employer need not satisfy a 'salary' test, only a duties test. (alteration in original) (citation omitted)); *Davis v. Lenox Hill Hosp.*, No. 03-CV-3746, 2004 WL 1926087, at *5 (S.D.N.Y. Aug. 31, 2004) (finding that the NYLL includes similar exception for professional employees but "[u]nlike the FLSA . . . employers claiming a professional exemption under the NYLL need not satisfy a 'salary' test, *only a duties test*." (citation and internal quotation marks omitted)).

As discussed above, Plaintiff's job did not require knowledge customarily acquired over a prolonged course of specialized intellectual instruction and study, thus Plaintiff is not an exempt professional under the NYLL.

The Court finds that Plaintiff is not exempt from the NYLL as a professional employee and dismisses Defendants' claim as to this exemption. The Court finds that there are disputed issues of material fact as to whether Plaintiff is exempt from the NYLL as a computer employee or administrative employee. Plaintiff's and Defendants' motions for summary judgment on the NYLL claim are therefore denied.

### d.  Individual Defendants — FLSA and NYLL Claims

Defendants also move to dismiss Plaintiff's FLSA and NYLL claims as to individual Defendants Lee and Morrissey on the basis that they were not Plaintiff's employer.[10]

### i.  FLSA

The FLSA creates liability for any "employer" who violates its terms. *See, e.g.*, 29 U.S.C. § 207(a)(1). Under the FLSA, an "employer" is defined broadly to include "any person

---

[10]  Defendants did not separately move to dismiss Narod on this basis. At oral argument the Court dismissed Plaintiff's claims as to Mitchel Robbins, Brian Wasserman, Richard Someck, Donald Trump, Jr., Neil Schorr, Stanley Pitkiewicz and Israel Dorinbaum.

acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C.

§ 203(d).  The FLSA's definition of "employer" may apply to "an individual, partnership,

association, corporation, business trust, legal representative, or any organized group of persons,"

29 U.S.C. §§ 203(a), (d), and the Department of Labor regulations state that an individual may

be employed by more than one employer.  29 C.F.R. § 791.2(a).  "Because the statute defines

employer in such broad terms, it offers little guidance on whether a given individual is or is not

an employer."  *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999).  "In answering that

question, the overarching concern is whether the alleged employer possessed the power to

control the workers in question, with an eye to the 'economic reality' presented by the facts of

each case."  *Id.* (internal citations omitted).

   "The determination of whether an employer-employee relationship exists for purposes of

the FLSA should be grounded in economic reality rather than technical concepts," and depends

"upon the circumstances of the whole activity."  *Irizarry v. Castimatidis*, 722 F.3d 99, 104 (2d

Cir. 2013) (citation and internal quotations omitted).  "[E]mployment for FLSA purposes" is "a

flexible concept to be determined on a case-by-case basis by review of the totality of the

circumstances."  *Id.* (citation and internal quotations omitted).  The Second Circuit has identified

factors to consider in determining "whether a defendant is an 'employer.'"  *Irizarry*, 722 F.3d at

104.  In *Carter v. Dutchess Community Coll.*, 735 F.2d 8 (2d Cir. 1984), the Second Circuit

"established four factors to determine the 'economic reality' of an employment relationship:

'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised

and controlled employee work schedules or conditions of employment, (3) determined the rate

and method of payment, and (4) maintained employment records.'"  *Irizarry*, 722 F.3d at 104

(quoting *Carter*, 735 F.2d at 12).[11]  These factors do not, however, "comprise a rigid rule for the identification of an FLSA employer," but rather "provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."  *Id.* at 105 (citations and internal quotation marks omitted).

When assessing "whether an individual within a company that undisputedly employs a worker is personally liable for damages as that worker's 'employer'" the Second Circuit applies the *Carter* factors, looks to the totality of the circumstances, and also considers the putative employer's level of "operational control."[12]  *Id.* at 105–17.  With regard to operational control, the Second Circuit held that "to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment," and "[i]t is appropriate . . . to require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation — even if this appears to establish a higher threshold for individual liability than for corporate 'employer' status."  *Id.* at 109.  "Evidence indicating an individual's

---

[11]  The Second Circuit has noted that the court has "identified different sets of relevant factors based on the factual challenges posed by particular cases" and that the *Carter v. Dutchess Community Coll.*, 735 F.2d 8 (2d Cir. 1984), factors are "relevant to the question of whether a defendant is an 'employer,'" while separate factors, set forth in *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988), are "used to distinguish between independent contractors and employees" and "to assess whether an entity that lacked formal control nevertheless exercised functional control over a worker."  *Irizarry v. Castimatidis*, 722 F.3d 99, 104–105 (2d Cir. 2013) (citations and internal quotations omitted).  In this case, the relevant question is whether the individual Defendants are "employers," thus the *Carter* factors are the appropriate factors.

