UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

HARSHARAN SETHI,

                        Plaintiff,

       v.

RANDY NAROD, ERICA LEE, DEBORAH
MORRISSEY and CAMBRIDGE WHO'S WHO
PUBLISHING, INC.,

                        Defendants.

**MEMORANDUM & ORDER**
11-CV-2511 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Harsharan Sethi brought the above-captioned action against Defendants Randy

Narod, Erica Lee, Deborah Morrissey, Mitchel Robbins, Brian Wasserman, Stanley Pitkiewicz,

Richard Someck, Israel Dorinbaum, Neil Schorr, Donald Trump, Jr., and Cambridge Who's Who

Publishing, Inc. ("CWW") alleging race and national origin discrimination under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State

Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"). Plaintiff also brought claims

against all Defendants under the Fair Labor Standards Act ("FLSA") and the New York State

Labor Law ("NYLL"), alleging failure to pay overtime compensation and violation of record-

keeping requirements. Defendants moved for summary judgment on all claims. At oral

argument on May 9, 2013, the Court granted Defendants' motion for summary judgment as to

Plaintiff's FLSA claim against individual Defendants Mitchel Robbins, Brian Wasserman,

Stanley Pitkiewicz, Richard Someck, Israel Dorinbaum, Neil Schorr, and Donald Trump, Jr., and

Plaintiff's claims for violation of the record-keeping provisions of the FLSA and the NYLL.

After oral argument Plaintiff cross-moved for summary judgment on his remaining claims. By

Memorandum and Order dated September 30, 2013 ("Sept. 30, 2013 Decision"), the Court denied Defendants' and Plaintiff's motions for summary judgment as to Plaintiff's FLSA and the NYLL claims for failure to pay overtime compensation. The Court deferred ruling on the parties' motions for summary judgment as to Plaintiff's Title VII and NYSHRL claims, pending the submission of additional documentation as set forth in the Sept. 30, 2013 Decision. The Court has reviewed the additional submissions of the parties. For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment as to his Title VII and NYSHRL claim and grants Defendants' motion for summary judgment as to Plaintiff's Title VII and NYSHRL claim.

## I. Background

The Court assumes familiarity with the facts of this proceeding which are set forth in detail in the Court's Sept. 30, 2013 Decision. The Court provides a summary of the facts necessary to explain its decision.

### a. CWW and the individual Defendants

CWW is a private company that "assists its members with strategies for enhancing their professional profiles." (Def. Mem. 3.) Randy Narod is the President of CWW and owns 85 percent of CWW. (Narod Dep. 5:22–6:2, 8:12–2; Pl. 56.1 ¶¶ 65–66.) Defendant Erica Lee is the Chief Operating Officer and Chief of Operations and Logistics for CWW. (Lee Decl. ¶ 1; Pl. 56.1 ¶ 32.) Deborah Morrissey is the Vice President of Human Resources for CWW. (Morrissey Dep. 5:19–24; Pl. 56.1 ¶ 1.) Plaintiff was interviewed for his position at CWW by both Narod and Lee. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 115; Sethi Dep. 39:25–40:2.) According to Narod, Lee made the decision to hire Plaintiff and Lee had the authority to send a termination severance agreement to Plaintiff without discussing it with Narod in advance. (Narod Dep.

38:5–21, 52:12–53:2; Pl. 56.1 ¶ 94.)  According to Lee, she made the recommendation to hire Plaintiff to Narod, and Narod accepted the recommendation and approved the decision to hire Plaintiff.  (Lee Decl. ¶ 17.)

### b.  Plaintiff's educational background and work at CWW

Plaintiff was born and educated in India.  (Sethi Dep. 9:21–10:19.)  He obtained a bachelor's degree in business administration, with a major in finance and a minor in business management.  (Sethi Decl. Ex. 3.)  His professional experience prior to CWW included working as a manager of information systems for approximately seven years.  (*Id.*)  Plaintiff worked as the Director of Management Information Systems ("MIS Director") at CWW from July 21, 2008 to May 10, 2010.  (Am. Compl. ¶ 2; Answer ¶ 2.)  Plaintiff reported to Lee.  (Def. 56.1 ¶ 25; Sethi Decl. ¶ 15.)

### c.  May 2009 USA Honors Society email

In approximately May 2009, Plaintiff received an email from the "USA Honors Society" ("Honors Society"), a new company established at CWW.  (Am. Compl. ¶¶ 27–28; Sethi Dep. 82:16–86:4.)  The email indicated that Plaintiff had been selected for membership in the Honors Society for his contributions to the profession.  (Am. Compl. ¶¶ 27–28; Sethi Dep. 82:16–86:4.)  Plaintiff believed that the representations in the email were false, and reported his concerns to Lee.  (Am. Compl. ¶¶ 27–28; Sethi Dep. 82:16–86:4.)  According to Lee, "Plaintiff believed [the Honors Society] was a separate entity [from CWW] and that customers should be advised of this."  Although she explained otherwise, Plaintiff continued to believe that CWW was engaged in "wrongful business offerings."  (Lee Decl. ¶ 36.)

After this incident, Plaintiff claims he experienced changes in his duties and responsibilities, including a unilateral increase in his work hours.  (Sethi Dep. 86:5–90:8.)

Plaintiff claims that he endured long hours of work in retaliation for questioning things such as the Honors Society, when he would receive overtime pay, and why he had to provide technical support to Narod's personal businesses outside of CWW. (Pl. 56.1 ¶¶ 127–30; Sethi Dep. 88:22–89:21.) Plaintiff alleges that as part of the "abus[e]" he subsequently experienced, beginning in September 2009, CWW's executives and managers constantly remarked about Plaintiff's Indian heritage, including calling him "Harshidoodle" or "Harshipoodle" in front of other employees.[1] (Am. Compl. ¶ 31.)

### d. November 2009 confrontation with Narod

On November 10, 2009, Plaintiff attended a meeting with Narod, Lee and Morrissey. (Sethi Decl. ¶ 26; Sethi Dep. 130:19; Lee Decl. ¶ 52.) According to Plaintiff, during this meeting Narod "physical[ly] assault[ed]" him. (Sethi Dep. 124:2; *see also* Pl. 56.1 ¶¶ 133–134; Sethi Dep. 120:2–125:25.) Plaintiff accused CWW of illegality, telling Narod, "This company is illegal. What you are doing here is illegal." (Sethi Dep. 122:4–5.) Narod allegedly responded, "You f--king Indian, what do you think about yourself? I will make sure you are sent back to India. You don't know who you are dealing with. You fear my wrath in your dreams." (Pl. 56.1 ¶ 133; Sethi Dep. 116:21–125:19.) Narod also told Plaintiff, "[I]f this is illegal, you are part of it, so we both will go to jail." (Sethi Dep. 124:20–22.) Plaintiff claims that during this meeting Narod "charged" at him, slapped his face, and "chested" him, hitting Plaintiff with his chest. (*Id.*

---

[1] Plaintiff recalls that he was first called "Harshidoodle" by Narod, (Sethi Dep. 103:22–104:3), but does not recall how many times Narod referred to him as "Harshidoodle," (*id.* at 105:23–106:5). Plaintiff also did not identify any other individual who called him "Harshidoodle." (*Id.* at 106:6–107:16.) Plaintiff stated that he had "no clue" where the nickname came from. (*Id.* at 108:3–5.) Plaintiff believes that Narod intended the word "Harshidoodle" to refer to Plaintiff's Indian heritage because "Narod had very poor look towards Indians in the sense he thought he could hire as many Indians for double the job and half the pay." (*Id.* at 112:21–113:4.)

at 122:19–123:21.)  Defendants admit that a meeting occurred, but deny Plaintiff's allegations concerning what happened at the meeting.  (Def. Cross-Mot. 56.1 ¶¶ 132–34.)

### e. Chief Technology Officer position

In January 2010, CWW created a Chief Technology Officer ("CTO") position.  (Def. 56.1 ¶ 52; Pl. Resp. 56.1 ¶ 52.)  Lee announced via email on January 13, 2010, that CWW was about three days away from hiring a CTO.  (Docket Entry No. 84-1 at 1–2.)  Lee wrote that all of the applicants had over twenty-plus years of experience and had managed technology for large companies.  (*Id.*)  Plaintiff forwarded the announcement to Narod and asked, "[a]ny reason I was not given this opportunity?"  (*Id.*)  In response, Narod asked Plaintiff if he had the experience necessary for the position.  (*Id.*)  Plaintiff responded, "Yes [t]ry [m]e."  (*Id.*)  Narod advised Plaintiff that he would have to go through the interview process, as the applicants had "high level" experience.  (*Id.*)  Plaintiff responded, "If done with an open mind, I am all for it."  (*Id.*)  Narod forwarded Plaintiff's inquiry to Lee.  (Docket Entry No. 80-1 at 2.)

According to Lee, Plaintiff "requested an opportunity to apply for the [CTO] position." (Lee Dep. 57:17–19.)  At that time, CWW was in the "final stage" of selecting a CTO, having posted the position on websites including CareerBuilder and Monster, vetted candidates and given a "soft response" to a candidate indicating that CWW was "leaning . . . that person's way" but was still discussing the position.  (*Id.* at 57:17–58:14.)  CWW was looking for a candidate with a wide range of skill sets.  (*Id.* at 59:5–7.)  After Plaintiff inquired about the CTO position, Lee emailed Plaintiff and told him that the top candidates had extensive programming experience and had taken projects from inception to execution on their own.  (Docket Entry No. 80-1 at 2; Sethi Dep. 167:9–18.)  She wrote that the candidates were willing to write code as well as manage CWW business practices, and that CWW had not approached Plaintiff about the position

because CWW was "looking for candidates that have executed from a business process, software development side and had strong programming backgrounds." (Docket Entry No. 80–1 at 2.) Plaintiff does not recall if he responded to this email. (Sethi Dep. 168:19–168:8.) Defendants claim that Plaintiff never applied for the CTO position. (Lee Decl. ¶ 57.)

CWW hired Gerard Mott for the CTO position. (Def. 56.1 ¶ 56; Pl. Resp. 56.1 ¶ 56.) Mott had served as the CTO at a number of large organizations, including WebMD, and had acted as "lead management" before. (Lee Dep. 60:18–25.) According to Lee, Mott was brought on because of his years of experience in big business and his large corporate CTO experience. (*Id.* at 61:16–23.) Mott also had experience in managing programmers and "taking projects from inception." (*Id.* at 63:17–65:6.) Lee did not believe that Plaintiff could "tak[e] on the position of the CTO at the time" because of his then current position. (*Id.* at 59:5–14.) Plaintiff admitted that he did not have the experience CWW was looking for, but asserts that Mott also lacked the required experience. (*See* Sethi Dep. 167:9–171:7.)

### f. Mott's assessment of Plaintiff

Mott met with Plaintiff after Mott was hired. (Def. 56.1 ¶ 58; Sethi Dep. 171:14–179:3.) Mott assessed Plaintiff's skills and experience and found Plaintiff's skillset to be "above a typical desktop technician but well below that of a competent network administrator." (Def. 56.1 ¶ 58.) According to Mott, Plaintiff had no knowledge regarding CWW's database and web servers, and he could not provide Mott with basic information about "the number of hard drives, processors, memory, or configuration for redundancy in case of failure." (Mott Decl. ¶ 8.) Mott assessed Plaintiff's knowledge as limited to knowing "the backup drives (or 'tapes') in the servers needed to be removed every night and replaced." (*Id.*) When questioned about his policies for "the configuration of the servers" that ran CWW's web services and online portals,

Plaintiff had no knowledge.  (*Id.* ¶ 9.)  Plaintiff disputes that this assessment occurred.  (Pl. Resp. 56.1 ¶ 58.)

### g.  Plaintiff's allegedly hostile behavior

Defendants allege that Plaintiff exhibited hostile behavior during his time at CWW. According to Lee, Plaintiff "demonstrated a hostile attitude" toward other CWW employees, as well as employees of CWW's technology vendor, Proactive.  (Lee Decl. ¶ 34, 40.)  After Plaintiff wrote a January 12, 2010 email to Proactive that Lee found to be "unnecessarily hostile and combative" and Proactive employees "expressed frustration" to Lee regarding "Plaintiff's aggression and his combative attitude toward them," Lee arranged a meeting with Proactive and Plaintiff for January 15, 2010.  (*Id.* ¶ 37–41.)  Lee felt that her "efforts to improve Plaintiffs behavior and cooperation with Proactive were not successful."  (*Id.* ¶ 42.)  On or about February 1, 2010, Proactive employees removed some computer components from Plaintiff's office in order to install them on other employees' computers.  (*Id.*)  When Plaintiff discovered this, he sent Lee an email stating that "[w]hoever opened my office this morning . . . can do so again at their own risk."  (*Id.*)  Lee found the email disturbing and threatening.  (*Id.*)  According to Lee, CWW employees reported other incidents to the human resources department where Plaintiff had belittled or behaved in a hostile manner toward other CWW employees.  (*Id.* ¶ 43.)  Lee claims that by February 2010, Plaintiff's "inexplicable anger, belligerence and hostility towards his CWW colleagues and members of Proactive made it impossible for him to carry out his duties and responsibilities effectively."  (*Id.* ¶ 44.)  Plaintiff disputes these allegations.  He claims that when he wrote that others can open his office "at their own risk," he meant that "whoever opens my office is responsible for anything missing from my office. . . . [W]hoever opens it has the risk of that liability that goes along with entering into somebody's office without a courtesy call,

without any monitoring, without any responsibility." (Sethi Dep. 209:7–18.) Plaintiff claims that Lee is "attempt[ing] to make something out of nothing," and that certain CWW colleagues were "pleased" with Plaintiff's treatment of them. (Sethi Decl. ¶ 21.)

### h. Plaintiff's departure from CWW

Plaintiff did not appear for work on February 10, 2010, due to snow, and on February 11, 2010, he was absent for a half-day. (Def. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59.) According to Defendants, Plaintiff subsequently requested clarification regarding the hours he was expected to be at CWW and how many days he had available for vacation and personal time. (Def. 56.1 ¶ 60.) Lee sent Plaintiff an email stating the hours CWW expected him to be at work. (Lee Decl. ¶ 63.) Lee asked a staff member from the human resources department to address Plaintiff's request about his available vacation and personal days. (*Id.*) According to Lee, Plaintiff questioned Lee's authority to clarify his work hours. (*Id.* ¶ 65.) The correspondence regarding Plaintiff's time prompted a meeting between Plaintiff, Lee, and others on February 12, 2010. (*See* Def. 56.1 ¶ 61–62; Pl. Resp. 56.1 ¶ 61–62.)