[12]  The Second Circuit also considered the relevance of a putative employer's level of "potential power," or unexercised authority, but because the putative employer *had* exercised control, did not reach the question of whether "unexercised authority is insufficient to establish FLSA liability."  *Irizarry*, 722 F.3d at 111.

direct control over the plaintiff employees" is not the "only evidence . . . to be considered"; "[i]nstead, evidence showing an individual's authority over management, supervision, and oversight of a company's affairs in general is relevant to the totality of the circumstances in determining the individual's operational control of the company's employment of the plaintiff employees." *Id.* at 110 (alterations, citations and internal quotation marks omitted).  "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.*

    The question of whether an individual is an employer under the FLSA is a mixed question of law and fact; "the existence and degree of each relevant factor lend[s] itself to factual determinations.  Therefore, individual employer liability is rarely suitable for summary judgment." *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012) (citations omitted); *see also Franco v. Ideal Mortg. Bankers Ltd.*, No. 07-CV-3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011) (same); *but see Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *61 (E.D.N.Y. Sept. 7, 2013) (granting summary judgment in favor of attorney defendants where, even accepting the plaintiff's factual allegations as true, the plaintiff failed to demonstrate that the economic realities of the plaintiff's work for the attorney defendants established an employer-employee relationship); *Bravo v. Eastpoint Int'l, Inc .*, No. 99-CV-9474, 2001 WL 314622, at *2 (S.D.N.Y. Mar. 30, 2001) (dismissing claim against fashion designer Donna Karan as employer under the FLSA because plaintiffs only alleged her status as the owner and chairperson of the employer company and failed to allege any facts establishing her power to control the plaintiff workers or otherwise meet the economic realities test).

### 1. Lee

Plaintiff reported to CWW's Chief Operating Officer Lee while employed at CWW. (Def. 56.1 ¶ 25; Sethi Decl. ¶ 15.)  Though Lee claims that she only recommended to Narod that CWW hire Plaintiff, according to Narod, Lee made the decision to hire Plaintiff.  (Lee Decl. ¶ 17; Narod Dep. 38:5–21.)  Lee, in consultation with Morrissey, prepared a list of duties and responsibilities for the position.  (Pl. Cross 56.1 ¶ 38; Def. Resp. 56.1 ¶ 38.)  For some period of time during Plaintiff's employment, Plaintiff was required to check in with Lee to obtain her permission before departing work.  (Lee Dep. 103:12–104:18; Pl. 56.1 ¶ 54.)  Lee generally provided Plaintiff with his assignments.  (Lee Dep. 166:15–20; Pl. 56.1 ¶ 48.)  Lee was also responsible for the day-to-day operations of CWW.  (Pl. Cross 56.1 ¶ 33; Def. Resp. 56.1 ¶ 33.)  Narod claims that Lee had the authority to send a termination severance agreement without first discussing it with him, (Narod Dep. 52:12–53:2; Pl. 56.1 ¶ 94), but Lee claims that she did not have the power to hire or fire Plaintiff, only the power to make recommendations in this regard, (Def. Resp. 56.1 ¶ 109).

Applying these facts to the *Carter* factors, there are disputed issues that prevent the Court from deciding whether Lee is an employer.  As to the first *Carter* factor, the facts are disputed as to whether Lee had the power to hire or fire Plaintiff.  Narod's testimony suggests that Lee did have the power to hire and fire Plaintiff, while Lee testified that her control was more limited. As to the second *Carter* factor, based on the evidence in the record, a reasonable jury could find that Lee supervised and controlled Plaintiff's "work schedule[] or conditions of employment." *Irizarry*, 722 F.3d at 105 (quoting *Carter*, 735 F.2d at 12).  Though it appears from the record that Lee did not "determine[] the rate and method of payment" or "maintain[] employment records" as required by the third and fourth *Carter* factors, Lee did handle all operations of the company on a day-to-day basis.  (Narod Dep. 41:21–42:3.)  Based on the foregoing, the Court

cannot determine as a matter of law whether Lee was an "employer" under the FLSA. Defendants' and Plaintiff's motions for summary judgment as to Lee are therefore denied.