The circumstances of the February 12, 2010 meeting and Plaintiff's subsequent departure from CWW are unclear. According to Defendants, the meeting was to discuss Plaintiff's time and attendance. (Lee Decl. Ex. M.) Plaintiff became combative and refused to listen to the policies and procedures, and tried to change the subject of the meeting and discuss other issues. (*Id.*) Plaintiff asked "what happens . . . if he doesn't obey the policies," and "challenge[d] and confront[ed] the authorities at the meeting." (*Id.*) According to Lee, Plaintiff questioned her authority and CWW's policies. (*Id.*) At the meeting, they also discussed Plaintiff's January 12, 2010 email that he sent after Proactive employees entered his office, which Lee construed as a threat to CWW employees and consultants. (Def. 56.1 ¶ 44.) Plaintiff informed Lee that he had

spoken with Narod by telephone and that "Narod had instructed him to leave for the day (with

pay)." (Lee Decl. ¶ 66.) After the meeting, Plaintiff asked CWW employee Michelle Trabucchi

for access to his personnel file. (Lee Decl. Ex. M.) CWW Handbook Policy states that all

employees may see their personnel file once each year and that a request to do so should be

submitted in writing. (*Id.*) Plaintiff was asked to follow the procedure. (*Id.*) Plaintiff "fumed

more harassment and stormed off." (*Id.*) Plaintiff disputes Defendants' characterization of the

meeting and asserts that he "was sent home immediately" on February 12, 2010, after requesting

in writing to see his personnel file. (Sethi Decl. ¶ 30.)

Following the meeting on February 12, 2010, Plaintiff took a leave of absence with pay.

(Def. 56.1 ¶ 65; Pl. Resp. 56.1 ¶ 50.) Narod told Plaintiff by telephone that he would personally

address Plaintiff's concerns on February 16, 2010. (Def. 56.1 ¶ 63; Pl. Resp. 56.1 ¶ 63.) On

February 16, 2010, Narod met with Plaintiff. (Def. 56.1 ¶ 64; Pl. Resp. 56.1 ¶ 64.) Lee attended

a portion of the meeting with Narod and Plaintiff and heard them discuss possible resolutions of

Plaintiff's concerns and complaints. (Lee Decl. ¶ 68.) After the meeting Narod decided not to

terminate Plaintiff. (*Id.* ¶ 69.) Instead, Narod decided to give Plaintiff a leave of absence but did

not change any of the terms of Plaintiff's employment. (*Id.*)

After Plaintiff was suspended he sent several emails to CWW employees accusing CWW

and its employees of wrongdoing, and threatening to take action to injure CWW and its

employees if they did not accede to his demands. (*Id.* ¶ 70.) Plaintiff claims that the emails were

"not designed to hurt CWW but to bring the company's attention to [his] concerns." (Pl. Resp.

56.1 ¶¶ 66–77.) In an email dated February 14, 2010, forwarding a note written by Plaintiff

dated February 12, 2010, Plaintiff stated that he was being forced to resign for "voicing

complaints against fraud and illegal activities" and stated that "this is very serious and might

become very very ugly by Monday/Tuesday [February] 16th." (Lee Decl. Ex. R.) Plaintiff also stated that he "fear[ed] for [his] life," and might "file a criminal complaint." (*Id.*) Plaintiff indicated that he would be sending the letter to various "State and Federal autho[]rities" and asked that CWW "let me know if I am to report to work on Monday 15th or Tuesday Feb. 16[] as usual so that this matter can be discussed and settled amicably for smooth running of the business." (*Id.*)

In an email dated February 19, 2010, Plaintiff levied further accusations at CWW, including that CWW was "buying girls for immoral sexual acts and or prostitution." (Lee Decl. Ex. S.) Plaintiff also claimed that CWW was "transacting drugs," "commit[ting] fraud, harass[ing] employees, enslav[ing] employees," "collectively assault[ing] employees," and engaging in "scare tactics" and other "various illegal activities." (*Id.*) Plaintiff wrote that he "was belittled, insulted, harassed, discriminated, enslaved, threatened and assaulted on the threat of getting fired." (*Id.*) He threatened to go to the media, as well as "have every call and every employee past and present subpoenaed . . . as I have had it with these threats." (*Id.*)

On February 22, 2010, Plaintiff sent another email to Narod and others at CWW suggesting that "we can set aside all our ego's [sic] and circumstances and start all over again to work together towards any common business goals there by [sic] rectifying the situation and the issues in the quickest time possible trying to achieve normalcy with minimum damage." (Lee Decl. Ex. T.) Plaintiff wrote, "[L]et me know what you want to do, I am giving you three days to figure this out calmly and coolly along with your associates. All I want is to go back to my work as before as I do not believe that I have done anything to cause such circumstances." (*Id.*) On March 5, 2010, Plaintiff emailed to Narod, "Its [sic] been a while now and I need to get back to work at Cambridge preferably by Monday March 8th." (Lee Decl. Ex. U.) On March 11,

2010, Plaintiff again wrote to Narod, "I am a patient and peaceful man you know that and I believe I have been patient enough but its [sic] high time I get back to work."  (Lee Decl. Ex. V.)  "Rectifying the wrong and letting me return to work is most probably the only way you can keep the attorney's [sic] out of this mess."  (*Id.*)

Plaintiff wrote to Morrissey, copying Narod and others, on April 30, 2010, requesting an "update . . . on my status of employment."  (Lee Decl. Ex. W.)  He asked if "any investigation [was] conducted by HR on my complaints," and requested that the findings be forwarded to him.  (*Id.*)  He accused Morrissey of "continuing to harrass [sic]" him.  (*Id.*)  Morrissey informed Plaintiff by email that Narod was not in that day but someone would contact him the following week to discuss the matter.  (Lee Decl. Ex. X.)  Plaintiff followed-up with another email on May 3, 2010, with further allegations of illegality, including accusing CWW of manipulating and falsifying his personnel file, and of "discriminatingly" and forcibly increasing Plaintiff's work hours.  (*Id.*)  Plaintiff accused CWW of "fooling around" with his life and wrote, "Please be advised that if my health runs into any complications cardiac or otherwise I will hold each of you individually responsible[ ]and liable."  (*Id.*)

On May 6, 2010, Plaintiff wrote to Narod and Morrissey that they had "till Friday May 7th," after which point he would be "busy at [CWW's building] Cafeteria . . . meeting employees, Newsday, [p]ossibly Channel 12 News, Help me Howard and EEOC Attorneys," and would also be posting information on various websites including "Cambridgeregistryscam.com," "Cambridgewhoswhoscams.com," "Cambridgewhoswhoconnectscam.com," and "Worldwidewhoswhoscam.com."  (Lee Decl. Ex. Y.)  Plaintiff wrote that "involving attorney's [sic] and third parties might have a spiral effect which could get out of control but you are leaving me no choice I guess.  This is your choice not mine."  (*Id.*)  Plaintiff referenced various

allegations including "threats to my life and assault," "VP HR illegally harassing me for my medical records," "discriminatory work hours," "defaming me for insubordination," and "HR trying to illegally and discriminatorily deduct[] my personal, sick and vacation hours." (*Id.*) Plaintiff signed the email "Buddy Hershidoodle." (*Id.*)

On May 8, 2010, Plaintiff emailed Morrissey and Narod regarding "www.worldwidewhoswhoscam.com," stating that he "would like to increase awareness by bringing it to peoples [sic] attention." (Lee Decl. Ex. Z.) The following day Plaintiff wrote to Narod, Morrissey and another CWW employee that "I guess we are now moving towards point of no return very rapidly." (Lee Decl. Ex. AA.) In the email Plaintiff challenged Morrissey's qualifications and asserted that she was "not qualified to look into my grieviences [sic] relating to my complaints for which I was sent on a so called legal leave of absence." (*Id.*)

Plaintiff was terminated by CWW on or about May 11, 2010. (Sethi Decl. ¶ 58.) CWW claims that based on Plaintiff's threats, it had no choice but to terminate him. (Lee Decl. ¶ 83.) Plaintiff commenced this action on May 25, 2011. (Docket Entry No. 1.)

### i. Plaintiff's alleged unfair treatment

Plaintiff alleges that he was subjected to unfair treatment during his employment at CWW. In Plaintiff's submissions prior to the Court's Sept. 30, 2013 Decision, in support of his allegations of unfair treatment Plaintiff substantially relied upon documents not in the record before the Court. (*See* Minute Entry dated Aug. 15, 2013 (striking from the record documents submitted by Plaintiff with his letter dated June 24, 2013 (Docket Entry No. 67), his letter dated July 3, 2013 (Docket Entry No. 70), and his cross-motion for summary judgment (Docket Entry No. 73)).) Plaintiff was represented by counsel from the filing of the Complaint through oral argument after which time he terminated counsel and proceeded *pro se*. In view of Plaintiff's

*pro se* status and to ensure that the Court was properly reviewing all the relevant evidence that was disclosed during discovery, in the Sept. 30, 2013 Decision, the Court directed Plaintiff to file a list identifying the documents that he relies upon to support his discrimination claims, along with the supporting documents.[2]  Plaintiff alleges that he was subject to the following unfair treatment.

Plaintiff claims that Morrissey, Lee and others received overtime pay, while he did not. (Oral Arg. Tr. 7:5–7:14; Docket Entry No. 81 at 22–24; Docket Entry No. 84 at 3–4.) Defendants claim that managers including Morrissey and Lee did not generally receive overtime, but Morrissey admits that she received overtime pay once for working on a Saturday.  (Morrissey Dep. 69:8–15; Pl. 56.1 ¶ 14.)  According to Morrissey, she generally works "[o]ver 60 hours a week" and never received overtime pay other than that one occasion.  (Morrissey Dep. 69:8–70:6.)  Lee testified that she "never received overtime," (Lee Dep. 87:2), but according to Morrissey, Lee did receive overtime pay once, when she worked on Memorial Day in 2012.  (Pl. 56.1 ¶ 15; Morrissey Dep. 70:7–15.)

---

[2]  Plaintiff was instructed that he should only submit documents that were exchanged by the parties during discovery in this proceeding, and that he may not rely upon documents produced in other actions unless those documents were also produced in discovery in the action before this Court.

Plaintiff filed his submissions with the Court on October 16, 2013.  (Docket Entry No. 84.)  Defendants responded with objections on October 25, 2013, and requested leave to file a response to the legal and factual arguments contained in Plaintiff's submission.  (Docket Entry No. 85.)  Plaintiff responded to Defendants' objections and request by letter dated October 28, 2013 and filed October 31, 2013.  (Docket Entry No. 86.)  By order dated November 3, 2013, the Court granted Defendants' application to file a response.  Plaintiff submitted additional arguments and evidence by letter dated November 5, 2013 and filed November 14, 2013. (Docket Entry No. 87.)  Defendants filed their response to Plaintiff's initial submission on November 19, 2013.  (Docket Entry No. 88.)  Plaintiff subsequently submitted additional arguments and evidence by letter dated November 26, 2013 and filed December 6, 2013. (Docket Entry No. 91.)

Plaintiff claims that he was required to produce medical documentation for sick leave, while other employees were not subject to this requirement. (Docket Entry No. 81 at 25.) Plaintiff claims that Morrissey demanded that Plaintiff produce a doctor's note whenever he was out of the office due to illness, regardless of how long he was absent, while other employees were only required to produce a doctor's note if they were out of the office more than two consecutive days due to illness. (Am. Compl. ¶ 33.) At oral argument, Plaintiff's counsel stated that "a letter was put into [Plaintiff's] file indicating that he was not providing a doctor's note when it was requested." (Oral Arg. Tr. 5:13–16.) Plaintiff alleges that CWW's policy was that medical documentation was only required when utilizing un-accrued time-off, and Plaintiff never took un-accrued time-off but was still required to submit medical documentation for his sick time. (Docket Entry No. 80 at 2–3.) According to Defendants, "CWW's standard policies and procedures required . . . medical documentation for any sick time for which an employee had no available accrued paid sick time." (Def. 56.1 ¶ 38.)

Plaintiff claims that he received only five vacation days while other employees received ten or more. (Docket Entry No. 81 at 30; Docket Entry No. 84 at 9.) Plaintiff also claims that he was only allowed to roll-over three vacation days each year, while other management employees were allowed to roll-over "infinite" vacation days, (Docket Entry No. 81 at 30), and that he was denied payment for vacation days after his termination, unlike other employees, (Docket Entry No. 81 at 29; Docket Entry No. 84 at 10.)

Plaintiff also asserts that he was treated unfairly because he was required to give advance notice to use his vacation leave and required to submit paperwork while other employees "were not required to fill out anything." (Docket Entry No. 80 at 4; Docket Entry No. 81 at 30; Docket Entry No. 84 at 13.) Defendants claim that "CWW's standard policies and procedures required

pre-approval of time taken for vacation and accrued personal time as well as same-day or prior notification of any sick time as practicable." (Def. 56.1 ¶ 38.)