### 2.  Morrissey

As Vice President of Human Resources, Morrissey's responsibilities include hiring, firing, payroll, and recordkeeping.  (*See* Morrissey Dep. 10:20–11:9.)  Morrissey specifically processed payroll and certain documents to implement Plaintiff's termination.  (Morrissey Decl. ¶ 31.)  According to Morrissey, Narod had to approve her decisions to hire, fire, or modify salary, hours or terms of employment.  (Morrissey Decl. ¶ 29.)  According to Narod, the decision as to Plaintiff's starting salary was made by him and Morrissey together, while according to Lee, the decision was made by Narod on Lee's recommendation.  (Narod Dep. 40:23–41:3;  Lee Decl. ¶ 18.)  Morrissey, in consultation with Lee, prepared a list of duties and responsibilities for Plaintiff's position.  (Pl. Cross 56.1 ¶ 38; Def. Resp. 56.1 ¶ 38.)  According to Narod, Plaintiff reported to both Lee and Morrissey.  (*Id.* at 42:20–43:2.)

Applying the *Carter* factors, it is undisputed that Morrissey was responsible for maintaining employment records, however, "the existence and degree" of Morrissey's power to hire and fire, her level of supervision and control, and her ability to determine the rate and method of payment cannot be determined based on the record before the Court.  *See Berrios*, 849 F. Supp. 2d at 393 (finding that "the existence and degree of each relevant factor lend[s] itself to factual determinations," rendering "individual employer liability . . . rarely suitable for summary judgment").  The Court cannot determine as a matter of law whether Morrissey was an employer under the FLSA.  Defendants' and Plaintiff's motions for summary judgment as to Morrissey are therefore denied.

ii.   **NYLL**

The NYLL defines "employer" to include "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer." N.Y. Lab. Law. §§ 190(3), 651(6); *see also Irizarry*, 722 F.3d at 117 (quoting N.Y. Lab. Law. §§ 190(3), 651(6)).  In *Irizarry*, the Second Circuit noted that the question of whether "the tests for 'employer' status are the same under the FLSA and the NYLL . . . has not been answered by the New York Court of Appeals," and did not decide this issue.  *Irizarry*, 722 F.3d at 117. District courts in this Circuit "have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA."  *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) (quoting *Jiao v. Shi Ya Chen*, No. 03-CV-0165, 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007) (interpreting the definition of "employer" under the New York Labor Law coextensively with the definition used by the FLSA because there is "general support for giving FLSA and the New York Labor Law consistent interpretations" (citation and internal quotation marks omitted)); *see also Hart v. Rick's Cabaret Int'l, Inc.*, No. 09-CV-3043, 2013 WL 4822199, at *31 (S.D.N.Y. Sept. 10, 2013) (noting that "[c]ourts in this District have regularly applied the same tests to determine, under the FLSA and the NYLL, whether entities were joint employers" because "[t]he statutory standard for employer status under the NYLL is nearly identical to that of the FLSA" and that while "the New York Court of Appeals has not yet resolved whether the NYLL's standard for employer status is coextensive with the FLSA's," "there is no case law to the contrary" (citations omitted)); *Cruz v. Rose Associates, LLC*, No. 13-CV-0112, 2013 WL 1387018, at *2 (S.D.N.Y. Apr. 5, 2013) (noting that the definitions of "employer" under the NYLL and the FLSA are coextensive (citing *Spicer*, 269 F.R.D. at 335 n.13)); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005) ("Courts hold that the New York Labor Law embodies the same standards for joint

42

employment as the FLSA." (citation omitted)); *Topo v. Dhir*, No. 01-CV-10881, 2004 WL

527051, at *3 (S.D.N.Y. Mar. 16, 2004) (noting that there is "general support for giving FLSA

and the New York Labor Law consistent interpretations"); *Ansoumana v. Gristede's Operating

Corp.*, 255 F. Supp. 2d 184, 189 (Jan. 28, 2003) ("[B]ecause New York Labor Law and the

FLSA embody similar standards . . . I will consider the federal law in deciding whether

defendants were joint employers."); *Lopez v. Silverman*, 14 F. Supp. 2d 405, 411 n.4 (S.D.N.Y.

1998) (considering federal law only as to question of joint employment under federal and New

York law)).

　　　　As set forth above with regard to the FLSA claims, issues of fact preclude the Court from

determining as a matter of law whether Lee and Morrissey are employers.  Defendants' and

Plaintiff's motions for summary judgment as to Plaintiff's NYLL claims against Lee and

Morrissey are therefore denied.

### e.　Race and National Origin Discrimination

　　　　Title VII prohibits an employer from discharging or discriminating "against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–

2(a)(1).  Thus, "[a]n employment decision . . . violates Title VII when it is 'based in whole or in

part on discrimination.'"  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting

*Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

　　　　Title VII claims are assessed using the burden-shifting framework established by

*McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See e.g.*, *St. Mary's Honor Ctr.

v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253–

55 (1981); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (race claims are subject

to burden shifting); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (national

origin claims are subject to burden shifting).  Under the framework, a plaintiff must first

establish a prima facie case of discrimination.  *Hicks*, 509 U.S. at 506; *see also Ruiz*, 609 F.3d at

491–92.  A plaintiff's burden at this stage is "minimal."  *Holcomb*, 521 F.3d at 139 (quoting

*Hicks*, 509 U.S. at 506).  If the plaintiff satisfies this initial burden, the burden then shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Hicks*, 509 U.S. at

506–07; *Ruiz*, 609 F.3d at 492.  Defendant's burden "is not a particularly steep hurdle."  *Hyek v.