Plaintiff asserts that he was subjected to unfair treatment in a number of other ways. Plaintiff alleges that he was treated unfairly because his benefits did not begin on the first day of his employment but were instead subject to a 90-day probation period, while other employees were given benefits from their first day. (Docket Entry No. 80 at 4; Docket Entry No. 81 at 30–31; Docket Entry No. 84 at 10.) Plaintiff claims that he was denied free health insurance benefits while other employees were given free individual health benefits. (Docket Entry No. 80 at 4; Docket Entry No. 81 at 31; Docket Entry No. 84 at 10.) Plaintiff alleges that he was deprived of a raise in exchange for "not taking medical benefits from CWW," while other employees "were given [a] raise in pay for not taking medical benefits from CWW." (Docket Entry No. 80 at 4; Docket Entry No. 81 at 31; Docket Entry No. 84 at 11.) Plaintiff claims that he was denied an orientation and an initial introduction to the CWW employees, as well as "a welcoming email," while other employees were "given very good introduction and emails were sent to the whole company welcoming" them "very cordially." (Docket Entry No. 80 at 4–5; Docket Entry No. 81 at 31; Docket Entry No. 84 at 11.) Plaintiff claims that CWW did not follow the company's "progressive discipline system" with regard to him, but did so with regard to other employees. (Docket Entry No. 80 at 3; Docket Entry No. 81 at 29; Docket Entry No. 84 at 12.) Plaintiff additionally asserts that he was not offered a prepaid legal services plan, unlike other employees, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 11); he was not allowed daily break time, unlike other employees, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 11); he was not provided with business cards, unlike other employees, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 12); he was not reviewed annually and given annual raises unlike other employees,

(Docket Entry No. 81 at 31; Docket Entry No .84 at 12); he was denied compensation for travel mileage, unlike other employees, (Docket Entry No. 81 at 29); and he was forced to use CWW's hand-scanner attendance system for logging his arrivals and departures at CWW while other employees were not required to hand-scan their arrivals and departures, (*id.* at 30).

Defendants dispute that Plaintiff was treated unfairly. Defendants allege that Plaintiff did not always comply with CWW procedures, including providing sufficient notice when he was leaving early or planning to be absent, and he was often absent, tardy and insubordinate. (Morrissey Decl. ¶¶ 17–28.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933, at *1 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide

"whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has "cautioned that [w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. Title VII and NYSHRL Claims

Title VII prohibits an employer from discharging or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Thus, "[a]n employment decision . . . violates Title VII when it is 'based in whole or in part on discrimination.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

Title VII claims are assessed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] *See e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981); *United States v. City of New York*, 717 F.3d 72, 83–84 (2d Cir. 2013) (discussing application of *McDonnell Douglas* framework to race discrimination claim); *Ruiz v. Cnty. of*

---

[3] The burden of proof and production for employment discrimination claims under Title VII and the NYSHRL are identical. *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999))). Therefore, Plaintiff's Title VII and NYSHRL discrimination claims are analyzed together for purposes of this motion.

*Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (national origin claims are subject to burden shifting).  Under the framework, a plaintiff must first establish a *prima facie* case of discrimination.  *Hicks*, 509 U.S. at 506; *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491.  The plaintiff's burden at this stage is "minimal."  *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506).  If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492.  The defendant's burden "is not a particularly steep hurdle."  *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010).  It "is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).  "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination."  *United States v. City of New York*, 717 at 102.  To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus."  *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

       **i.**    ***Prima Facie* Case**

       To establish a *prima facie* case of race or national origin discrimination under Title VII, a plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse

employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491–92. Plaintiff was born and educated in India, (Sethi Dep. 9:21–10:19), and is therefore a member of a protected class for race and national origin. *See Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 148 (D. Conn. 2012) (finding it undisputed that Indian-born Plaintiff is a member of a protected class for purposes of race and national origin claim); *Kureshy v. City Univ. of New York*, 561 F. Supp. 1098, 1108 (E.D.N.Y. 1983), *aff'd*, 742 F.2d 1431 (2d Cir. 1984) (Indian-born Plaintiff's "national origin clearly place[s] him within the class of people protected by Title VII."). Defendants do not dispute that Plaintiff belongs to a protected class based on his national origin but asserted at oral argument that Plaintiff has not alleged that he belongs to a protected class based on his race. (Oral Arg. Tr. 3:23–4:3.) Plaintiff asserts that his race is Asian, (*id.* at 3:9–10), a protected class for purposes of a race discrimination claim. *See Krishnapillai v. Donahoe*, No. 09-CV-1022, 2013 WL 5423724, at *9 (E.D.N.Y. Sept. 26, 2013) ("Plaintiff is a member of protected classes under Title VII due to his race (Asian) and national origin (Indian) . . . ."); *Abraham v. New York City Dep't of Educ.*, No. 06-CV-1053, 2009 WL 1194164, at *6 (E.D.N.Y. Apr. 30, 2009) ("[P]laintiff is a member of a protected class based on his Indian national origin [and his] Asian race . . . ."), *aff'd in relevant part*, 398 F. App'x 633 (2d Cir. 2010). Defendants do not dispute that Plaintiff was qualified for his position as MIS Director. (Oral Arg. Tr. 4:4–13.) Defendants assert, however, that Plaintiff cannot demonstrate that he suffered any adverse employment action or that he did so under circumstances giving rise to an inference of discriminatory intent.

### 1. Adverse Employment Action

The Second Circuit has made clear that an "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown*, 673 F.3d at 150 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold*, 366 F.3d at 152 (alteration, citation and internal quotation marks omitted).

Plaintiff was terminated from his employment at CWW but is *not* claiming his termination as an adverse employment action.[4] (*See* Pl. Opp. Mem. of Law 2.) At oral argument, Plaintiff for the first time identified the following alleged material adverse employment actions: (1) Plaintiff's suspension with pay in February 2010, (Oral Arg. Tr. 15:14–15:24); (2) Defendants' failure to promote Plaintiff to the CTO position given to Mott, (*id.* at 46:18–48:20); (3) the alleged physical assault by Narod at the November 2009 meeting, (*id.* at 8:14–8:20); (4) failure to pay Plaintiff overtime, (*id.* at 7:5–7:14); (5) requiring Plaintiff to

---

[4] Plaintiff has repeatedly told the Court that he is *not* claiming his termination as an adverse employment action. (*See* Pl. Opp. Mem. of Law 2 ("This is not a lawsuit about [P]laintiff's termination on May 11, 2010. The allegations of wrongdoing only cover the period July 21, 2008 to February 12, 2010," the date of Plaintiff's suspension.); Sethi Decl. ¶ 58 ("This lawsuit has nothing to do with my termination on May 11, 2010. It only covers the period July 21, 2008 to February 12, 2010. What happened after February 12, 2010 is irrelevant."); Oral Arg. Tr. 16:18–18:2 (Counsel reiterated that Plaintiff was not claiming wrongful termination as an adverse employment action, initially stating that it was "an oversight." When questioned further by the Court, counsel made clear that Plaintiff did not believe he was terminated for discriminatory reasons, and admitted that there was "not . . . any evidence that the termination decision was based on [Plaintiff's] national origin or his race")).

provide medical documentation when he was absent from work due to illness, (*id.* at 4:22–7:3); (6) placing a memorandum in Plaintiff's personnel file that he gave insufficient notice when he left the office early or was going to be absent from the office, (*id.* at 7:17–8:1); and (7) placing an entry in Plaintiff's personnel file regarding chronic lateness, (*id.* at 8:3–8:13). In Plaintiff's subsequent cross-motion for summary judgment, he reasserts that he suffered an adverse employment action when he was not promoted to CTO. (*See* Docket Entry No. 77 at 5; Docket Entry No. 80 at 1.)

In Plaintiff's submissions following the Sept. 30, 2013 Decision, he describes allegedly discriminatory practices of Defendants (including actions identified in the above list) but does not identify which, if any, he believes are adverse employment actions. The Court examines the following actions identified by Plaintiff: (1) receiving five vacation days instead of ten, (Docket Entry No. 84 at 9); (2) lack of payment for unused vacation time after his termination, (*id.* at 10); (3) not receiving paid health benefits, (*id.*); (4) not receiving benefits from the first day of his employment, (*id.*); (5) not being offered a prepaid legal services plan, (*id.* at 11); (6) not receiving daily break time, (*id.*); (7) not being introduced to his coworkers via a welcome email when he commenced employment at CWW, (*id.*); (8) not receiving a raise in return for refusing company health benefits, (*id.*); (9) not being provided with business cards, (*id.* at 12); (10) not receiving annual reviews and raises, (*id.*); and (11) not being subject to progressive discipline, (*id.*).

For the reasons discussed below, the Court will consider Plaintiff's suspension with pay, denial of overtime compensation and deprivation of entitled vacation days to be adverse employment actions for purposes of the motions for summary judgment, but finds that the other

actions are not material adverse employment actions as required to establish a discrimination claim.

## A. Suspension with pay

Plaintiff alleged for the first time at oral argument that his suspension with pay on or about February 12, 2010, constitutes a material adverse employment action. (Oral Arg. Tr. 15:14–15:24.) The Second Circuit has held that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action." *Brown*, 673 F.3d at 150 (quoting *Joseph*, 465 F.3d at 91). The Court explained that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Id.* (quoting *Joseph*, 465 F.3d at 91). However, the Court recognized that "a suspension with pay may, in some circumstances, rise to the level of an adverse employment action." *Id.* To determine if it does, the Second Circuit requires a determination of "whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment." *Id.* (quoting *Joseph*, 465 F.3d at 92 n.1). The Court concluded that "[p]aid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies." *Id.* (quoting *Joseph*, 465 F.3d at 92 n.1); *see also Levitant v. City of New York Human Res. Admin.*, No. 05-CV-230, 914 F. Supp. 2d 281, 299 (E.D.N.Y. 2012) ("Based on the complete lack of any evidence that plaintiff's suspension was without pay, otherwise changed the terms and conditions of his employment, or was unreasonable or procedurally flawed, a jury could not find that the suspension constituted a materially adverse employment action.").

Plaintiff was suspended with pay.  (Def. 56.1 ¶ 65; Pl. Resp. 56.1 ¶ 50.)  However, the reasons for Plaintiff's February 2010 suspension are unclear.  Plaintiff contends that he was sent home on February 12, 2010, immediately after he made a request in writing to see his personnel file, (Sethi Decl. ¶ 30), and later claimed that he was suspended for "voicing complaints about fraud and illegal activities," (Lee Decl. Ex. R).  Lee states that on the day Plaintiff was suspended, he questioned her authority and CWW policies and she confronted him about a threatening email he sent to the office.  (Lee Decl. ¶¶ 63, 65, 44.)  Lee also states that by February 2010, Plaintiff's "inexplicable anger, belligerence and hostility towards his CWW colleagues and members of Proactive made it impossible for him to carry out his duties and responsibilities effectively."  (*Id.* ¶ 44.)  Lee further states that following Plaintiff's suspension, on February 16, 2010, Narod and Plaintiff discussed possible resolutions of Plaintiff's "concerns" and "complaints."  (*Id.* ¶ 68.)  With regard to Plaintiff's request to see his personnel file, according to Defendants, Plaintiff's was instructed to follow CWW procedures for access to his file, which procedures provide that all employees may see their personnel file once each year and that a request to do so should be submitted in writing.  (Lee Decl. Ex. M.)

Because of the factual dispute as to the reason for Plaintiff's suspension, the Court cannot determine whether Defendants applied reasonable disciplinary procedures to Plaintiff or whether CWW exceeded those procedures and subjected Plaintiff to an adverse employment action.  *Brown*, 673 F.3d at 150.  For purposes of the motions for summary judgment, the Court will assume that Plaintiff's suspension with pay was an adverse employment action.

### B.    Failure to promote

Plaintiff argues that CWW's failure to promote him to the CTO position in February 2010 was an adverse employment action.  (Oral Arg. Tr. 46:18–48:20.)  A failure to promote

may constitute an adverse employment action.  *See Mills*, 519 F. App'x at 75 ("failure to promote [plaintiff] constitutes an adverse employment action"); *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (recognizing "discriminatory failure to promote falls within the core activities encompassed by the term 'adverse actions'").

In order to state a failure to promote claim, a plaintiff must show that he applied for a position and was rejected.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226–27 (2d Cir. 2004) ("A specific application is required to 'ensure[] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.'" (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998))).  Merely expressing an interest in a position is insufficient to support a failure to promote claim.[5]  *Id.* ("[E]vidence that a plaintiff generally requested promotion consideration" is insufficient to state a claim for discriminatory failure to promote.); *see also Moore v. Metro. Transp. Auth.*, --- F. Supp. 2d ---, ---, 2013 WL 4757527, at *10 (S.D.N.Y. Aug. 22, 2013) (stating that "merely asserting that on several occasions she or he generally requested promotion" is insufficient to meet the application requirement for a failure to promote claim); *Ciulla-Noto v. Xerox Corp.*, No. 09-CV-6451T, 2012 WL 6043882, at *7 (W.D.N.Y. Dec. 5, 2012) ("Because plaintiff never applied for the positions she was allegedly prevented from obtaining, she cannot state a claim for retaliatory failure to hire."); *Billups v. Dent Wizard Int'l Corp.*, No. 05-CV-9356, 2010 WL 2541361, at *8

---

[5]  "[T]o be excused from the specific application requirement, an employee must demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004).  Based on the evidence in the record, the CTO position was posted to multiple job listing websites, and it had not yet been filled at the time Plaintiff learned of it.  (Lee Dep. 57:17–58:14.)  Plaintiff also has not shown that he attempted to apply for the CTO position through informal procedures endorsed by CWW.  Plaintiff is therefore required to comply with the specific application requirement.