Field Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010).  It "is one of production, not

persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.,

Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509)).  If the defendant offers a

legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied,

however, if plaintiff can show that "the evidence in plaintiff's favor, when viewed in the light

most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [his] dismissal

was motivated at least in part by [race or national origin] discrimination."  *Adamczyk v. N.Y.

Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (alterations in original) (quoting

*Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)).[13]

Having reviewed the arguments of the parties on the cross-motions for summary

judgment and the evidence in the record, the Court finds that additional clarification is necessary

in order to evaluate Plaintiff's race and national origin discrimination claims.

---

[13]  The burden of proof and production for employment discrimination claims under Title
VII and the NYSHRL are identical.  *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d
Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of
an employment discrimination claim made pursuant to the NYSHRL is the same as it is
under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363
n.1 (2d Cir. 1999))).  Therefore, Plaintiff's Title VII and NYSHRL discrimination claims are
analyzed together for purposes of this motion.

Plaintiff argues that he is entitled to summary judgment on his race and national origin discrimination claims because "[t]here is absolutely no other verifiable logical explanation" for Defendants' treatment of him.  (Pl. Cross-Mot. 6.)  Defendants argue that they are entitled to summary judgment on Plaintiff's discrimination claims because Plaintiff did not sustain an adverse employment action and CWW had legitimate, nondiscriminatory reasons for the actions Plaintiff complains of.  (Def. Reply 1.)

Plaintiff argues that Defendants' failure to promote him to the position of CTO in early 2010 was an adverse employment action.  (Oral Arg. Tr. 46:18–48:20.)  However, it is unclear whether Plaintiff applied for the CTO position.  Plaintiff also claims that he was unfairly treated as compared to other similarly situated employees because of his national origin.  (*See generally* Pl. Cross-Mot. Reply.)  The Court is unable to determine from the evidence in the record whether the employees Plaintiff compares himself to are, in fact, similarly situated to Plaintiff, including whether they were outside his protected group, were subject to the same performance evaluation and discipline standards, and whether they engaged in comparable conduct.

In support of his arguments that CWW discriminated against him, Plaintiff attempts to rely, in part, on documents that were among those struck by the Court at the conference on August 15, 2013.  For example, Defendants argue that Plaintiff never applied for the CTO position and therefore he cannot demonstrate that he was discriminated against.  However, Plaintiff argues that he did apply for the position and cites to an email that is not in the record to show that he communicated to CWW that he was open to being interviewed for the position. Plaintiff also argues that he was denied overtime while other similarly situated employees were not.  Plaintiff again cites to evidence that includes documents not in the record to show that all other managers and directors at CWW who worked overtime were paid overtime compensation.

In view of Plaintiff's *pro se* status and to ensure that the Court is properly reviewing all the relevant evidence that was disclosed during discovery, the Court will allow Plaintiff to serve on Defendants and file with the Court a list identifying the documents that he relies on to support his discrimination claims with the supporting documents. Plaintiff can only submit documents that were exchanged by the parties during discovery in this proceeding. Plaintiff may not rely upon documents produced in other actions, including his state court actions, unless those documents were also produced in discovery in the action before this Court. Plaintiff shall specifically serve on Defendants and submit to the Court the following: (1) a list identifying each individual document, including any individual email, upon which Plaintiff relies to support his discrimination claims, and (2) for each individual document, including each individual email, a brief sentence describing how the document is relevant to his discrimination claims. Plaintiff must also serve on Defendants and submit to the Court only those documents identified in the list. The Court will not accept any documents from Plaintiff in support of any other claims. Plaintiff shall serve and file the instructed list and accompanying documents on or before October 14, 2013. Defendants shall file any objections to those documents on or before October 28, 2013.

**IV. Conclusion**

For the foregoing reasons, the Court denies Defendants' and Plaintiff's motions for summary judgment as to the FLSA and the NYLL claims. The Court defers ruling on Defendants' and Plaintiff's motions for summary judgment as to the Title VII and the NYSHRL

claims and directs Plaintiff to submit additional documentation as specifically set forth above on or before October 14, 2013.  Defendants shall file any objections to those documents on or before October 28, 2013.

                                 SO ORDERED:


                                 _____s/ MKB_____
                                 MARGO K. BRODIE
                                 United States District Judge


Dated: September 30, 2013
         Brooklyn, New York