(S.D.N.Y. June 14, 2010) (finding that a "[p]laintiff cannot meet the application requirement for stating a failure to promote claim merely with evidence that he generally requested promotion consideration," and "[w]hile it is true that the facts of a particular case may sometimes make a specific application a quixotic requirement," the "exception to the application rule is narrow" (citation and internal quotation marks omitted)); *but see Arroyo v. N.Y. Downtown Hosp.*, No. 07-CV-4275, 2010 WL 3861071, at *4 (E.D.N.Y. Sept. 28, 2010) (noting that "[w]hile a specific application for a promotion is generally required, the rule is not inflexible" and finding that where a plaintiff "sent emails . . . expressing his interest in the positions and . . . had follow-up conversations . . . about them . . . a jury could find that by doing so [plaintiff] applied for the positions" (citation and internal quotation marks omitted)).[6]

Plaintiff expressed an interest in the CTO position. (Def. 56.1 ¶ 54; Pl. Resp. 56.1 ¶ 54.) After Plaintiff expressed an interest in the position in a series of email communications with

---

[6] Plaintiff argues that he was subjected to unnecessary and irrelevant requirements for the promotion to CTO, (Docket Entry No. 81 at 20), and "was discriminatorily required to appear for a formal interview[] as a deterrent, while no other employee was ever required to appear for a formal interview for an internal promotion," (Docket Entry No. 67 at 3). There is no evidence in the record concerning the procedures for internal promotions at CWW and Plaintiff's claim is therefore unsupported. Furthermore, to the extent Plaintiff is alleging that he attempted to apply for the position through informal procedures endorsed by CWW, there is no evidence in the record to support the contention that CWW endorsed any informal procedure that Plaintiff utilized. To the extent Plaintiff is arguing that Defendants discouraged him from applying for the position, Plaintiff cannot maintain such a claim. The Second Circuit has held that an employee is barred from bringing a claim for discriminatory failure to promote where the employee did not specifically apply for the position, because a plaintiff cannot avoid this requirement by generally requesting to be considered for the position or by alleging an "aura of discrimination" that "somehow discouraged [him] from filing a formal application." *Petrosino*, 385 F.3d at 227; *see also Moore v. Metro. Transp. Auth.*, --- F. Supp. 2d ---, ---, 2013 WL 4757527, at *10 (S.D.N.Y. Aug. 22, 2013) (stating that the exception to the application requirement is narrow and "does not pertain simply because an employee asserts that an aura of discrimination in the workplace somehow discouraged her from filing a formal application" (citation and internal quotation marks omitted)); *Ikewood v. Xerox Corp.*, No. 07-CV-6553, 2011 WL 147896, at *6 (W.D.N.Y. Jan. 18, 2011) (same); *Dunn v. Sec'y of U.S.*, No. 00-CV-1747, 2006 WL 1510097, at *13 (N.D.N.Y. May 26, 2006) (same).

Narod, (*see* Docket Entry No. 84-1 at 1), Narod forwarded the email conversation to Lee, (*see* Docket Entry No. 80-1 at 2). Lee responded to Plaintiff and provided information regarding the qualifications of the candidates being considered by CWW and what CWW was looking for in a candidate. Plaintiff never applied for the CTO position. (Lee Decl. ¶ 57.) Plaintiff does not recall if he ever responded to Lee's email. (Sethi Dep. 168:19–168:8.) Plaintiff has failed to present any evidence that he applied for the CTO position after expressing an interest to Narod or ever responded to Lee's email. The Court finds that Plaintiff has not established that he applied for and was denied the CTO position and as a result Plaintiff cannot show that he suffered a material adverse employment action when he was not promoted to the position.

## C. Incident at November 2009 meeting

Plaintiff argues that Narod's conduct and comments at the November 2009 meeting constitute an adverse employment action. (Oral Arg. Tr. 8:14–8:20.) Plaintiff alleges that at the November 2009 meeting, Narod charged, slapped and "chested" Plaintiff and said to him, "You f--king Indian, what do you think about yourself? I will make sure you are sent back to India. You don't know who you are dealing with. You fear my wrath in your dreams." (Pl. 56.1 ¶ 133; Sethi Dep. 116:21–125:19.) The Second Circuit has held that "unprofessional and boorish" treatment does not amount to an adverse employment action. *Mathirampuzha*, 548 F.3d at 78. "An adverse employment action is 'a materially adverse *change* in the terms and conditions of employment.'" *Id.* (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). "Only in limited circumstances does a single, acute incident of abuse qualify as an adverse employment action. . . . But we require that the incident constitute an intolerable alteration of the plaintiff's working conditions, so as to substantially interfere with or impair his ability to do his job." *Id.* at 78–79 (citation and internal quotation marks omitted). In *Mathirampuzha*, a supervisor grabbed the plaintiff's arm, punched him in the shoulder and the

chest, spit in his face, poked him in the eye, and shouted at him. *Id.* at 73. The Second Circuit

held that "[t]he physical encounter itself, while understandably upsetting, was not so severe as to

alter materially the plaintiff's working conditions," to qualify as an adverse employment action.[7]

*Id.* at 79.

The confrontation between Plaintiff and Narod is similar to the confrontation in

*Mathirampuzha* that the Second Circuit found not to qualify as an adverse employment action. It

did not constitute "an intolerable alteration of the [P]laintiff's working conditions, so as to

---

[7] At oral argument, Plaintiff's counsel argued that in Plaintiff's state court claim against
Narod, Lee, Morrissey, CWW and others, Judge Stephen Bucaria of the Supreme Court of the
State of New York concluded that the assault on the plaintiff was an adverse employment action.
(Oral Arg. Tr. 8:18–20.) Plaintiff appears to argue that issue preclusion bars this Court from
concluding that the alleged assault by Narod in November 2009 was not an adverse employment
action. Plaintiff's claim is unavailing. In Plaintiff's state court action for retaliatory discharge,
when deciding a motion to dismiss Plaintiff's claim, Judge Bucaria stated that although
"Defendants argue that plaintiff has not alleged an actual violation of Labor Law § 740 . . .
plaintiff alleges that he was harassed and ultimately fired in May 2010. Discharge is expressly
included within the definition of 'retaliatory personnel action.' The harassment presumably
includes the November 2009 assault, which would constitute adverse action 'in the terms and
conditions of employment.'" *Sethi v. Narod*, Index No. 002499/11, Slip Op. at 4 (N.Y. Sup. Ct.
July 25, 2011). Judge Bucaria did not decide whether the alleged assault was in fact an adverse
employment action, and his reference to the November 2009 incident was not a final judgment
on the merits. *See Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (holding that "[t]he
burden of showing that the issues are identical and were necessarily decided in the prior action
rests with the party seeking to apply issue preclusion" and issue preclusion is "inappropriate" if
the issue in question was not "actually *and necessarily* decided in a prior proceeding." (citation
omitted); *Tannenbaum v. Corbis Sygma*, No. 02-CV-5066, 2002 WL 31778813, at *2 (S.D.N.Y.
Dec. 12, 2002) ("denial of a motion to dismiss at the pleading stage" is "not a final judgment on
the merits"). In addition, in the action before this Court, Plaintiff's claim is for discrimination,
while the action before Judge Bucaria concerns whether the November 2009 confrontation
constituted an adverse action for purposes of a *retaliation* claim. Issue preclusion or collateral
estoppel bars litigation of an issue when "(1) the identical issue was raised in a previous
proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the
party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was
necessary to support a valid and final judgment on the merits." *Proctor*, 715 F.3d at 414
(citation and internal quotation marks omitted). All of these conditions must be met for issue
preclusion to apply. *Id.* Plaintiff has not met his burden here of demonstrating that (1) the issue
was decided by Judge Bucaria, and (2) that the issues are the same.

substantially interfere with or impair his ability to do his job." *Mathirampuzha*, 548 F.3d at 78–79. Indeed, Plaintiff continued working at CWW after the confrontation for approximately three months until his suspension in February 2010, (Def. 56.1 ¶ 65; Pl. Resp. 56.1 ¶ 50), and even expressed interest in being promoted within the Company, (Def. 56.1 ¶ 54; Pl. Resp. 56.1 ¶ 54). The November 2009 incident is not an adverse employment action.

### D. Failure to pay overtime

Plaintiff claims that he suffered an adverse employment action because Defendants failed to pay him for overtime hours worked. (Oral Arg. Tr. 7:5–7:14.) Defendants considered Plaintiff an exempt employee throughout his employment at CWW, and never paid Plaintiff overtime pay. (Sethi Dep. 48:19–21.) Plaintiff currently has a FLSA claim pending before this Court which challenges Plaintiff's exempt status. If Plaintiff was improperly categorized as exempt from the FLSA's overtime compensation requirements and was denied proper compensation for overtime hours worked, he suffered an adverse employment action. *See Robinson v. Goulet*, 525 F. App'x 28, 31 (2d Cir. 2013) ("The loss of overtime hours or pay on the basis of race . . . violates Title VII."); *Lawson v. City of New York*, No. 10-CV-5238, 2013 WL 6157175, at *7 (E.D.N.Y. Nov. 22, 2013) (noting that the denial of overtime pay is an adverse employment action); *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 373 (S.D.N.Y. 2002) (finding that the plaintiff satisfied the standard for adverse employment action where he produced evidence of actual loss in income due to lost overtime). Since this is a disputed issue of fact, for purposes of the motions for summary judgment, the Court will assume that Plaintiff's alleged denial of overtime pay is an adverse employment action.[8]

---

[8] The Court notes that Plaintiff was treated as an exempt employee and denied overtime pay for the duration of his employment, and he therefore never suffered any *change* in the terms

### E. Allotted vacation days

Plaintiff asserts that he received only five vacation days each year, when he was entitled to ten, and that the failure of CWW to award him ten vacation days is an adverse employment action.  (Docket Entry No. 84 at 9.)  The CWW handbook states that full-time employees are eligible for paid vacation at their one-year anniversary date.  (Docket Entry No. 41-1 at 311.)  After one year, employees are entitled to five days of paid vacation annually, which increases to seven days of vacation after five years at CWW, and increases to ten days of vacation after ten years at CWW.  (*Id.*)  Plaintiff was terminated prior to his second anniversary.  (*See* Am. Compl. ¶ 2 and Answer ¶ 2.)  Therefore, according to the handbook, Plaintiff was entitled to five days of paid vacation.  Morrissey testified that Plaintiff was entitled to ten vacation days, (Docket Entry No. 84-3 at 13), however an email from Morrissey to Plaintiff dated January 7, 2010, suggests

---

and conditions of his employment.  The Court recognizes that the Second Circuit has defined an "adverse employment action" as a "materially adverse change," *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004), and recently has emphasized the word "change."  *See Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 73 (2d Cir. 2013) (finding that various incidents including a hug, intimidating behavior, shunning by colleagues and refusal to accommodate scheduling requests do not constitute adverse actions as they did not reflect "a materially adverse *change* in the terms and conditions of employment" (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008))); *Mathirampuzha*, 548 F.3d at 78 ("An adverse employment action is "a materially adverse *change* in the terms and conditions of employment." (quoting *Sanders*, 361 F.3d at 755)); *see also Cutler v. Stop & Shop Supermarket Co., LLC*, 856 F. Supp. 2d 416, 420 (D. Conn. 2012) (no adverse employment action where the requirement that the plaintiff work 40 hours a week to retain his position, pay and benefits as a full-time employee was in the collective bargaining agreement at all times), *aff'd*, 513 F. App'x 81 (2d Cir. 2013).  However, the Second Circuit also has recognized that the adverse action inquiry is fact-intensive and includes "other indices . . . unique to a particular situation."  *Sanders*, 361 F.3d at 755; *see also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'").  The Court declines to adopt a narrow interpretation of the case law that a materially adverse employment action cannot arise if a plaintiff did not suffer a *change* in the terms or conditions of employment.  *See John v. Kingsbrook Jewish Medical Center/Rutland Nursing Home*, No. 11-CV-3624, 2014 WL 1236804, at *8 (E.D.N.Y. Mar. 25, 2014).

that Plaintiff received five vacation days each year, (Docket Entry No. 84-3 at 23). The evidence submitted by Plaintiff indicates that he was allotted five vacation days from approximately July 2009 through 2010, and that five vacation days would be "re-banked" in July 2010. (Docket Entry No. 84-3 at 23.) Thus, Plaintiff's allotted vacation time is a disputed issue of fact.

If Plaintiff was deprived of five paid days of vacation each year to which he was entitled, then Plaintiff suffered a materially adverse impact in the terms and conditions of employment sufficient to establish an adverse employment action. *See Lockhart v. Hofstra Univ.*, 123 F. App'x 31, 32–33 (2d Cir. 2005) ("An 'adverse employment action is one that affects the terms, privileges, duration or conditions of employment.'" (quoting *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996)); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (noting that a materially adverse employment action must have an impact on "some tangible job benefits such as compensation, terms, conditions or privileges of employment." (citation and internal quotation marks omitted)).

Because whether Plaintiff was deprived of vacation time to which he was entitled is a disputed issue of fact, for purposes of the motions for summary judgment, the Court will assume that Plaintiff's alleged deprivation of his entitled vacation days is an adverse employment action.

### F.  Other Claims

Plaintiff's numerous other claims are trivial inconveniences and do not amount to adverse employment actions.

### (1)  Medical documentation

Plaintiff claims that he was subject to more stringent requirements than other employees by being required to provide documentation that he was sick when he took a day off for illness and argues that this treatment constitutes an adverse employment action. (Docket Entry No. 80

at 2–3.)  At oral argument Plaintiff's counsel stated that "a letter was put into [Plaintiff's] file indicating that he was not providing a doctor's note when it was requested."  (Oral Arg. Tr 5:14–6:22.)  Plaintiff has not submitted any evidence to support this allegation.  At oral argument, Plaintiff's counsel admitted that he could not point to any adverse change in the terms of Plaintiff's employment related to the required medical documentation.  (*Id.* at 19:7–20:7.)

Accepting Plaintiff's allegations as true, requiring Plaintiff to supply medical documentation for sick leave is not an adverse employment action where Plaintiff has not alleged that he was prevented from using his sick leave or that his terms of employment were altered because of the documentation requirement.  *See Pierre v. Napolitano*, No. 11-CV-4935, 2013 WL 3835428, at *13 (S.D.N.Y. July 24, 2013) ("requiring an employee to provide medical documentation is not a materially adverse action" (alteration and citations omitted)); *Solomon v. Southampton Union Free Sch. Dist.*, No. 08-CV-4822, 2011 WL 3877078, at *8 (E.D.N.Y. Sept. 1, 2011) (requiring plaintiff to submit a doctor's note for sick leave does not materially change the terms of her employment such that it constitutes an adverse employment action), *aff'd*, 504 F. App'x 60 (2d Cir. 2012); *Blake v. Potter*, No. 03-CV-7733, 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007) ("[N]o reasonable fact-finder could conclude that Plaintiff was subject to 'adverse employment actions' as a result of being asked to provide a doctor's note in connection with a request for sick leave . . . .  [C]ourts in this District have held that an employer's request for documentation in connection with medical leave does not constitute such an 'adverse employment action.'" (citation omitted)), *aff'd*, 330 F. App'x 232 (2d Cir. 2009).

To the extent that Plaintiff claims that any resulting note to his personnel file constituted an adverse employment action, such a note without "some present, tangible effect on the employee's terms of employment" is insufficient to establish an adverse employment action.

*Adams-Martin v. Connecticut Dep't of Developmental Servs.*, No. 10-CV-0099, 2012 WL 878306, at *10 (D. Conn. Mar. 14, 2012) (holding that "[a] disciplinary letter does not constitute adverse employment action in a Title VII discrimination claim without some tangible consequence" (collecting cases)); *see also Cristofaro v. Lake Shore Central School District*, No. 06-CV-0487S, 2011 WL 635263 at *10 (W.D.N.Y. Feb. 11, 2011) (noting that "[c]ourts have held that disciplinary write-ups, whether placed in a personnel file or not, which are not accompanied by any adverse change in the terms and conditions of her employment do not amount to an adverse employment action"); *Ludwig v. Rochester Psychiatric Ctr.*, 550 F. Supp. 2d 394, 398 (W.D.N.Y. 2008) (holding that alleged disciplinary write-ups placed in the plaintiff's personnel file did not constitute an adverse employment action where there was no evidence that the "write-ups were accompanied by any adverse changes in the terms and conditions of [the plaintiff's] employment"), *aff'd*, 347 F. App'x 685 (2d Cir. 2009); *see also Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) ("While negative employment evaluation letters[] or reprimands may be considered adverse employment actions," that is not the case where there is "no proof that [the] evaluation had any effect on the terms and conditions of [the plaintiff's] employment." (citations and internal quotation marks omitted)).

### (2)    Advance notice, lateness and personnel file

Similarly, Plaintiff's claim that he was required to provide advance notice before taking time off, (Docket Entry No. 84 at 13), that a memorandum was placed in his personnel file indicating that he gave inadequate notice when he left the office early or planned to be absent from work, (Oral Arg. Tr. 7:17–8:1), and that an entry was placed in his personnel file regarding chronic lateness, (*id.* at 8:3–8:13), are not adverse employment actions.  As discussed above,

Plaintiff cannot show that any adverse action was taken as a result of any alleged memorandum and entry in his personnel file.[9]

### (3) Unpaid vacation days following termination

Plaintiff's argument that he was denied compensation for unused vacation days following his termination on May 10, 2010, (Docket Entry No. 84 at 10), is not supported by any evidence in the record. Plaintiff argues that other employees were "generously paid vacation time compensation after termination." (*Id.*) On February 23, 2011, Plaintiff asked Morrissey by email about his "vacation, personal time and sick time balance and the compensation for it." (Docket Entry No. 84-3 at 30–31.) Addressing Plaintiff's request for compensation, Morrissey sent an email to Lee, Narod and others stating that CWW does "not have a policy that pays out vacation and/or PTO time upon employee departure with CWW." (*Id.*) Morrissey did not address whether CWW would compensate Plaintiff even though there was no policy. (*Id.*) Plaintiff submits what appear to be print-outs from a Microsoft Access database with notes that appear to record time paid to others in support of his claim that others were paid for vacation time after termination.[10] (Docket Entry No. 84-3 at 33–42.) But even assuming this is true,

---

[9] Plaintiff has not argued that his February 12, 2010 suspension resulted from the above-described actions. Plaintiff has asserted that his suspension resulted from his request to view his personnel file, and as discussed *infra*, in his correspondence with CWW immediately following his suspension Plaintiff claimed that his suspension was retaliatory based on his complaints that CWW was engaged in illegal business activities. Drawing all inferences in favor of Plaintiff, Plaintiff's suspension did not result from his failure to comply with time and attendance requirements.

[10] These documents contain fields labeled "HR Notes" and "Payroll Info," and unidentified individuals have the following entries in those fields referencing compensation for vacation: "EE termed over phone. . . . Per Randy Narod: 2 week's severance + 1 week's [p]aid vacation," (Docket Entry No. 84-3 at 34); "'Laid off' . . . . One week's paid vacation per Randy," (*id.* at 36); "EE LAID OFF due to [d]ownsizing. 2 week[']s severance + 1 week vacation . . . per Randy," (*id.* at 38); "EE . . . [l]aid [o]ff — [P]er Randy Narod . . . 3 week[']s

Plaintiff has not shown that he was entitled to compensation for unused vacation days after his termination, that he had unused accrued vacation days at the time of his termination, or that he was in fact denied compensation for vacation days that he had accrued and did not use prior to his termination.

### (4)   Paid health benefits

Plaintiff's claim that he did not receive paid health benefits, (Docket Entry No. 84 at 10), contrary to CWW's policy which was to pay the full cost of a single individuals' medical insurance contract, is not supported by the record.  CWW paid Plaintiff a stipend of $280 per month for his health benefits.  (*Id.* (citing Docket Entry Nos. 84-3 at 43–46).)  Plaintiff argues that the cost to him for his medical insurance contract exceeded $1,000 per month.  (*Id.*)  Plaintiff offers no evidence, apart from his unsworn statement, for his medical insurance costs.  Plaintiff does not offer any admissible evidence that the cost of his medical insurance contract exceeded the $280 monthly stipend that CWW provided to him.

### (5)   Delayed benefits

Plaintiff's challenge to his 90-day probationary period at the beginning of his employment is also not an adverse employment action.  Plaintiff claims that when he was offered employment by CWW, his benefits were made subject to a 90-day probationary period, while other employees were provided with benefits from the first day of their employment and that this disparate treatment was an adverse employment action.  (Docket Entry No. 84 at 10–11.)  Plaintiff submits a copy of his offer letter, stating that he would have the "option to enroll" in medical, dental and vision insurance plans "[a]fter 90 days of employment."  (Docket Entry No.

---

severance + 1 week vacation, (*id.* at 40); "2 week[']s severance and 3 vacation days paid out, per Randy Narod," (*id.* at 42).

84-4 at 2.)  Plaintiff also submits a copy of what appears to be another employee's offer letter from CWW, stating that that employee would "not need to wait the 90-day probationary period for Benefits," (Docket Entry No. 84-3 at 47), and an email from an unidentified individual at CWW to another unidentified individual stating that "Deb . . . will forgo the 90 day waiting period and allow you access to the medical coverage beginning October 1st (the next available period).  This is something we do not make a habit of doing, so please keep this confidential," (Docket Entry No. 84-4 at 1).

Excerpts from the CWW employee handbook submitted by Plaintiff state that medical, vision and dental insurance plans may be enrolled in after an employee "complet[es] their 90 day probationary period."  (Docket Entry Nos. 84-3 at 43, 84-4 at 3.)  Plaintiff has not offered evidence that he was ever entitled to benefits from CWW without having to wait the 90-day probationary period.  The fact that CWW may have waived this requirement for some employees does not support Plaintiff's claim that enforcement of the company's policy as to him created an adverse employment action.  *Cf. Joseph*, 465 F.3d at 91 (relying on Fourth Circuit's reasoning that the "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from an employer's disciplinary procedures" to hold that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner" (alterations omitted) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001))); *see also Neratko v. Frank*, 31 F. Supp. 2d 270, 297 (W.D.N.Y. 1998) ("A plaintiff who does no more than demonstrate that the employer was enforcing a generally applicable policy against him fails to establish an adverse

employment action." (citing *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)).

### (6)  Legal services plan

CWW's offer of employment to Plaintiff which did not include information about CWW's prepaid legal services plan, as set forth in the employee handbook, is not an adverse employment action.  The CWW handbook states that full-time employees are eligible to enroll in a PrePaid Legal Services Program, and if they do so, the employee will be responsible for the full cost of the insurance.  (Docket Entry No. 84-4 at 3.)  The handbook states that information and enrollment forms may be obtained from the human resources department.  (*Id.*)  Plaintiff complains that his offer letter did not include an offer for him to join this plan "as per company policy [and] procedures."  (Docket Entry No. 84 at 11.)  Plaintiff has not offered any evidence that it was CWW policy to include an offer to enroll in the PrePaid Legal Services Program in an offer letter to a new employee, nor has Plaintiff offered any evidence that he requested the opportunity to enroll in the program and was denied, or that he was prevented from enrolling in the program.  Nor has Plaintiff has asserted that he was not provided the CWW handbook which specifies the services that were available to Plaintiff.

### (7)  Break time

Plaintiff's claim that he did not receive two 15-minute breaks daily to which he was entitled is not supported by the record.  Plaintiff submits a copy of a document titled "Administrative / Operational Employees Attendance Policies and Procedures," which includes attendance policies for employees covered by the policy, including providing for two 15-minute breaks per day.  (Docket Entry No. 84-4 at 5.)  This policy covers administrative and operational

employees only, (*id.*), and Plaintiff has offered no evidence that he was an administrative or operational employee, entitling him to breaks.

### (8) Welcome email and business cards

Plaintiff's claim that CWW's failure to send a company-wide introduction or "welcome email" when he started working at CWW, unlike for other employees, (Docket Entry No. 84 at 11), borders on being frivolous and this failure does not raise to the level of an adverse employment action. So too is his claim that denying him business cards is an adverse employment action. (Docket Entry No. 84 at 12.)

Plaintiff does not state that he requested business cards and was denied said cards, nor does Plaintiff present any evidence that he was provided with business cards and then later denied them. In addition, Plaintiff does not submit any evidence of CWW's policies with regard to business cards, or any other evidence demonstrating that he was entitled to business cards. An adverse employment action must be "more than trivial, insubstantial, or petty," and Plaintiff's lack of a welcome email and business cards are trivial matters that do not qualify as adverse employment actions. *See Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012) (adverse employment action must be material and "more disruptive than a mere inconvenience"); *Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, No. 12-CV-7405, 2013 WL 5677047, at *7 (S.D.N.Y. Oct. 18, 2013) ("[A]dverse employment actions . . . must be more than trivial, insubstantial, or petty." (citation and internal quotation marks omitted)); *see also Gmyrek v. Metro. Life Ins. Co.*, No. 04-CV-3801, 2007 WL 2403205, at *6 (E.D.N.Y. Aug. 20, 2007) (holding that the failure to provide updated business cards after the employee's telephone number was changed was "not a materially adverse change in the terms and conditions of employment" (citing *Nakis v. Potter*, No. 01-CV-10047, 2004 WL 2903718, at *20 (S.D.N.Y.

Dec. 15, 2004))); *Nakis*, 2004 WL 2903718, at *19, 20 (holding that plaintiff's contention that she "was not provided with . . . business cards, despite her requests" did "not rise to the level of [a] materially adverse change[] in the terms and conditions of employment").

### (9) Raise in exchange for refusing health benefits

Plaintiff's claim that other employees were given raises for "not taking company health benefits," but he was "denied a raise as compensation," (Docket Entry No. 84 at 11), is not supported by the record. Plaintiff submits a single email from Narod to Morrissey stating, "Please give [R]onda [L]eaderman a 50 week [sic] raise in sall [sic] she does not use health insurance." (Docket Entry No. 84-4 at 11.) Plaintiff has admitted that he received health insurance through CWW and was provided a $280 monthly stipend toward his insurance. (Docket Entry No. 84 at 10.) Plaintiff has not shown that he refused health insurance at any time, or that he was entitled to additional compensation in return for refusing CWW's contribution to his health insurance costs.

### (10) Denial of annual reviews and raises

Plaintiff's claim that he was denied annual reviews and raises, (Docket Entry No. 84 at 12), is not supported by the record. Plaintiff submits an excerpt from the CWW employee handbook stating that new employees will be reviewed periodically, including annually on their anniversary date. (Docket Entry No. 84-4 at 14.) Plaintiff also submits an email from Morrissey to Narod stating that "Barb was at: $40k Jan 2007[,] $55k June 2008[,] $60k Feb 2009," and asking if "Barb" should be "bump[ed] [by] $5k." (Docket Entry No. 84-4 at 15.) In addition, Plaintiff submits what appear to be print-outs from a Microsoft Access database, the first page of which document references a "Kara Lee" and the third page indicates than an unidentified individual received a salary increase in July 2009 and January 2009. (Docket Entry No. 84-4 at

16–18.)  Plaintiff appears to be asserting that while other employees received regular salary increases, he did not.  Plaintiff has not shown that he was entitled to, and denied, annual raises.  Moreover, to the extent that the CWW employee handbook provides for annual reviews, Plaintiff offers no evidence, apart from his unsworn statement, that he was ever denied an annual review, or that he suffered an adverse change in work conditions as a result of his alleged denial of an annual review.

### (11)  Failure to apply progressive discipline

Plaintiff's claim that CWW has a company policy of progressive step discipline that was not followed as to him, and that Defendants fabricated reprimands in his file without his knowledge, (Docket Entry No. 84 at 12), is not supported by the record.  As evidence of CWW's policy of progressive step discipline Plaintiff submits two documents, including an excerpt from the CWW handbook addressing tardiness of sales representatives, which provides for a verbal warning the first time late to work, a written warning to be placed in the personnel file after the second occurrence, after the third time a "reduction of one commission bracket," and possibly termination for excessive lateness.  (Docket Entry No. 84-4 at 19–20.)  Plaintiff also submits a document titled "Operational & Administrative Employees, October 2009, Departmental Confidentiality" directed to "[a]dministrative and [o]perational [p]ersonnel" and directing them to follow the listed guidelines on confidentiality.  (*Id.* at 21.)  It provides for violations to be disciplined by means of verbal warning, warning letter, possible demotion, reduction of salary, suspension and/or possible termination.[11]  (*Id.*)  Plaintiff also submits a November 24, 2008

---

[11]  Plaintiff also submits an October 29, 2009 document titled "Employee Warning" addressed to "Employee" as evidence of what the "actual form" for a warning letter should include.  (*Id.* at 23.)  The document addresses an employee with a "base + commission position"

warning letter addressed to him from Morrissey which states that "[t]ardiness occurrences may happen on occasion, and while we provide one to two verbal warnings, if tardiness becomes a constant, there will be consequences." (*Id.* at 22.) The letter reiterates CWW work day hours, and informs Plaintiff that if he needed to arrive late or change his lunch hour, to notify Lee or Morrissey. (*Id.*) A handwritten note at the bottom of the letter states that a "verbal warning [was] given to Harsh by Erica Lee — 11/24 2:58 PM (EE did not sign a [*word illegible*] letter) verbal already given" with an unknown signature below it.[12] (*Id.*) There is no line for Plaintiff's signature on the document. (*Id.*) Plaintiff submits a document titled "Time Card Report" for "Sethi, Harsharan," which lists the times he entered and left on November 24, 2008 as 9:07 a.m. "In"; 9:10 a.m. "Out"; 11:36 a.m. "In"; 2:30 p.m. "Out"; 4:51 p.m. "In"; 5:45 p.m. "Out." (*Id.* at 24.)

Plaintiff argues that the foregoing evidence demonstrates that CWW had a "company policy of progressive step disciplinary system . . . for tardiness," that this policy was not followed with regard to Plaintiff, and that the warning letter addressed to Plaintiff was "frivolously fabricated" as evidenced by the lack of a signature and the fact that Plaintiff was not on CWW premises at 2:58 p.m. on November 24, 2008. (Docket Entry No. 84 at 12–13.) However, the documents submitted by Plaintiff demonstrate only that CWW policy provides for progressive discipline when addressing the tardiness of sales representatives, a position Plaintiff did not hold, and when addressing confidentiality guideline compliance by operational and

_____

whose "recent sales performance has been suffering and declining," and includes a line for the employee's signature. (*Id.*)

[12] The note does not indicate if the date and time refers to when the verbal warning was issued or when it was recorded by the note writer. (Docket Entry No. 84-4 at 22.)

administrative employees, a guideline Plaintiff does not suggest that he was accused of violating, and a job title that Plaintiff has not shown applies to him. Even if CWW utilized such a policy to address tardiness by all employees, and even if, as Plaintiff claims, he was not verbally warned regarding his tardiness by Lee on November 24, 2008, the warning letter to Plaintiff does not establish that Plaintiff did not receive any verbal warnings prior to CWW issuing the written letter, nor does the lack of a signature from Plaintiff establish that the letter was fabricated.[13] Plaintiff has not provided evidence establishing that CWW had a policy of progressive discipline that applied to him, that Plaintiff was disciplined in a matter that failed to comply with that policy, and that the terms and conditions of his employment were changed in a materially adverse.

In sum, the Court will assume Plaintiff's suspension with pay, denial of overtime compensation and deprivation of entitled vacation days to be adverse employment actions for purposes of the motions for summary judgment.

### 2. Inference of Discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro–N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y.2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at

---

[13] Nor is a verbal or written warning an adverse employment action in and of itself. *See Glover v. Donahoe*, No. 12-CV-189, 2013 WL 6183891, at *4 (D. Conn. Nov. 25, 2013) (collecting cases); *Wharton v. Cnty. of Nassau*, No. 10-CV-0265, 2013 WL 4851713, at *8 (E.D.N.Y. Sept. 10, 2013) ("[O]ral and written warnings do not amount to materially adverse conduct . . . ." (citing *Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007)); *Adams-Martin v. Connecticut Dep't of Developmental Servs.*, No. 10-CV-0099, 2012 WL 878306, at *10 (D. Conn. Mar. 14, 2012) (holding that "[a] disciplinary letter does not constitute adverse employment action in a Title VII discrimination claim without some tangible consequence" (collecting cases)).

*6 (E.D.N.Y. July 30, 2013) (same). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore*, 2013 WL 3968748, at *6 (citations omitted). "An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)); *see also Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (finding that an inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." (quoting *Ruiz*, 609 F.3d at 493)); *Russell v. Cnty. of Nassau*, 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) ("a discriminatory race and/or color motive can be inferred if a plaintiff was treated differently than similarly situated white employees or if the defendants engaged in a pattern of discriminatory treatment of African-American employees" (citing *Abdu-Brisson*, 239 F.3d at 468 and *Johnson v. Cnty. Of Nassau*, 480 F. Supp. 2d 581, 597 (E.D.N.Y. 2007))).

However, a plaintiff's "mere subjective belief that he was discriminated against . . . does not sustain a . . . discrimination claim." *Moore*, 2013 WL 3968748, at *6 (quoting *Gue v. Suleiman*, No. 10-CV-8958, 2012 WL 4473283, at *8 (S.D.N.Y. Sept. 27, 2012)); *Karim-Seidou v. Hosp. of St. Raphael*, No. 09-CV-51, 2012 WL 6628886, at *5 (D. Conn. Dec. 19, 2012) (the plaintiff's "own subjective beliefs" that he was discriminated against based on national origin and race were insufficient to survive summary judgment). "Hostility or unfairness in the

workplace that is not the result of discrimination against a protected characteristic is simply not actionable." *Nakis*, 2004 WL 2903718, at *20; *Gue*, 2012 WL 4473283, at *8 (same).

Assuming Plaintiff's suspension, denial of overtime compensation and deprivation of entitled vacation days were adverse employment actions, Plaintiff cannot establish a *prima facie* case of race or national origin discrimination because as discussed below, the circumstances surrounding the adverse employment actions do not evidence discriminatory animus, the remarks Plaintiff relies on are not probative of discrimination, and Plaintiff has not presented any evidence that he was treated less favorably than similarly situated employees outside his protected groups. Plaintiff has failed to provide any evidence from which a reasonable jury could conclude that race or national origin discriminatory animus motivated Plaintiff's suspension, denial of overtime compensation and deprivation of entitled vacation days.

### A. Surrounding circumstances

### (1) Suspension

None of the descriptions of the events surrounding Plaintiff's suspension on February 12, 2010, makes any reference to Plaintiff's race or national origin. Plaintiff characterizes his suspension as flowing from his request to see his personnel file. Defendants describe Plaintiff's suspension as following a meeting where Plaintiff was combative and questioned Lee's authority and CWW's policies, and where Lee asked Plaintiff to address a "threatening" email. In addition, Plaintiff's communications in the days following his suspension suggest that there was no race or national origin animus surrounding Plaintiff's suspension and Plaintiff did not believe that discrimination played any role in his suspension. Shortly after his suspension, Plaintiff wrote to Defendants complaining of their conduct and characterizing his suspension as retaliatory based on Plaintiff's complaints that CWW was engaged in illegal business activities.

In his February 14, 2010 email sent to Narod and consulting Chief Executive Officer Robbins two days after his suspension, Plaintiff states that he was being forced to resign for "voicing complaints against fraud and illegal activities." (Lee Decl. Ex. R.) A few days later, on February 19, 2010, Plaintiff emailed Robbins a response to a letter he had received from CWW's attorney, in which Plaintiff accused CWW of many types of illegal activities.[14] (Lee Decl. Ex. S.) Plaintiff told Robbins that he "was belittled, insulted, harassed, discriminated, enslaved, threatened and assaulted on the threat of getting fired." (*Id.*) At no time during any of his correspondence with Defendants and others on their behalf in the days immediately after his suspension did Plaintiff assert that his suspension or any action by CWW was a result of race or national origin discrimination. Thus, nothing about the circumstances of Plaintiff's suspension or his perception of those circumstances immediately thereafter demonstrates racial or national origin animus. *See, e.g.*, *Moore v. Syracuse City Sch. Dist.*, No. 05-CV-5, 2009 WL 890576, at *4 (N.D.N.Y. Mar. 31, 2009) (granting summary judgment dismissing plaintiff's discrimination claim where "[p]laintiff's own characterization of the evidence fails to show racial animus"); *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 523 (S.D.N.Y. 2007) (finding that plaintiff had failed to show evidence that she was discrimination against because of her race where her "own characterization" of her treatment described conduct not prohibited by Title VII), *aff'd*, 288 F. App'x 757 (2d Cir. 2008); *see also Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) (holding that the plaintiff failed to state a retaliation claim based on a good faith belief that the widespread sexual favoritism

---

[14] Plaintiff accused CWW of illegal activities including "buying girls for immoral sexual acts and or prostitution," "transacting drugs," "commit[ting] fraud, harass[ing] employees, enslav[ing] employees," "collectively assault[ing] employees," engaging in "scare tactics" and other "various illegal activities." (Lee Decl. Ex. S.)

constituted gender discrimination where the plaintiff's "own characterization of his internal complaints . . . [was] entirely gender-neutral").[15]

### (2) Denial of overtime compensation and deprivation of vacation days

The circumstances surrounding Plaintiff's denial of overtime compensation and deprivation of vacation days do not raise an inference of race or national origin discrimination. According to Plaintiff, he was denied overtime compensation and five annual vacation days throughout his employment at CWW. The terms of Plaintiff's employment were established when he was hired in July 2008, and Plaintiff has not argued or provided any evidence demonstrating that his exempt status and vacation allotment were changed at any time during his employment. The Court accordingly looks to the circumstances of Plaintiff's employment offer and hiring for evidence that would raise an inference of race or national origin discrimination.

---

[15] Plaintiff, in his post-oral argument submissions, asserted that when he started at CWW, the "American person/entity" Plaintiff replaced was paid more per hour than Plaintiff, (Docket Entry No. 67 at 3; Docket Entry No. 81 at 23), and that after he was suspended, his position was filled by a "white American, Mr. Bryan Daly," (Docket Entry No. 81 at 32). Defendants deny this allegation. (Docket Entry No. 82 at 31, 37.) There is no evidence in the record concerning the race or national origin of the person or entity that Plaintiff allegedly replaced, nor is there any evidence concerning who replaced Plaintiff, if anyone, or that person's race or national origin. Plaintiff has elsewhere claimed that "CWW never hired any Director of MIS prior to hiring the Plaintiff nor did it hire any Director of MIS as of this day, after Plaintiff was terminated in May of 2010." (Docket Entry No. 81 at 118.) Plaintiff's unsworn and unsupported allegation does not raise an inference of discrimination. *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 463–64 (W.D.N.Y. 2009) (the plaintiff's "subjective beliefs, and naked allegations, unsupported by any facts" were insufficient to support a discrimination claim based on national origin), *aff'd*, 392 F. App'x 887 (2d Cir. 2010). In addition, in his cross-motion for summary judgment Plaintiff described additional "discriminating factors in relation to Plaintiff's origin," claiming that he was subject to conditions that included being forced to travel to off-site locations and carry heavy equipment, and to do work that was not in his "profile of work," like cabling and wiring. (*See* Docket Entry No. 81 at 32–33.) Plaintiff has not provided any evidence to support the allegations of "discriminating factors," and Plaintiff's unsworn and unsupported allegations do not raise an inference of discrimination. *See Casciani*, 659 F. Supp. 2d at 463–64.

Plaintiff has provided no such evidence. Nothing about the circumstances of Plaintiff's employment offer and hiring demonstrates racial or national origin animus.

## B.    Discriminatory remarks

Plaintiff argues that Narod made remarks allegedly based on national origin which raise an inference of discrimination sufficient to sustain a *prima facie* case. Plaintiff claims that Narod called Plaintiff "Harshidoodle," (Sethi Dep. 103:22–113:4), and at a meeting on November 10, 2009, Narod told Plaintiff, "You f--king Indian, what do you think about yourself? I will make sure you are sent back to India. You don't know who you are dealing with. You fear my wrath in your dreams." (Pl. 56.1 ¶ 133; Sethi Dep. 116:21–125:19.) Although Defendants deny that these statements were made, the Court will assume the remarks were made for purposes of analyzing whether the remarks raise an inference of discrimination. *See Crump v. NBTY, Inc.*, 847 F. Supp. 2d 388, 395 (E.D.N.Y. 2012) (assuming, despite the defendant's denials, that the allegedly discriminatory remark was made for the purposes of the motion for summary judgment).[16]

When assessing whether remarks are probative of discriminatory intent, the Second Circuit has held that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (citation omitted). "The relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show

---

[16] In Plaintiff's cross-motion for summary judgment he asserts additional "discriminating factors in relation to Plaintiff's origin" (as discussed *supra*), and describes other "degrading language" that was used to refer to him in addition to the comments made at the November 10, 2009 meeting. (*See* Docket Entry No. 81 at 33–35.) Other than the statements made at the November 10, 2009 meeting, there is no evidence in the record about these additional statements. Plaintiff's unsworn and unsupported allegations do not raise an inference of discrimination. *See Casciani*, 659 F. Supp. 2d at 463–64.

that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Id.* at 116. In considering whether a remark is probative of discrimination or whether it is a non-probative "stray remark," a court should consider factors such as: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry*, 616 F.3d at 149; *see also Obinabo v. Radioshack Corp.*, 522 F. App'x 55, 57 (2d Cir. 2013) ("When considering 'stray remarks' as evidence of discrimination, courts consider who made the remark, when the remark was made in relation to the employment decision, the remark's content, and the context in which the remark was made." (citing *Henry*, 616 F.3d at 149)). In assessing these factors, the Court concludes that the complained-of remarks do not constitute sufficient evidence to establish an inference of discrimination.

### (1)   Source of the remarks

The alleged discriminatory statements were made by Narod, CEO and majority owner of CWW.[17] Defendants concede that Narod runs CWW and has the power to hire and fire

---

[17] Although Plaintiff alleged in the Amended Complaint that CWW executives and managers also called him Harshidoodle, Plaintiff has only identified one occasion on which he was referred to as Harshidoodle by Narod. Thus, Plaintiff has not presented any evidence from which the Court can find that Plaintiff was referred to as Harshidoodle by anyone other than Narod, or that he was referred to by this name on more than one occasion. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (alteration in original) (citation omitted)); *Sanborn v. Jennings*, No. 12-CV-00228, 2013 WL 4040391, at *2 (D. Vt. Aug. 8, 2013) ("Summary judgment cannot be defeated by mere conjecture, allegations, or speculations without hard evidence for support." (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998))); *Billhofer v. Flamel Technologies, S.A.*, No. 07-CV-9920, 2013 WL 866778, at *3 (S.D.N.Y. Mar. 8, 2013) ("[T]he non-moving party may not rely simply on

employees.  (Def. Mem. of Law 24–25.)  Narod's role as a supervisor and decision-maker with
regard to Plaintiff's employment at CWW renders his remarks more probative of discrimination.
*See Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (holding that discriminatory
remarks by "individuals with substantial influence over [the plaintiff's] employment" are
relevant in determining whether an employment decision was motivated by discriminatory
animus); *Eldaghar v. City of N.Y. Dept. of Citywide Admin. Servs.*, No. 02-CV-9151, 2008 WL
2971467, at *9 (S.D.N.Y. July 31, 2008) (holding that a jury could reasonably find
discriminatory motivation based on oral comments by plaintiff's supervisors who had a
substantial influence over plaintiff's employment); *Greenbaum v. Handelsbanken*, 67 F. Supp.
2d 228, 253–54 (S.D.N.Y. 1999) ("[C]omments by high-ranking officials . . . are admissible
as . . . evidence suggesting that there is a particular [discriminatory] corporate atmosphere in
which decisions are made."); *c.f. Brown v. Cnty. of Erie*, No. 12-CV-251, 2013 WL 885993,
at *7 (W.D.N.Y. Mar. 8, 2013) ("Courts have routinely held that stray remarks by non-decision
makers are insufficient, without other evidence, to raise an inference of discrimination." (citation
and internal quotation marks omitted) (collecting cases)); *but see Abdu-Brisson*, 239 F.3d at 468

---

conclusory allegations or speculation to avoid summary judgment, but instead must offer
evidence to show that its version of the events is not wholly fanciful." (quoting *Morris v. Lindau*,
196 F.3d 102, 109 (2d Cir. 1999))); *Muhammad v. Reeves*, No. 08-CV-182, 2012 WL 5617113,
at *8 (W.D.N.Y. Nov. 15, 2012) ("[A]llegations, unsupported by any evidence and based solely
on speculation and surmise, are insufficient to withstand the motion for summary judgment.");
*Marczeski v. Gavitt*, 354 F. Supp. 2d 190, 195 (D. Conn. 2005) ("When opposing summary
judgment, [plaintiff] may not rely on . . . speculation, but must offer evidence that her version of
events is not "wholly fanciful." (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d
Cir. 2003))); *Welch–Rubin v. Sandals Corp.*, No. 3-CV-481, 2004 WL 2472280, at *1 (D. Conn.
Oct. 20, 2004) ("A party opposing summary judgment cannot defeat the motion by relying on the
allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits
supporting the motion are not credible.  At the summary judgment stage of the proceeding,
Plaintiffs are required to present admissible evidence in support of their allegations; allegations
alone, without evidence to back them up, are not sufficient." (internal quotation marks and
citations omitted)).

("the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"). Because Narod is an individual with substantial influence over Plaintiff's employment, the fact that he made the discriminatory remarks weighs in favor of finding that the remarks are probative of discrimination.

### (2)  Timing of the remarks

Narod allegedly made these remarks to Plaintiff at a meeting on November 10, 2009.[18] (Pl. 56.1 ¶ 133; Sethi Dep. 116:21–125:19.) Plaintiff's employment terms, denying him overtime compensation and five annual vacation days, were established more than 15 months earlier in July 2008, while Plaintiff's suspension occurred just over three months after Narod's remarks, on February 12, 2010.

There is no bright line rule regarding the length of time that renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination. District courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination. *See, e.g.*, *Callistro v. Cabo*, No. 11-CV-2897, 2013 WL 322497, at *7 (S.D.N.Y. Jan. 25, 2013) (finding remarks too attenuated where they were not made in connection with the events surrounding the plaintiff's termination, one remark was made at least one month before any discussion of terminating the plaintiff's employment, and the other remark was made at the

---

[18]  Plaintiff claims that Narod and others began calling him "Harshidoodle" in approximately September 2009, but Plaintiff has not identified the timing of any specific instances of the remark being made. (*See* Am. Compl. ¶ 31; Sethi Dep. 103:22–113:4.) The remaining allegedly discriminatory remarks were made by Narod at the November 10, 2009 meeting. Even if the Court were to assume that such a remark was made sometime in September 2009, the extended duration between the remark and Plaintiff's hiring in July 2008 and suspension in February 2010 does not change the Court's conclusion concerning the probative value of the timing of Narod's remarks.

beginning of her employment); *Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 537 (E.D.N.Y.2006) (finding no temporal connection where "slightly more than three months" elapsed between alleged discriminatory statements and termination), *aff'd*, 245 F. App'x 42 (2d Cir. 2007); *Rinsler v. Sony Pictures Entm't, Inc.*, No. 02-CV-4096, 2003 WL 22015434, *6 (S.D.N.Y. Aug. 25, 2003) (finding stray remark insufficient to create an inference of discrimination where the remark was made three months before the plaintiff's transfer); *see also Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *9 (E.D.N.Y. Sept. 11, 2013) (finding remark did not exhibit discriminatory intent where chief operating officer who had previously exercised influence over plaintiff's salary but was not involved in the employment decisions at issue made informal statement in the parking lot of a social function approximately three months prior to the plaintiff's replacement); *Obinabo v. RadioShack Corp.*, No. 09-CV-1772, 2012 WL 1565113, at *5 (D. Conn. Apr. 30, 2012) (holding that slur was "too far removed" from the plaintiff's termination where it was "uttered some six weeks before [the plaintiff's] termination" by an individual "ceding his authority" over the plaintiff and in a context "far removed from the decision-making process" that led to the plaintiff's termination), *aff'd*, 522 F. App'x 55 (2d Cir. 2013); *but see Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894, 2012 WL 3288234, at *7 n.7 (E.D.N.Y. Aug. 10, 2012) (finding that "[a]lthough the alleged remark preceded [the plaintiff's] discharge by at least six months, that [did] not significantly weaken its probative value" because "[i]t appear[ed] [that] the Defendants intended for some time to terminate" the plaintiff and "[t]hus, it [was] plausible that they decided to fire him in 2007, but waited to do so until . . . Spring of 2008"); *Papalia v. Milrose Consultants, Inc.*, No. 09-CV-9257, 2011 WL 6937601, at *12 (S.D.N.Y. Dec. 29, 2011) (finding that although the discriminatory comments were made one year prior to the plaintiff's

demotion, the company president "revealed active hostility toward women serving in key positions" and his "statements evidence[d] sexism in the context of employment decisions relating to positions of importance and are therefore probative of the argument that [the plaintiff's] replacement by a man was not coincidental but rather motivated by discriminatory intent").[19] Narod's remarks to Plaintiff more than 15 months after his employment terms were determined denying him overtime compensation and five annual vacation days, and three months before Plaintiff's suspension, weighs in favor of finding that the remarks are not probative of discrimination.

### (3)   The content of the remarks

Narod allegedly said to Plaintiff, "You f--king Indian, what do you think about yourself? I will make sure you are sent back to India.  You don't know who you are dealing with.  You fear my wrath in your dreams."  Plaintiff also alleges that Narod referred to him as Harshidoodle.

Plaintiff has "no clue" where the nickname "Harshidoodle" came from but he believed that Narod intended the word to refer to Plaintiff's Indian heritage because "Narod had [a] very

_____

[19]   Neither *Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894, 2012 WL 3288234, at *7 n.7 (E.D.N.Y. Aug. 10, 2012) nor *Papalia v. Milrose Consultants, Inc.*, No. 09-CV-9257, 2011 WL 6937601, at *12 (S.D.N.Y. Dec. 29, 2011) undermines the Court's conclusion that the timing of Narod's remarks weighs against finding that the remarks are probative of discrimination.  In *Dupree*, the court found that while the alleged remark preceded the plaintiff's termination by at least six months, a reasonable jury could find that the decision to terminate the plaintiff happened much closer in time to the remark at issue, and therefore the relevant temporal connection was much closer.  2012 WL 3288234, at *7 n.7.  There is no evidence to support a similar finding here.  In *Papalia*, the Court did not find that the one-year period between the company president's discriminatory comments and the plaintiff's demotion weighed in favor of finding the remarks probative of discrimination; rather, the Court found that this factor was outweighed by the president's active hostility toward women serving in key positions and his sexism in the specific context of employment decisions.  2011 WL 6937601, at *12.  This holding does not undermine the conclusion that a three-month lapse between alleged discriminatory statements and an adverse employment action weighs against finding that a remark is probative of discrimination.

poor look towards Indians in the sense he thought he could hire as many Indians for double the job and half the pay." (Sethi Dep. 108:3–5, 112: 21–113:4.) According to Plaintiff, his co-workers called him nicknames like "Harsh" and "Harshy." (*Id.* at 106:12–19.) Plaintiff has not alleged that there is anything about the name "Harshidoodle" that is discriminatory or derogatory to his race or national origin. In contrast, Narod's alleged statement, "You f--king Indian, what do you think about yourself? I will make sure you are sent back to India. . . ." evidences animus based on Plaintiff's Indian origin, and a reasonable jury could find the statement discriminatory. *See, e.g.*, *O'Diah v. Yogo Oasis*, No. 11-CV-309, 2013 WL 3796619, at *7 (S.D.N.Y. July 22, 2013) (finding statement by individual at the time the plaintiff was fired that, "You Nigerians can't be trusted," "support[s] the inference that [the individual's] decision to terminate [the plaintiff] was motivated by discriminatory animus."); *Richmond v. Gen. Nutrition Cntrs. Inc.*, No. 08-CV-3577, 2011 WL 2493527, at *3, *11 (S.D.N.Y. June 22, 2011) (finding that where the defendant told the plaintiff to "Go back to Africa," criticized his accent, and advised him that he was being demoted because an African should not be in his position, the defendant had made "racially charged comments" supporting the plaintiff's disparate treatment claim). The content of Narod's November 2009 statement referencing Plaintiff's Indian origin weighs in favor of finding that the remarks are probative of discrimination.

### (4) The context of the remarks

The Court must also consider the context in which the remarks were made, "whether it was related to the decision-making process." *See Henry*, 616 F.3d at 149. Narod's November 2009 remarks were made during a heated meeting with Plaintiff. Plaintiff claims that in the meeting he accused CWW of illegality and Narod "physical[ly] assault[ed]" him, and "charged" at him, slapped his face, and "chested" him, hitting Plaintiff with his chest. (Sethi Dep. 122:4–

124:2.)  After the meeting, Plaintiff continued to work at CWW until his February 2010 suspension, (Def. 56.1 ¶ 65; Pl. Resp. 56.1 ¶ 50), and even expressed interest in applying for another position at CWW, (Def. 56.1 ¶ 54; Pl. Resp. 56.1 ¶ 54).  Plaintiff has not presented any evidence that the statements made at the November 2009 meeting were tied in any way to the setting of his employment terms in July 2008 or the decision to suspend him in February 2010. Where a supervisor's remarks are related to the employment decision made, they are probative of discriminatory intent.  *See Jowers v. Family Dollar Stores, Inc.*, No. 09-CV-2620, 2010 WL 3528978, at *3 (S.D.N.Y. Aug 16, 2010) ("Only where decision-makers repeatedly make comments that draw a direct link between a plaintiff's membership in a protected class and an adverse employment action can an inference of discriminatory animus be drawn." (citation omitted)), *aff'd*, 455 F. App'x 100 (2d Cir. 2012); *Klings v. N.Y.S. Office of Court Admin.*, No. 04-CV-3400, 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) ("[S]upervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made."); *Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894, 2012 WL 3288234, at *6–7 (E.D.N.Y. Aug. 10, 2012) (holding that statements such as defendants "had a practice of not hiring black people" were "directly related to the claimed discriminatory motive in terminating [plaintiff] and could reasonably be construed . . . as explaining why that decision was taken." (alteration in original) (citation and internal quotation marks omitted)).

Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent.  *See Del Franco*, 429 F. Supp. 2d at 537 (finding that discriminatory remarks were "insufficient evidence from which discriminatory animus can be inferred" because, among other things, the alleged remarks were unrelated to the defendant's decision to discharge the plaintiff); *Brollosy v. Margolin, Winer & Evens, LLP*, No. 05-CV-0873,

2006 WL 721433, at *11 (E.D.N.Y. Mar. 20, 2006) (discriminatory animus not established where record devoid of evidence showing supervisor's comment made five months prior to plaintiff's termination that position was "better performed by a person closer in age to the younger accountants" bore any nexus or was in any way related to plaintiff's termination decision). Plaintiff has failed to show that the November 2009 remarks were related to the setting of his employment terms in July 2008 or his February 2010 suspension. The context of Narod's remarks therefore weigh in favor of finding that the remarks are not probative of discriminatory intent.

### (5) Indication of discrimination

When assessing whether remarks are probative of discriminatory intent, none of the four factors is dispositive of the issue. *See Henry*, 616 F.3d at 149–50 (cautioning "that none of [the four] factors should be regarded as dispositive"). The fact that the remarks were spoken by Narod, and evidenced discriminatory animus, support a finding that the remarks were probative of discrimination. However, the discriminatory remarks were made 15 months after Plaintiff's employment terms were established and three months prior to Plaintiff's suspension, in a context unrelated to these employment decisions, which supports a finding that the remarks are not probative of discriminatory animus.[20] The Second Circuit has said that "stray remarks, even if

---

[20] Moreover, Narod played a role in Plaintiff's hiring at CWW, further undermining Plaintiff's claim of racial and national origin animus. Plaintiff was interviewed for his position at CWW by Narod and Lee, (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 115; Sethi Dep. 39:25–40:2), though it is disputed who ultimately made the decision to hire Plaintiff, (*see* Narod Dep. 38:5–21, 52:12–53:2; Pl. 56.1 ¶ 94; Lee Decl. ¶ 17). According to Lee, on the day of Plaintiff's suspension Plaintiff informed Lee that he had spoken with Narod by telephone and that "Narod had instructed [Plaintiff] to leave for the day (with pay)." (Lee Decl. ¶ 66.) Narod later "decided . . . not to terminate Plaintiff, but rather to give him a leave of absence with no changes to any of the terms of his employment, including title, salary, and benefits." (*Id.* ¶ 69.) *See Filozof v. Monroe Cmty. Coll.*, 411 F. App'x 423, 427 (2d Cir. 2011) ("[W]hen the person who made the decision

made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *see also Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (citing *Danzer*, 151 F.3d at 56). The Court finds that although Narod is a decisionmaker, his comments were stray remarks as they were unrelated to Plaintiff's suspension, and therefore they do not constitute sufficient evidence to establish an inference of discrimination.

## C. Similarly situated individuals

Plaintiff argues that he was treated less favorably than similarly situated employees outside his protected group in numerous ways, and that his less favorable treatment raises an inference of discrimination. An inference of discrimination can be raised by "showing that an

---

to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997))); *Mastrolillo v. Conn.*, 352 F. App'x 472, 474 (2d Cir. 2009) (plaintiff failed to establish an inference of discrimination because, among other things, "the decision not to renew her contract was made by the same individual who initially recommended her for the teaching position"); *Kaplan v. Beth Israel Med. Ctr.*, No. 07-CV-8842, 2010 WL 1253967, at *5 (S.D.N.Y. Mar. 31, 2010) (the "same actor doctrine" negated any inference of age discrimination where the same individual who hired the plaintiff was also one of the two individuals involved in the plaintiff's termination). Although an extended time period between hiring and firing will weaken the same actor inference that discrimination was not a motivating factor, Plaintiff was suspended less than two years after he was hired, and courts have found that such a time span supports drawing the same actor inference. *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (applying same actor inference to a plaintiff that was "fired by the same man who had hired him three years earlier"); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993) (same actor inference appropriate where nothing in the record would suggest that the actor "would develop an aversion to older people less than two years later" (cited with approval by *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137–38 (2d Cir. 2000))); *Dellaporte v. City Univ. of New York*, No. 12-CV-7043, 2014 WL 684764, at *9 (S.D.N.Y. Feb. 21, 2014) (same actor inference "particularly strong" where same individuals hired the plaintiff and then fired him "less than two years later"); *Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 89 & n.54 (D. Conn. 2011) (collecting cases applying the same actor inference when the hiring and firing of the plaintiff occurred within either a two or three-year period); *Campbell v.. Alliance Nat'l, Inc.*, 107 F. Supp. 2d 234, 248 (S.D.N.Y. 2000) ("[W]here the interim period is under two years, the same actor inference remains significant.").

employer treated [an employee] less favorably than a similarly situated employee outside his protected group." *Abdul-Hakeem*, 523 F. App'x at 20 (quoting *Ruiz*, 609 F.3d at 493); *see also Shlafer v. Wackenhut Corp.*, 837 F. Supp. 2d 20, 25 (D. Conn. 2011) ("Discriminatory motivation may be established by allegations of preferential treatment given to similarly situated individuals, or remarks conveying discriminatory animus." (citations omitted)); *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011) ("Allegations supporting motive may include preferential treatment given to similarly situated individuals . . . ."). Such a showing "is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (internal quotation marks omitted). "The 'standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' such that 'the comparator must be similarly situated to the plaintiff in all material respects.'" *Abdul-Hakeem*, 523 F. App'x at 21 (quoting *Ruiz*, 609 F.3d at 494); *see also Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247, 2013 WL 1232355, at *16 (E.D.N.Y. Mar. 26, 2013) ("Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." (alteration, citation and internal quotation marks omitted)).

"An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Abdul-Hakeem*, 523 F. App'x at 21 (quoting *Ruiz*, 609 F.3d at 493–94 (internal quotation marks omitted)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir. 2000) ("We have said that to satisfy *Shumway* [*v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)] 'all

material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards.  In addition, the standard we used in *Shumway* requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct."  (citations omitted)).  The determination of "whether other employees are similarly situated is a factual issue that should be submitted to a jury, but '[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Sweeney v. Leone*, No. 05-CV-871, 2006 WL 2246372, at *13 (D. Conn. July 31, 2006) (quoting *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)); *see also Lugo v. City of New York*, 518 F. App'x 28, 30 (2d Cir. 2013) (the plaintiff had not provided "any information from which a reasonable jury could conclude that the officers referenced were similarly situated to" the plaintiff).

Plaintiff argues that he was treated less favorably than similarly situated employees outside his protected group in a variety of ways, including:  not receiving overtime, unlike other employees, (Docket Entry No. 81 at 22–24; Docket Entry No. 84 at 3–4); requiring him to produce medical documentation for sick leave, while other employees were not subject to this requirement, (Docket Entry No. 81 at 25); receiving five vacation days while others received ten or more, (*Id.* at 30; Docket Entry No. 84 at 9); requiring him to give advance notice before using vacation time and to fill out forms while other employees were not required to do either, (Docket Entry No. 81 at 30; Docket Entry No. 84 at 13); allowing him to only roll-over three vacation days each year while other management employees were allowed to roll-over "infinite" vacation days, (Docket Entry No. 81 at 30); denying him benefits from the first day of his employment, unlike other employees, (*Id.* at 30–31; Docket Entry No. 84 at 10); denying him free health

insurance, while other employees were given free individual health benefits, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 10); denying him a raise in return for him refusing company health benefits, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 11); denying him orientation and an initial introduction to the CWW employees, as well as "a welcoming email," while other employees were "given very good introduction and emails were sent to the whole company welcoming" them "very cordially," (Docket Entry No. 81 at 31; Docket Entry No. 84 at 11); not allowing him progressive discipline, unlike other employees, (Docket Entry No. 81 at 29; Docket Entry No. 84 at 12); denying him payment for vacation days after his termination, unlike other employees, (Docket Entry No. 81 at 29; Docket Entry No. 84 at 10); not offering him a prepaid legal services plan, unlike other employees, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 11); not allowing him daily break time, unlike other employees, (Docket Entry No. 84 at 11); not providing him with business cards, unlike other employees, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 12); not reviewing him annually and giving him raises unlike other employees, (Docket Entry No. 81 at 31; Docket Entry No. 84 at 12); denying him compensation for travel mileage, unlike other employees, (Docket Entry No. 81 at 29); and forcing him to use CWW's hand-scanner attendance system for logging arrivals and departures at CWW while other employees were not required to hand-scan their arrivals and departures, (*id.* at 30).[21]

Plaintiff's allegations of unfair treatment fail to raise an inference of discrimination

---

[21] Plaintiff also asserts that the changes in his hours raise an inference of discrimination. (Pl. Opp. Mem. of Law 16.) However, Plaintiff has not shown that those changes were motivated by discriminatory animus, and Plaintiff himself testified that his hours were changed in retaliation for questioning management about things such as the Honors Society, when he would receive overtime pay, and why he must provide technical support to Narod's personal businesses outside of CWW. (Pl. 56.1 ¶¶ 127–30; Sethi Dep. 88:22–89:21.) Plaintiff's unsupported allegation does not raise an inference of discrimination. *See Casciani*, 659 F. Supp. 2d at 463–64.

because Plaintiff has failed to establish that CWW treated him less favorably than a similarly situated employee outside of his protected group. Plaintiff has compared his treatment at CWW to that of more than 50 other individuals. Plaintiff must show that these comparators are outside of his protected group and "similarly situated to the plaintiff in all material respects." *Abdul-Hakeem*, 523 F. App'x at 21 (citation and internal quotation marks omitted). Plaintiff has failed to do so. Plaintiff is of a protected race (Asian) and national origin (Indian), and Plaintiff has not provided evidence to establish that these other employees belonged to races and nationalities outside of Plaintiff's protected group (Lee, in fact, is also Asian, (Lee Decl. ¶ 23)). *See Moore v. N.Y.S. Div. of Parole*, No. 06-CV-1973, 2008 WL 4394677, at *13 (E.D.N.Y. Sept. 23, 2008) (holding that by failing to identify the race and sex of the plaintiff's alleged comparators the plaintiff had failed to identify which employees were outside of her protected group and therefore failed to meet her burden of establishing a *prima facie* case for her race and gender discrimination claim); *see also Abdul-Hakeem*, 523 F. App'x at 20 (An inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee *outside his protected group*." (emphasis added) (quoting *Ruiz*, 609 F.3d at 493)).

In addition, although Plaintiff has provided copies of emails and other documents that suggest that other employees did on occasion receive many of the benefits or concessions that he contends that he was denied, Plaintiff has failed to demonstrate how he is similarly situated to these individuals. For example, Plaintiff has provided copies of emails and other documents which reference the titles of some individuals, such as in email signature blocks, but these documents fails to provide any specificity concerning the nature of those employees' job duties or responsibilities, nor do they establish that these employees who were directors and employees

from CWW groups like sales, editorial, copyediting, publishing, "book reps," "new mem reps," and "proof" and a computer programmer were subject to the same performance evaluation and discipline standards as Plaintiff, who was the Director of Management Information Systems. (*See* Docket Entry Nos. 84-1, 84-2, 84-3, 84-4.) *See also Abdul-Hakeem*, 523 F. App'x at 21 ("An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." (quoting *Ruiz*, 609 F.3d at 493–94 (internal quotation marks omitted)); *Whethers v. Nassau Health Care Corp.*, No. 06-CV-4757, 2013 WL 3423111, at *9 (E.D.N.Y. July 8, 2013) ("These allegations . . . do not provide sufficient evidence that defendants treated her less favorably than similarly situated employees because plaintiff fails to name similarly situated individuals with similar job titles and responsibilities. As a result, these conclusory allegations of discriminatory intent are not sufficient to make out the required *prima facie* case."); *Ugactz*, 2013 WL 1232355, at *16 ("Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." (alteration, citation and internal quotation marks omitted)); *Amna v. N.Y.S. Dep't of Health*, No. 08-CV-2806, 2011 WL 4592787, at *8 (E.D.N.Y. Sept. 30, 2011) (finding that plaintiff failed to present adequate evidence that she was treated differently from other similarly situated employees where plaintiff provided "no explanation of how they were similarly situated in terms of team assignments, availability, departmental roles, or any other relevant consideration"), *aff'd sub nom. Amna v. N.Y. Dep't of Health*, 505 F. App'x 44 (2d Cir. 2012). Plaintiff has failed to meet his burden with regard to his alleged comparators.

In sum, Plaintiff cannot establish that his suspension, denial of overtime compensation and deprivation of entitled vacation days "occurred under circumstances giving rise to an inference of discriminatory intent." *See Gue*, 2012 WL 4473283, at *8 ("[U]nfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable." (quoting *Nakis*, 2004 WL 2903718, at *20)); *Williams v. City of Rochester*, No. 08-CV-6063, 2010 WL 986484, at *5 (W.D.N.Y. Mar. 17, 2010) (same); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 416 (E.D.N.Y. 2010) (same). Plaintiff is therefore unable to meet his *prima facie* burden to show that he suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent, *Brown*, 673 F.3d at 150; *Ruiz*, 609 F.3d at 491–92, and thus cannot make out a claim for race or national origin discrimination.

### ii. Defendants' Non-Discriminatory Reasons

Even assuming that Plaintiff could establish a *prima facie* case, Plaintiff cannot meet his burden of establishing pretext and his claim would nevertheless fail for this reason. Defendants presented evidence that they did not pay Plaintiff overtime because they classified him as an exempt employee under the FLSA, (*see* Lee Decl. ¶¶ 18, 45), that Plaintiff was allotted five days of paid vacation pursuant to CWW's policy as set forth in the handbook, (*see* Docket Entry No. 88 at 14; Docket Entry No. 41-1 at 311), and that they suspended Plaintiff because by February 2010, Plaintiff's "inexplicable anger, belligerence and hostility towards his CWW colleagues and members of Proactive made it impossible for him to carry out his duties and responsibilities effectively," (Lee Decl. ¶ 44). Defendants have met their burden. These are legitimate reasons for Plaintiff's treatment, even if Defendants were erroneous in reaching any of these conclusions. *See Miller v. Nat'l Assoc. of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination

articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification. Plaintiff cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even [if he] has evidence that the decision was objectively incorrect.'" (alteration in original) (citations and internal quotations marks omitted)); *Oliveras v. Wilkins*, No. 06-CV-3578, 2012 WL 3245494, at *14 (S.D.N.Y. June 26, 2012) (holding that even if employer's conclusion that plaintiff was responsible for an argument was in error, "that error in and of itself would not allow one to infer a . . . discriminatory motive underlying the decision to terminate plaintiff"), *report and recommendation adopted*, No. 06-CV-3578, 2012 WL 3245493 (S.D.N.Y. Aug. 3, 2012); *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F. Supp. 2d 197, 205 (D. Conn. 2008) (finding that, even if decisionmaker was incorrect in her understanding and implementation of defendant's policies, or even if plaintiff implicitly had permission to engage in the allegedly improper conduct, there was no evidence that wrongful discrimination played a role in plaintiff's termination).

### iii. Pretext

Once a defendant has proffered a nondiscriminatory reason for its adverse action, the burden shifts back to the plaintiff to show that this reason is pretextual. *Holcomb*, 521 F.3d at 141. To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that racial or national origin discrimination played a role in the adverse action taken by Defendant. *See id*. A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Id.* at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 570 U.S. at ---, 133 S. Ct. at 2526; *Garcia v. Hartford*

*Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013). At this stage of the burden-shifting analysis,

"[c]onclusory and speculative allegations will not suffice to demonstrate discriminatory intent."

*Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012).

At the pretext stage, "[a] court may re-consider evidence presented to find an inference of

discrimination at the prima facie stage." *Ingenito v. Riri USA, Inc.*, No. 11-CV-2569, 2013 WL

752201, at *12 (E.D.N.Y. Feb. 27, 2013); *see Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173

(2d Cir. 2006) (holding that a plaintiff may demonstrate pretext "either by the presentation of

additional evidence showing that the employer's proffered explanation is unworthy of credence,

or by reliance on the evidence comprising the prima facie case, without more"); *Back v. Hastings*

*on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("[T]he plaintiff may,

depending on how strong it is, rely upon the same evidence that comprised her prima facie case,

without more.").

Plaintiff has not established that CWW's legitimate and non-discriminatory reasons for

suspending him and denying him overtime and additional vacation days were motivated in part

by race or national origin discrimination. Plaintiff relies on the same evidence he presented at

the *prima facie* stage. Construing all of the evidence in the light most favorable to Plaintiff, a

reasonable jury could not find that racial or national origin discrimination played a role in the

adverse action taken by Defendant. Plaintiff's motion for summary judgment as to his

discrimination claim is denied, and Defendants motion for summary judgment as to Plaintiff's

race and national origin discrimination claim is granted.[22]

---

[22] In response to Plaintiff's supplemental submissions, Defendants raise a number of objections to Plaintiff's arguments and evidence and contend that Plaintiff's submissions offer new theories of disparate treatment that were not pled in his EEOC charge or in his Amended Complaint and should therefore be disregarded. (Docket Entry No. 88.) Because the Court finds

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment as to Plaintiff's Title VII and NYSHRL claims for race and national origin discrimination. Plaintiff's FLSA and NYLL claims, as to which the Court previously denied summary judgment, will proceed to trial.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: April 2, 2014
Brooklyn, New York

---

that Plaintiff's allegations, even if considered, fail to establish a claim for race or national origin discrimination, the Court declines to disregard Plaintiff's arguments and evidence.